# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION (CINCINNATI)

| | | |
|---|---|---|
| JOHN KLOSTERMAN, et al | ) | Case No: 25 C V 3 1 2 |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| V. | ) | DLOTI |
| | ) | |
| KONZA, LLC; | ) | M.J. LITKOVITZ |
| RICHARD BOYDSTON; | ) | |
| DENTONS BINGHAM GREENEBAUM LLP; | ) | |
| TRI-STATE ORGANIZATION, INC.; | ) | |
| JOSEPH LENTINE; | ) | |
| ANGEL STRUNK; | ) | |
| JENNIFER DONATHAN; | ) | |
| KELLER WILLIAMS ADVISORS REALTY ; | ) | |
| TERRY JAMES; | ) | |
| CITY OF CINCINNATI; | ) | |
| COMMUNITY ACTION AGENCY; | ) | CONSOLIDATED COMPLAINT FOR |
| and DOES 1-10, | ) | CIVIL VIOLATIONS OF THE RACKETEER |
| | ) | INFLUENCED AND CORRUPT |
| | ) | ORGANIZATIONS ACT (18 USC 1961-1968) |
| | ) | & DEPRIVATIONS OF CONSTITUTIONAL |
| **Defendants.** | ) | RIGHTS (42 U.S.C. § 1983). |
| | ) | JURY DEMAND |

**NOTICE REGARDING PRO SE FILING AND INTENTION TO SEEK COUNSEL Plaintiff John Klosterman respectfully submits this complaint pro se due to the approaching statute of limitations deadline and the complexity of securing appropriate representation for such a multifaceted case. Despite diligent efforts to obtain counsel, including contacting numerous attorneys with RICO and complex civil litigation experience, the combination of case**

complexity, extensive documentation requirements, and time constraints necessitated this pro se filing to preserve Plaintiff's claims.

Plaintiff has invested hundreds of hours researching applicable law and preparing this complaint which spans 4119 pages with 965 motions, 132 filings, answers, affidavits and transcript totaling 3,372 pages, to the best of my ability as a non-attorney. Plaintiff intends to continue seeking qualified counsel following this filing and respectfully requests the Court's patience and consideration regarding any procedural or formatting deficiencies in this complaint. Plaintiff stands ready to address any such issues promptly upon the Court's guidance or upon securing representation. This request for forbearance is made with the utmost respect for the Court's time and procedures, while balancing Plaintiff's substantive right to have these serious allegations heard on their merits. Plaintiff offers this court case summary on pages

## TABLE OF CONTENTS I. INTRODUCTION AND PROCEDURAL

I. HISTORY...................................................................,..........................¶¶ 1-12

II. EXECUTIVE SUMMARY.........................................................................¶¶ 13-23

III. THE ENGINEERED SALE CHEME.............................................................¶¶ 24-40

IV. JURISDICTION AND VENUE....................................................................¶¶ 41-44

V. PARTIES...........................................................................................¶¶ 45-59

A. Plaintiff............................................................................................¶ 45

B. Defendants...................................................................................¶¶ 46-57

C. Nonprofit and Governmental Immunity Exceptions......................................¶¶ 58-59

VI. RICO ENTERPRISE AND RACKETEERING ACTIVITY...............................¶¶ 60-163

A. The RICO Enterprise......................................................................¶¶ 60-68

B. Pattern of Racketeering Activity.........................................................¶¶ 69-88

C. Precedent for Liability in Similar Cases of Fiduciary Breach.......................¶¶ 89-92

D. Wire Fraud and Mail Fraud (18 U.S.C. §§ 1341, 1343).........................¶¶ 93-112

E. Bank Fraud (18 U.S.C. § 1344)........................................................¶¶ 113-120


F. Money Laundering (18 U.S.C. § 1956)................................................¶¶ 121-127

G. Obstruction of Justice and Witness Tampering.......................................¶¶ 128-147

H. Conversion and Theft of Personal Property...........................................¶¶ 148-152

I. Coordinated Cover-Up and Obstruction................................................¶¶ 153-160

J. Extension of the Enterprise to Prosecutorial Functions............................¶¶ 161-163

VII. RICO COUNTS..........................................................................¶¶ 164-179

COUNT I: Violations of 18 U.S.C. § 1962(c) - RICO Direct Liability...............¶¶ 164-173

COUNT II: Conspiracy to Violate 18 U.S.C. § 1962(c)...............................¶¶ 174-179

VIII. CONSTITUTIONAL VIOLATIONS UNDER 42 U.S.C. § 1983..................¶¶ 180-242

A. State Actors................................................................................¶¶ 180-184

B. Fifth Amendment Takings Clause Violations...........................................¶¶ 185-190

C. Fourteenth Amendment Due Process Violations......................................¶¶ 191-195

D. Fourth Amendment Unreasonable Seizure.............................................¶¶ 196-200

E. The 634 Delhi Avenue Fraud Scheme and Wrongful Prosecution...................¶¶ 201-212

F. Absolute and Qualified Immunity Considerations......................................¶¶ 213-236

G. Summary of Constitutional Claims......................................................¶¶ 237-242

IX. STATE LAW CLAIMS......................................................................¶¶ 243-342

COUNT VI: Breach of Fiduciary Duty...................................................¶¶ 243-258

COUNT VII: Conversion.....................................................................¶¶ 259-265

COUNT VIII: Fraudulent Misrepresentation...........................................¶¶ 266-274

COUNT IX: Civil Conspiracy..............................................................¶¶ 275-281

COUNT X: Unjust Enrichment.............................................................¶¶ 282-289

COUNT XI: Abuse of Process.............................................................¶¶ 290-295

COUNT XII: Malicious Prosecution......................................................¶¶ 296-308

COUNT XIII: Negligent Supervision.....................................................¶¶ 309-320

COUNT XIV: Civil Aiding and Abetting.................................................¶¶ 321-328

COUNT XV: Intentional Infliction of Emotional Distress...........................¶¶ 329-342

X. DAMAGES OVERVIEW AND FINANCIAL ANALYSIS..................................¶¶ 343-351

XI. PRAYER FOR RELIEF...................................................................¶¶ 352-367

XII. LIST OF EXHIBITS.....................................................................¶¶ 367

APPENDIX: RICO CASE STATEMENT…………………………. …………….Pages 99-104

---

## I. INTRODUCTION AND PROCEDURAL HISTORY

1. This action exposes a breathtaking criminal enterprise that operated under color of law through a court-appointed receivership, systematically defrauding Plaintiff John Klosterman and his entities of their property rights and financial interests valued at over $3.5 million. After four years of litigation involving 640 court filings across

multiple proceedings, the full scope of this coordinated scheme has finally come to light through damning admissions made under oath during the January-February 2025 bench trial in Lentine v. Konza LLC.

2. This action represents an unprecedented application of RICO against the City of Cincinnati and its officials. While municipalities have occasionally faced RICO claims in cases involving systemic police misconduct, this case breaks new ground by documenting how multiple city departments and officials - from building inspectors to city attorneys to prosecutors - coordinated their activities to deprive Plaintiff of his constitutional property rights. The extraordinary scope of this enterprise, spanning regulatory, legal, and prosecutorial functions, necessitates the comprehensive remedies that only RICO can provide.

3. Significantly, this lawsuit vindicates Plaintiff's numerous court filings over the preceding 34 months - filings that alleged precisely the scheme now confirmed under oath and other court filings.  Plaintiff submitted dozens of fact-based motions, filings, objections, and requested the removal of Konza, LLC and Lentine multiple times. He detailed specific instances of fraud, collusion, and constitutional violations. These filings were systematically denied, stricken, or ignored by the court, only to be proven accurate in extraordinary detail through the January-February 2025 bench trial testimony, affidavits and the memorandum prepared by substitute plaintiff Cynthia Fisher of Dinsmore & Shohl LLP.

4. At the heart of this case lies a deliberate, calculated scheme to deprive Plaintiff of his constitutional property rights through the manipulation of court documents and judicial processes. The original sales document governing the disposition of Plaintiff's

properties explicitly provided that "any balance after all bills were paid would go to Klosterman"

5. However, when the Hamilton County Land Reutilization Corporation (HCLRC) entered the picture, Defendants executed a fraudulent "bait and switch." HCLRC was provided exclusive access to occupied units - access denied to all other potential purchasers. Defendant Boydston then materially altered the Agreement for Purchase and Sales agreement to explicitly preclude Plaintiff from receiving any proceeds, and in further court filings stating Plaintiff had "no pecuniary interest or claims to any funds paid or payable by the land bank to purchase the properties from the receiver."

6. The modified sales document shows evidence that the "sale" was predetermined rather than a legitimate market transaction. When later questioned about this arrangement in court, Boydston testified that there was a "side agreement" between Konza and HCLRC regarding any balance remaining after expenses, but conveniently "could not recall any of the details." Yet when HCLRC's representative Allesee and her attorney testified, they contradicted Boydston, stating that their "agreement" was merely that "they would think about it." Due to the HCLRC had to request funding for the purchase of the "propertys portfolio from the City> (exibit A) Discovery will verify that statement.

7. Defendant Boydston, under questioning by attorney Neiberding, admitted that the sale price was calculated to cover predetermined expenses rather than reflect market value, stating: "well, all of the administration expenses, and anticipated administration expenses, were, in general, a consideration." This explicit admission demonstrates a clear breach of fiduciary duty by a court-appointed receiver.

8. The 36 lots alone, all within 7 minutes from Cincinnati, were valued at $300,000, with the 24 properties conservatively valued at $2.9 million based on rental income. Yet Defendants rejected a legitimate cash offer of $1,000,000 from a Columbus developer in favor of HCLRC's structured deal of $800,000 cash (funded by the City Exhibit A:) plus assumption of liens - further evidence of the "engineered" nature of the transaction.

9. Throughout this receivership, TSO/Lentine collected and allegedly spent approximately $637,000 on Plaintiff's estate while making minimal improvements to the properties. Despite red flags raised by Plaintiff as early as May 2020 when he became an FBI whistleblower, Konza LLC and Richard Boydston were ultimately paid over $499,000 in fees, despite objections filed by Plaintiff that were never ruled upon by the court.

10. When Plaintiff discovered and reported fraudulent activities involving Defendants, they coordinated a retaliatory scheme, resulting in Plaintiff's wrongful incarceration for approximately one year based on demonstrably false allegations. Defendant Lentine testified that when he threatened to quit the receivership, Boydston encouraged him to "stick it out" and stay for the court hearings on "the Klosterman thing" - referring to the criminal proceedings against Plaintiff. This testimony confirms Boydston's active participation in the malicious prosecution scheme.

11. The violations of federal law detailed in this complaint include mail fraud, wire fraud, bank fraud, money laundering, obstruction of justice, witness tampering, and constitutional violations, all committed over a period of approximately 34 months and causing Plaintiff damages exceeding $4,527,961, warranting treble damages under

RICO of $13,583,883 and additional state law punitive damages for a potential total recovery of $22,639,805.

12. This action exposes a breathtaking criminal enterprise that operated under color of law through a court-appointed receivership, systematically defrauding Plaintiff John Klosterman and his entities of their property rights and financial interests valued at over $3.5 million.

## II. EXECUTIVE SUMMARY

13. This action arises from a coordinated criminal enterprise operating through a court-appointed receivership that systematically violated Plaintiff's constitutional property rights and defrauded him of his property interests. Through sworn testimony and documentary evidence, Plaintiff has established that Defendants:

14. Executed a Fraudulent "Bait and Switch" by altering a sales agreement that originally provided proceeds to Plaintiff, instead inserting language in the order to purchase properties agreement that denied his property rights;

15. Conducted an "Engineered Sale" of Plaintiff's properties at a deliberately undervalued price, as explicitly admitted under oath by Defendants Boydston and Lentine;

16. Provided HCLRC with exclusive access to properties and preferential treatment, rejecting a higher cash offer in favor of their predetermined arrangement;

17. Misappropriated approximately $437,000 in rental income and deposits while making minimal property improvements;

18. Fraudulently obtained federal funds through PPP loans and rental assistance programs;

19. Orchestrated Plaintiff's wrongful prosecution to neutralize his objections, with Boydston encouraging Lentine to "stick it out" for the "Klosterman thing," demonstrating their coordination in the malicious prosecution scheme;

20. Abused regulatory authority to fraudulently condemn Plaintiff's property despite contrary engineering evidence;

21. Converted Plaintiff's personal property, including a historic BMW motorcycle and irreplaceable artifacts.

22. These coordinated schemes have caused Plaintiff actual damages exceeding $4,527,961, warranting treble damages under RICO of $13,583,883 and additional state law punitive damages for a potential total recovery of $22,639,805.

23. The scope and coordination of these schemes demonstrates the existence of a criminal enterprise operating through the receivership, justifying the application of RICO remedies.

## III. THE ENGINEERED SALE SCHEME

### A. Direct Testimony Evidence

24. At the heart of this case is the "engineered sale" of Plaintiff's 24 real properties and 36 lots, explicitly admitted to under oath by Defendants Boydston and Lentine. As Defendant Richard Boydston testified when directly asked if the purchase price was the value of the properties or calculated to satisfy the expenses of the receivership: "It was hoped that would cover the expenses of the receivership with agreed reductions...that was my belief at the time." (Exhibit G:) Exclusion of any remaining funds to Plaintiff.

25. Boydston further testified under oath: "The 800,000 was a negotiated number and it took into account all the claims and possible claims." (Exhibit B: Boydston testimony by Neberding, Bench trial pg 214)

26. Defendant Lentine provided additional confirmation by explicitly testifying that this was "an engineered sale" rather than a legitimate market transaction and Boydston was forced to sell to the Land Bank by the City. (Exhibit C:) Lentine testimony by Boydston Bench trial pg 50

27. These sworn admissions directly contradict Boydston's earlier statements in court filings where he dismissed Plaintiff's objections to the sale, claiming they had "no factual foundation."

## B. The True Value vs. Engineered Sale Price: Financial Analysis

28. The true value of the properties was substantially higher than the engineered sale price: a. Coldwell Banker estimated value: $2,895,000 in 2019 (Exhibit D) b. With pandemic-driven market increase of at least 25%: ~$3,618,000 by 2021/2022 c. Engineered sale price: Only $1,474,017.00 ($800,000 cash plus assumption of liens)

29. This valuation discrepancy of over $2,201,983 represents a direct financial loss to Plaintiff that was deliberately orchestrated by Defendants to ensure the receivership funds would be distributed to themselves rather than to Plaintiff, and the properties to the HCLRC at .30 cents on the dollar.

## C. Rejected Higher Offer: Clear Evidence of Bad Faith

30. A legitimate cash offer of $1,000,000 from developer Kim Knoppe was rejected in favor of the Land Bank's structured deal of $800,000 cash plus assumption of liens.

This rejection of a higher cash offer provides clear evidence that the sale was not conducted in good faith with the intent to maximize value for the receivership estate, as required by Defendants' fiduciary duties.

## D. Pattern of Financial Fraud Through Court Processes

31. Contemporaneously with the coordinated property undervaluation scheme, Defendants engaged in systematic financial fraud through the court-appointed receivership:

32. Billing Practices: Defendants submitted expenses where 50% of the amounts quoted to be paid were incorrect. Ie. water bills filed in Boydstons final billing September 9, 2022

33. Fraudulent Billing: Boydston billed the receivership for legal services at $350 per hour while simultaneously billing for the same activities through Konza, LLC at $300.00 per hour for an unlicensed real estate manager and had no legal license for charging that amount.

34. Asset Diversion: Approximately 80% of rental income and deposits, including over an estimated $50,000 in CAA rental assistance, was diverted into Defendant Lentine's control (pocket) rather than being used to improve properties for sale, pay mortgages, water bills, and permitting fees. So, each of the 17 properties rented by TSO / Lentine should have received $38,647.00 each in repairs and upgrades for sale. It was nowhere to be seen or found in any of the properties. In fact they lost value as stated by Cynthia Fisher substitute Plaintiff for HCLRC from Dinsmore & Shohl as she stated in her memorandum court filing (exhibit H:) But Mr. Boydston billed receivership for driving by properties each time he visited the offices of TSO but apparently rarely

walked in and reviewed any of the work the Lentine stated in his monthly reports. Plaintiff did, and was astonished at the poor workmanship.

35. Fraudulent Property Valuations: Defendant Donathan, at Boydston's direction, artificially reduced property valuations, including valuing 685 Halsey (nearly an acre of developable land with a cottage) at merely $1,000, and 636 Delhi from $137,000 to $50,000 to facilitate the engineered sale. Other unnamed persons assisted in the devaluation of the properties from transcripts from the BOR that will be revealed at trial.

36. The premeditated nature of the fraud is further evidenced by Defendant Boydston's September 9, 2022 proposed order to terminate the receivership, in which he sought to be "acquitted, discharged and released from any and all claims of whatever kind or nature arising out of or related to this action, the Receivership, and the Properties." (exhibit E: from court filing 9/9/2022) This brazen attempt to secure blanket immunity for himself and all parties involved in the scheme—combined with a proposed court order that would permanently enjoin Plaintiff from pursuing any claims whatsoever—demonstrates Boydston's consciousness of guilt and foreknowledge that his actions regarding the engineered sale and other violations constituted severe breaches of fiduciary duty.

37. Notably, this self-serving immunity request came months before his January 2025 sworn admission of the "engineered sale," revealing that Boydston knew the transaction was fundamentally improper even as he actively worked to shield himself and his co-conspirators, namely HCLRC and others from legal accountability.

38. The engineered sale scheme represents a sophisticated form of racketeering with the assistance of the courts and the court-appointed receivership as a vehicle to facilitate the unlawful taking of Plaintiff's property. This scheme fulfilled the requirements of a pattern of racketeering activity under RICO by involving multiple predicate acts of wire fraud, mail fraud, and money laundering committed over a substantial period.

39. The fraudulent nature of the engineered sale is further evidenced by the deliberate actions taken to disadvantage competing bidders, including the strategic removal of building code violation information from the original sale documents while simultaneously adding "no warranties" language to create a deliberate information asymmetry that would discourage legitimate market offers, while all the properties deeds were clear.

40. The explicit design of the sale agreement was to reduce the number of bidders on the properties to favor the predetermined buyer, the HCLRC. Defendant Boydston's sworn admission that the sale price was calculated to cover predetermined expenses rather than to reflect market value, constitutes a clear violation of the fundamental fiduciary duties of a court-appointed receiver.

## IV. JURISDICTION AND VENUE

41. This Court has subject matter jurisdiction pursuant to 18 U.S.C. § 1964(c) and 28 U.S.C. § 1331 because this action arises under the laws of the United States, specifically the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-1968.

42. This Court also has jurisdiction pursuant to 28 U.S.C. § 1343(a)(3) and (4), which provide jurisdiction for suits brought under 42 U.S.C. § 1983.

43. This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367 because they are so related to the federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

44. Venue is proper in this District pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims occurred in this District, and Defendants reside or transact business in this District.

## V. PARTIES

### A. Plaintiff

45. Plaintiff John Klosterman is a resident of Hamilton County, Ohio, and the owner of real property that was placed into receivership in Hamilton County Court of Common Pleas Case No. A1905588. Plaintiff was wrongfully incarcerated for approximately one year due to Defendants' orchestrated scheme of false statements and withheld exculpatory evidence. Plaintiff's property interests are also held through his various limited liability companies, including Emily Vets LLC, Sedamsville Heritage Properties LLC, Virginia Williamsburg LLC, and Boldface Properties LLC, all of which are Ohio limited liability companies wholly owned and controlled by Plaintiff.

### B. Defendants

46. Defendant Konza, LLC is an Ohio limited liability company with its principal place of business in Hamilton County, Ohio. Konza, LLC was appointed with the recommendation of the City as receiver, as Boydston stated in sworn testimony for Plaintiff's properties in February 2020. This represents a clear conflict of interest.

Evidence at trial revealed Konza, LLC was created in 2019 specifically for this receivership, despite testimony suggesting it had been used in approximately 10 receiverships.

47. Defendant Richard Boydston is a resident of Hamilton County, Ohio, and the sole member and manager of Konza, LLC. Boydston is sued both in his personal capacity and in his capacity as manager of Konza, LLC. He directed the day-to-day activities of the receivership. Boydston is a partner at Dentons, Bingham, Greenebaum, LLP. Evidence at trial has shown that Boydston began billing the receivership for services even before his formal appointment, charging over $10,250.00 when Konza began as receiver on February 13, 2020. Plaintiff wrote a letter to Dentons stating the errors in Boydston's billing but Dentons took no action. (Exhibit F: Email sent to Dentons April 28, 2023).

48. Defendant Dentons, Bingham, Greenebaum, LLP is a law firm with offices in Cincinnati, Ohio, and is the employer and law firm of Defendant Richard Boydston. Dentons is liable for Boydston's actions under principles of partnership liability, respondeat superior, and for negligent supervision of its partner who operated the receivership through his position at the firm. Boydston leveraged his credentials and position at Dentons to provide legitimacy to the fraudulent receivership scheme, and Dentons benefited from Boydston's receivership activities through partnership income while failing to provide adequate supervision of his activities.

49. Defendant City of Cincinnati is a municipal corporation organized under the laws of the State of Ohio. The City of Cincinnati is liable for the unconstitutional and tortious actions of its employee, Terry James, who was acting under color of state law and

within the scope of his employment when he issued fraudulent condemnation notices for Plaintiff's property at 621 Delhi Avenue despite evidence confirming the building's structural safety. The City maintained policies and/or customs of inadequate supervision that allowed building inspectors to issue condemnation notices without proper structural assessment or verification, and failed to stop the relocation of Plaintiff's tenants which was an abuse of regulatory authority.

50. Defendant Terry James is a retired former building inspector for the City of Cincinnati who, in coordination with other Defendants, issued fraudulent condemnation notices and forced tenant relocation orders for Plaintiff's properties, specifically 621 Delhi Avenue, despite evidence confirming the structural safety of that property.

51. Defendant Tri-State Organization, Inc. ("TSO") is a corporation organized under the laws of the State of Connecticut and doing business in Ohio. TSO was contracted by Konza, LLC to manage Plaintiff's properties during the receivership. Trial testimony revealed TSO was not in good standing in Connecticut at the time of its engagement. And Lentine testified that Boydston was aware of his 10-year prison term.

52. Defendant Joseph Lentine is a resident of Hamilton County, Ohio, and the owner and operator of TSO. Lentine was previously convicted of felony fraud charges and served a 10-year prison sentence prior to his involvement in this matter. Lentine has recently been sentenced to 63 months in federal prison for PPP fraud and money laundering in connection with activities conducted through the receivership properties (Case No. 1:23-cr-00030).

53. Defendant Angel Strunk is a resident of Hamilton County, Ohio, and was employed by TSO. Strunk has pled guilty to federal charges in connection with fraudulent PPP loan

applications related to the receivership properties. Evidence further establishes that Strunk, in concert with Lentine and others, orchestrated Plaintiff's wrongful prosecution and conviction.

54. Defendant Jennifer Donathan is a resident of Hamilton County, Ohio, and a real estate agent affiliated with Keller Williams Advisors Realty. Donathan received fees from Boydston for playing a real estate appraiser in the devaluation of 636 Delhi and 685 Halsey resulting in over $100,000 at the Board of Revision, and received a commission of $147,401.00 for the sale of the receivership properties despite evidence that the transaction was not a legitimate market sale but an "engineered" transfer at a predetermined price. Asked Lentine if he would sign a NDA for $25,000.00 to settle for his over budget amount outstanding (exhibit V:)

55. Defendant Keller Williams Advisors Realty is a real estate brokerage firm with its principal place of business in Hamilton County, Ohio. Keller Williams, through its agent Jennifer Donathan, received a commission of $147,401.00 for the engineered sale of the receivership properties.

56. Defendant Community Action Agency ("CAA") is a state, local and federally-funded non profit agency responsible for administering rental assistance and other public assistance funds in Hamilton County, Ohio. CAA participated in the Enterprise by processing and approving multiple fraudulent rental assistance applications submitted by Defendants Lentine and Strunk, including for properties at 634 Delhi Avenue (outside the receivership entirely) and 649 Sedam Street (where the tenant was current with rents). Despite direct notification from Plaintiff about these fraudulent activities, CAA failed to take corrective action and instead participated in coordinated efforts to

conceal the fraud. CAA knew or should have known these applications were fraudulent based on Plaintiff's direct communication with CAA board member Matt Strauss, wherein Strauss acknowledged the situation "sounds like mail and bank fraud" but failed to take appropriate action.

57. Defendants Does 1-10 are individuals or entities whose identities are currently unknown to Plaintiff but who participated in the racketeering activities described herein. Plaintiff expressly reserves the right to amend this Complaint to add additional defendants as their identities and roles in the Enterprise become known through discovery and further investigation.

## C. Nonprofit and Governmental Immunity Exceptions

59. Although Defendants, CAA, and City of Cincinnati are established as governmental and nonprofit entities under Ohio law, their participation in the fraudulent schemes described herein falls within recognized exceptions to immunity under Ohio law. Under Ohio Revised Code Chapter 1702 (Nonprofit Corporation Law) and applicable case law, nonprofit organizations and their directors are not immune from liability for: (a) Acts not in good faith; (b) Intentional misconduct; (c) Knowing violations of the law; (d) Breaches of fiduciary duty; (e) Self-dealing transactions from which directors or officers derive improper personal benefits.

60. In Judgment Liens, Inc. v. Belmont County, 2010-Ohio-2850, ¶ 21, the Ohio appellate court recognized that governmental immunity does not extend to conduct involving "fraud, corruption, or malice" and that actions taken outside the scope of an entity's authority are not protected. The "engineered sale" admitted to under oath by Defendants Richard Boydston and Lentine constitutes exactly the type of fraudulent

transaction and breach of fiduciary duty that pierces nonprofit and governmental

immunity under Ohio law.

## VI. RICO ENTERPRISE AND RACKETEERING ACTIVITY

### A. The RICO Enterprise

61. Defendants formed an association-in-fact enterprise (the "Enterprise") for the
purpose of defrauding Plaintiff, misappropriation of assets from the receivership
estate, neutralizing Plaintiff's ability to impede their schemes through his wrongful
prosecution, and leveraging regulatory authority to further damage Plaintiff's property
interests.

62. Defendant Boydston's influence extended far beyond his formal role as receiver
manager. Through both his position at Dentons and his relationships with City officials,
he coordinated efforts across multiple domains—financial, regulatory, and criminal—to
facilitate the Enterprise's objectives. His collaboration with former City attorney
Jackolyn Martin in drafting the receivership order created extraordinary powers and
protections that enabled the subsequent fraudulent activities and then when Martin left
former City Solicitor , Andrew Garth, who is now employed by HCLRC, said it was ok
for Lentine to stay even after the FBI arrest.   It verified to Plaintiff of an inside
fabricated hit job.

63. The Enterprise's reach is further evidenced by Defendant Boydston's ability to
influence protection order enforcement against Plaintiff despite such matters being
entirely outside the scope of legitimate receivership activities. This demonstrates how
Defendants leveraged multiple legal systems simultaneously—civil receivership

proceedings, foreclosure action, and protection orders—to create an interlocking web of restrictions that prevented Plaintiff from protecting his property interests.

64. The Enterprise maintained its continuity and effectiveness by neutralizing Plaintiff's ability to challenge their activities. When Plaintiff attempted to monitor receivership properties and document mismanagement by Defendant Lentine, Defendants responded not by addressing property security concerns but by engineering additional legal impediments to Plaintiff's oversight. This pattern of using legal processes to obstruct legitimate property oversight further demonstrates the Enterprise's coordination and continuing pattern of racketeering activity.

65. As established by the Supreme Court in United States v. Turkette, 452 U.S. 576, 583 (1981), an enterprise is "a group of persons associated together for a common purpose of engaging in a course of conduct" that is proved by "evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit."

66. The Enterprise here satisfies all requirements established in Boyle v. United States, 556 U.S. 938, 948 (2009), having "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose."

67. The Enterprise consisted of all named Defendants working in coordinated fashion through the following operational roles: a. Legal Cover and Authority: Konza, LLC and Richard Boydston used their court-appointed receiver status to provide legal protection for Lentine with regard to CAA fraud for the scheme to continue. b. Operational Management: TSO and Joseph Lentine managed the day-to-day property

operations, including diversion of rental income and security deposits. c. Regulatory Fraud: Terry James issued fraudulent condemnation notices despite evidence of structural safety. (exhibit I: GFI report) d. Property Value Manipulation: Jennifer Donathan and Keller Williams artificially reduced property values and facilitated the "engineered sale" while collecting a $147,401 commission. e. Asset Control and Liquidation: Doe #1 allegedly participated in the structured transaction to acquire the properties at a fraction of their market value. f. Funding Facilitation: Community Action Agency processed and approved fraudulent rental assistance applications submitted by Defendants Lentine and Strunk, disbursing funds that were diverted from legitimate uses. CAA's participation enabled the Enterprise to access state and local funding streams, expanding the scope and profitability of the fraudulent scheme.

68. The Enterprise engaged in interstate commerce through: a. Using interstate wire and mail facilities to transmit fraudulent financial reports b. Submitting fraudulent applications for federal COVID-19 relief programs c. Conducting banking transactions across state lines d. Engaging in real estate transactions affecting interstate commerce

69. The City of Cincinnati participated in the Enterprise through its building inspector Terry James, who used his regulatory authority to issue fraudulent condemnation notices that furthered the Enterprise's goals by destroying his income flow and Plaintiff's property values and facilitating the engineered sale scheme. The City's failure to properly supervise James and its customs or policies allowing such abuses enabled the Enterprise to operate effectively.

**B. Pattern of Racketeering Activity**

70. Defendants engaged in multiple related acts of racketeering activity, including but not limited to wire fraud, mail fraud, bank fraud, money laundering, obstruction of justice, witness tampering, and conversion of personal property.

71. These racketeering activities were related, had similar purposes and results, involved the same or similar participants, and were committed as part of Defendants' regular way of conducting business.

72. The pattern of racketeering activity extended over a substantial period of time (approximately 34 months).

73. As established in H.J. Inc. v. Northwestern Bell Telephone Co., 492 U.S. 229, 239 (1989), a "pattern of racketeering activity" requires both relatedness between the predicate acts and continuity of those acts. The multiple schemes carried out by Defendants (engineered sale, fraudulent billing, PPP loan fraud, malicious prosecution, property conversion) were not isolated or disconnected events but formed a pattern of continuous and related criminal activity that satisfies both requirements.

74. The racketeering activities directly damaged Plaintiff's business and property interests through: a. Deprivation of the fair market value of his real estate holdings b. Misappropriation of rental income and security deposits c. Fraudulent billing for receivership services d. Excessive and unearned commissions e. Theft and conversion of personal property f. Damage to real property through neglect and mismanagement

75. Defendants employed sophisticated methods to conceal their fraudulent activities, including: a. Filing false and misleading reports with the court b. Deliberately withholding financial records and bank statements c. Creating fraudulent property valuations d. Structuring transactions to obscure their true purpose e. Using their

positions of authority to resist scrutiny and audits f. Orchestrating Plaintiff's wrongful prosecution to silence his objections

76. The injuries suffered by Plaintiff were the direct and proximate result of Defendants' racketeering activities, satisfying the causation requirement established in Holmes v. Securities Investor Protection Corp., 503 U.S. 258, 268 (1992), which requires "some direct relation between the injury asserted and the injurious conduct alleged."

77. The Enterprise's activities created a significant risk of continuing criminal activity that extended beyond the specific predicate acts committed against Plaintiff, as many of the fraudulent practices (such as PPP loan fraud) also victimized government agencies and the public at large.

78. Each Defendant knowingly and willfully participated in the Enterprise and committed multiple predicate acts in furtherance of the Enterprise's goals.

79. Defendants' pattern of racketeering activity involved numerous victims beyond Plaintiff, including federal loan programs, rental assistance programs, and other governmental entities.

80. The Enterprise conducted its affairs through a coordinated pattern of racketeering activity rather than through legitimate business operations.

81. The Enterprise's activities resulted in ascertainable and quantifiable damages to Plaintiff that can be directly attributed to specific predicate acts committed by identified Defendants.

82. The pattern of racketeering activity satisfied both the "relationship" and "continuity" requirements established by the Supreme Court, as the predicate acts were related to each other and posed a threat of continued criminal activity.

83. The Enterprise's scope and sophistication are further evidenced by its ability to leverage multiple legal systems simultaneously—civil receivership proceedings, building code enforcement, criminal protection orders, and prosecutorial functions—to create an interlocking web of restrictions that prevented Plaintiff from effectively challenging the ongoing fraud. This level of coordination across disparate governmental functions demonstrates the Enterprise's extraordinary reach and influence, extending far beyond what any individual participant could accomplish alone.

84. The Supreme Court in Boyle v. United States, 556 U.S. 938, 948 (2009) established that an association-in-fact enterprise need not have a hierarchical structure, a chain of command, or even a name, so long as it has "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." The Enterprise here clearly satisfies these minimal requirements, with its coordinated activities extending from the receivership court to the prosecutor's office, from building code enforcement to criminal court proceedings, all with the common purpose of defrauding Plaintiff and converting his property.

85. Defendants' racketeering activities were part of their regular way of doing business and represented their standard operating procedures rather than isolated or unusual incidents.

86. The Enterprise operated with a distinct division of labor, with each Defendant playing a specific role in the coordinated scheme to defraud Plaintiff and convert his property.

87. The Enterprise functioned as a continuing unit from approximately March 2020 through December 2023, with sufficient longevity to pursue the Enterprise's fraudulent purposes.

88. The Enterprise was separate and distinct from the pattern of racketeering activity, with organizational structure and relationships that existed beyond the predicate acts themselves.

89. Defendants engaged in "open-ended" continuity by committing predicate acts that, by their nature, projected a threat of repetition and continuing criminal activity.

## C. Precedent for Liability in Similar Cases of Fiduciary Breach

90. Recent case law demonstrates courts' willingness to hold professional fiduciaries accountable for admissions of misconduct similar to those made by Defendant Boydston in this case. In RevoLaze LLC v. Dentons US LLP, 2022-Ohio-1392, the Ohio Court of Appeals upheld a $32.2 million verdict against a law firm that breached its fiduciary duties to its client. The court found that RevoLaze had established that but for the breach, it would have achieved a substantially better outcome in its underlying case.

91. Similarly, in this case, Defendant Boydston's explicit admission under oath that the sale was structured to cover receivership expenses rather than to obtain fair market value constitutes a clear acknowledgment of breach of fiduciary duty. Just as in RevoLaze, this admission serves as powerful evidence that Defendants put their own interests above their legal and fiduciary obligations to Plaintiff, causing substantial damages that are directly attributable to their misconduct.

92. Courts have established clear precedent for substantial damages awards in cases involving admitted breaches of fiduciary duty by legal professionals. In RevoLaze LLC v. Dentons US LLP, 2022-Ohio-1392 (upheld by the Ohio Supreme Court's denial of review on November 9, 2022), the Ohio Court of Appeals upheld a $32.2 million verdict

based on a law firm's breach of fiduciary duty where, as here, the defendant law firm admitted under oath to conduct that breached its duty to the client.

93. The RevoLaze precedent is particularly applicable to this case, as both involve professionals who were entrusted with significant responsibilities, breached their fiduciary duties, and then explicitly admitted to their misconduct under oath. This Court has ample precedent to award significant damages, including treble damages under RICO, based on Defendants' orchestrated scheme to defraud Plaintiff through the "engineered sale" and other predicate acts described herein.

### D. Wire Fraud and Mail Fraud (18 U.S.C. §§ 1341, 1343)

94. Defendants used interstate mail and wire facilities to transmit fraudulent financial reports to the Hamilton County Court of Common Pleas on a monthly basis for approximately 34 months. These reports contained material misrepresentations regarding: a. Expenses allegedly incurred for property management and maintenance; b. Labor costs, including "ghost employees" who did not actually perform work, as stated in the FBI arrest warrant; c. Rental income and deposits collected, amounting to over $437,000.00; d. Services allegedly performed by TSO and Lentine.

95. The most significant fraudulent misrepresentation was the "engineered sale" scheme, which Defendant Boydston explicitly admitted under oath was designed not to achieve market value but to cover predetermined expenses: "It was hoped that would cover the expenses of the receivership with agreed reductions...that was my belief at the time." (exhibit G: Boydston testimony by Neiberding, Bench trial pg 215)

96. This testimony directly contradicts Boydston's earlier court filings where he claimed all allegations of fraud presented to the court by Plaintiff in motions and filings regarding

the sale had "no factual foundation." The contrast between his sworn testimony and his court filings provides compelling evidence of knowing and willful fraud.

97. Each Defendant committed specific acts of wire fraud as follows:

98. Defendant Konza, LLC: a. Filed 34 fraudulent monthly financial reports with the court containing material misrepresentations between March 2020 and December 2022; b. Submitted fraudulent billing statements on a monthly basis throughout the receivership; c. Transmitted documentation for the "engineered sale" to the court in September 2022.

99. Defendant Richard Boydston: a. Drafted and transmitted fraudulent motions to the court between February 2020 and December 2023; b. Filed responses dismissing Plaintiff's objections while knowing they had merit. c. Transmitted misleading information regarding property valuations to the Hamilton County Auditor.

100. Defendant TSO: a. Created and transmitted fraudulent property management reports monthly between March 2020 and January 2023;( all are records filed to the court on case A1905588) b. Submitted false billing records for services not performed on at least 30 occasions between April 2020 and December 2023; c. Transmitted fraudulent rental assistant applications to CAA.

101. Defendant Joseph Lentine: a. Submitted fraudulent reports to Konza/Boydston for transmission to the court between March 2020 and March 2024; b. Transmitted false statements regarding 634 Delhi Avenue to CAA;

102. Defendant Angel Strunk: a. Created and transmitted fraudulent rental assistance applications; b. Filed false police reports on September 17, 2021 and 3 other times; c. Transmitted false information regarding occupancy of properties to CAA.

103.    **Defendant Jennifer Donathan: a. Transmitted fraudulent property valuations to the Hamilton County Auditor; b. Communicated false information to potential buyers via email during the sales period; c. Submitted commission invoices for an engineered transaction.**

104.    **Defendant Keller Williams: a. Transmitted fraudulent listing agreements for properties at artificially reduced values; b. Processed commission payments for the non-arm's length engineered sale.**

105.    **Defendant Terry James: a. Transmitted fraudulent condemnation notices for 621 Delhi Avenue; b. Electronically filed false building safety reports; c. Communicated false information about 621 Delhi Avenue's structural condition to tenants; d. Failed to acknowledge the Structural Engineer's report (Exhibit I: GEI report September 18, 2020)**

106.    **Defendant Community Action Agency: a. Electronically processed fraudulent rental assistance applications for 634 Delhi Avenue in 2020-2021, despite this property not being part of the receivership; b. Electronically processed fraudulent rental assistance applications for 649 Sedam Street in 2020-2021, but after Plaintiffs allerting Matt Strauss and proving though management reports showing the tenant was current on monthly $795 rental payments and never late, did nothing; c. Transmitted approval documentation and funds for properties they knew or should have known were not legitimately represented by the applicants; d. Used interstate wire facilities to transmit these fraudulent applications and approvals in furtherance of the scheme.**

107.    **These fraudulent communications included specific documented instances such as:**

108.   The May 25, 2022 letter to Plaintiff from Stanten & Hughes summarizing a call with Boydston. Boydston falsely stated in paraphrase: "(1) The receiver had not yet reviewed the offers" and (3) "An accounting will occur before any proceeds of the sale are allocated". (Exhibit K: Letter from Stanten) Boydston legal billing records show Boydston had already reviewed bids and had communicated with prospective buyers weeks earlier and was paid $499,000 over objections of Plaintiff and were never addressed by the court.

109.   The monthly financial reports submitted by Konza LLC to the Hamilton County Court of Common Pleas that deliberately omitted proper accounting for the approximately $437,000 in rental income and security deposits collected during the receivership.

110.   Boydston's September 9, 2022 proposed order seeking blanket immunity while simultaneously concealing the fact that the sale was "structured " rather than conducted at arm's length—a fact he would later admit under oath.

111.   The deliberate removal of the Building Code Violations list from the old sales documents while simultaneously adding "no warranties" language, when the deeds were all clean.

112.   The communications(legal billing records show) between Jackolyn Martin, Richard Boydston, Susan Zurface and Angel Strunk regarding protection order enforcement November 4, 2021—matters entirely outside the scope of legitimate receivership activities but directly serving the Enterprise's goal of neutralizing Plaintiff's ability to challenge their fraudulent activities.

113.     The transmission of fabricated timelines and coached testimony regarding the alleged September 17, 2021 stalking incident, when documentary evidence conclusively establishes Plaintiff's presence elsewhere at the time Defendant Strunk saw him before her Dr's appointment. (exhibit L: Strunk testimony at criminal trial)

114.     Each of these communications involved interstate wire facilities and directly furthered the fraudulent scheme by concealing material information, misrepresenting facts, facilitating the engineered sale that deprived Plaintiff of fair market value, and orchestrating Plaintiff's wrongful prosecution to prevent his interference with the ongoing fraud.

115.     Particularly egregious was the coordinated wire fraud scheme involving the Community Action Agency. After Plaintiff directly informed CAA board member Matt Strauss of the fraudulent rental assistance application at 649 Sedam Street, CAA not only failed to investigate or correct the fraudulent payment but continued to process additional fraudulent applications for 634 Delhi from the same parties. This knowing facilitation of wire fraud after explicit notification constitutes a flagrant violation of federal law and CAA's fiduciary responsibilities as an administrator of federal, state and local funds.

E. Bank Fraud (18 U.S.C. § 1344)

116.     Defendants Lentine and Strunk, with the knowledge of Richard Boydston and Konza, LLC, submitted fraudulent applications for Paycheck Protection Program loans to multiple financial institutions. These fraudulent applications involved ghost employees who were allegedly being paid by Plaintiff through the receivership was not a mere oversight by Boydston who reviewed, edited and filed 34 of them to the court

117.   Based on these misrepresentations, Defendants obtained approximately $178,882 in PPP loans from Stock Yards Bank and Fifth Third Bank and co-mingled those funds to subsidize rents and rent deposits until the CAA would provide rental assistance reimbursements.

118.   These fraudulent activities have been proven beyond a reasonable doubt in federal criminal proceedings (Case No. 1:23-cr-00030 and 1:21-mj-00633-KLL), resulting in Lentine's conviction and 63-month federal prison sentence.

119.   Specific acts of bank fraud committed by each Defendant include:

120.   Defendant Joseph Lentine: a. Submitted fraudulent PPP loan applications to Stock Yards Bank; b. Submitted fraudulent PPP loan applications to Fifth Third Bank; c. Provided false employee information from and for Plaintiff's properties to financial institutions between April 2020 and January 2021.

121.   Defendant Angel Strunk: a. Prepared documentation for fraudulent PPP applications in 2020; b. Submitted false information regarding employee salaries in 2020 and 2021; c. Participated in creation of false business records for loan applications between 2020 and 2021.

122.   Defendant Konza, LLC allegedly: a. Chose to disregard TSO/Lentine's financial statements used in PPP and unemployment applications between March 2020 and 2021; b. Concealed Lentine/Strunk's fraudulent applications while continuing to employ them even after the FBI interviewed Boydston in 2021.

123.   Defendant Richard Boydston: a. Continued employing Lentine/Strunk after learning of PPP fraud investigation beginning with the CAA cover up; b. Failed to report known bank fraud to the court despite fiduciary obligations following FBI

interview in 2021 before the arrest of Lentine/Strunk; c. Created legal cover for fraudulent activities through court filings.

**F. Money Laundering (18 U.S.C. § 1956)**

124.   Defendants engaged in transactions to conceal the nature, source, and ownership of proceeds from their fraudulent activities, including: a. Transferring rental income between multiple accounts to conceal its source; b. Using shell companies to launder proceeds of fraudulent PPP loans; c. Converting rental income to cash to avoid detection; d. Using receivership funds for personal and business expenses (fuel and office supplies etc); e. Concealing the true nature of the $147,401.00 payment to Jennifer Donathan and Keller Williams by characterizing it as a legitimate real estate commission when it was in fact compensation for co-operating with Boydston orders and facilitating a predetermined transfer at an engineered price.

125.   Specific acts of money laundering committed by each Defendant include:

126.   Defendant Joseph Lentine: a. Transferred PPP loan proceeds between multiple accounts in 2020 and 2021; b. Converted rental income to cash on at least 30 occasions between June 2020 and December 2023; c. Used receivership funds for personal expenses throughout 2020 and 2023.

127.   Defendant Konza, LLC: a. Created structure to facilitate improper payment transfers between March 2020 and December 2023; b. Processed commission payments knowing they were for a predetermined sale in 2022; c. Diverted receivership funds for non-approved purposes throughout the receivership period.

128.   Defendant Richard Boydston: a. Oversaw non-legitimate fund transfers between March 2020 and December 2023; b. Structured the engineered sale to conceal the true

nature of the transaction; c. Authorized payment of the $147,401 commission knowing it was for a non-arm's length transaction in 2022.

129. Defendant Jennifer Donathan: a. Accepted the $147,401 commission knowing it was for a non-arm's length transaction in 2022; b. Structured the sale to appear legitimate while knowing it was engineered in 2022; c. Participated in communications to conceal the true nature of the transaction during the sales period of 2022.

130. The Sixth Circuit has further elaborated on the concept of association-in-fact enterprises, holding that such enterprises are "proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." United States v. Qaoud, 777 F.2d 1105, 1115 (6th Cir. 1985). This standard is clearly met by the Enterprise in this case, which maintained a consistent organizational structure and continuity of personnel throughout the scheme.

**G. Obstruction of Justice (18 U.S.C. § 1503) and Witness Tampering (18 U.S.C. § 1512)**

131. Defendants obstructed justice by: a. Concealing and withholding bank records and financial documentation from the court and the Plaintiff after repeated requests between March 2020 and December 2023; b. Altering financial records to hide fraudulent transactions throughout the receivership; c. Filing misleading reports with the court on a monthly basis; d. Providing false testimony under oath regarding the number of receiverships in which Konza, LLC had served: Richard Boydston claimed "around 10" when evidence showed only this one during the January 2025 bench trial; e. Seeking blanket immunity and releases from liability through court orders on September 9, 2022.

132.    Defendants Lentine and Strunk engaged in witness tampering and obstruction by: a. Filing 4 false police reports and providing false statements against Plaintiff on September 17, 2021 and in the criminal trial; b. Coordinating to suppress exculpatory evidence in Plaintiff's criminal case beginning in 2021; c. Orchestrating Plaintiff's wrongful prosecution to neutralize his ability to halt their fraudulent schemes.

133.    Defendants' obstruction of justice extended beyond merely concealing financial information and included coordinated efforts to manipulate the criminal justice system to prevent Plaintiff from monitoring his properties. Legal billing records reveal that Defendant Boydston, alongside former City of Cincinnati attorney Jackolyn Martin, and Susan Zurface assisted Defendant Strunk in obtaining a forth protection order violation charge against Plaintiff, despite Plaintiff having received explicit permission to be within 500 feet of Defendant Strunk.

134.    This calculated manipulation of the protection order system served the Enterprise's purpose by further restricting Plaintiff's ability to document ongoing property damage and mismanagement. Defendant Boydston's billing records demonstrate he expended receivership resources on matters entirely unrelated to his fiduciary duties as receiver—specifically, facilitating Defendant Strunk's protection order enforcement—further evidencing his participation in the broader conspiracy to neutralize Plaintiff's ability to protect his property interests.

135.    The timing of this protection order violation is particularly telling, as it occurred after Plaintiff had alerted the FBI about potential fraud and had documented unsecured receivership properties. Defendants Lentine and Strunk, with Defendant Boydston's assistance, maintained continuous pressure on Plaintiff through both civil and criminal

proceedings to ensure he remained unable to effectively challenge their ongoing scheme.

136. Specific acts of obstruction of justice committed by each Defendant include:

137. Defendant Richard Boydston: a. Provided false testimony about the number of receiverships Konza had managed during the January 2025 bench trial; b. Concealed financial records from the court after at least 12 requests by Plaintiff between March 2020 and December 2023; c. Filed misleading responses to Plaintiff's objections; d. Sought blanket immunity through proposed court orders.

138. Defendant Joseph Lentine: a. Assisted Strunk in filing 4 false police reports against Plaintiff beginning on September 17, 2021; b. Suppressed exculpatory evidence showing Defendant Strunk had no Dr.'s appointment on September 17, 2021; c. Coordinated with Strunk to fabricate stalking allegations on September 17, 2021.

139. Defendant Angel Strunk: a. Filed false police reports against Plaintiff on September 17, 2021; b. Provided false testimony concerning her Dr's appointment during criminal trial proceedings; c. Provided false testimony regarding Plaintiff's alleged stalking in criminal court trial; d. Coordinated false reports with Lentine on September 17, 2021.

140. Defendant Konza, LLC: a. Withheld financial bank records despite court obligations between March 2020 and December 2024; b. Submitted misleading reports to the court monthly throughout the receivership; c. Concealed evidence of the fraudulent sale structure in court filings.

141. Concrete examples of obstruction of justice and witness tampering in this case include:

142. The twelve separate instances where Plaintiff's motions for accounting and audits were denied, despite recommendations for audits from both the HCLRC (Kelly Allesee) and substitute plaintiff Cynthia Fisher. (exhibit M: Letters from Allesee of HCLR to Boydston)

143. The explicit coordination between Defendants Lentine and Strunk to file four false police reports alleging stalking by Plaintiff on September 17, 2021, when documentary evidence (including U-Haul receipt at 8:00 am, fuel receipts at 8:28 am and 10:46 am in Hebron, Ohio) proves Plaintiff was en route to Pittsburgh, PA at the time of the alleged stalking. (Exhibit N: receipts)

144. The suppression of exculpatory evidence showing Defendant Strunk had no doctor's appointment on September 17, 2021, contrary to her sworn statements.

145. Defendant Boydston's active participation in Plaintiff's prosecution, as evidenced by his billing records showing communication with former City of Cincinnati attorney Jackolyn Martin and Susan Zurface regarding protection order enforcement—matters entirely outside the scope of legitimate receivership activities.

146. The September 9, 2022 proposed order sought blanket immunity from "any and all claims of whatever kind or nature" months before the damning admission under oath of the "engineered sale."

147. The deliberate fabrication by prosecutor Susan Zerface of an "approximately 8:15 AM" timeline for the alleged stalking incident, created without any factual foundation whatsoever and later proven physically impossible by Plaintiff's documented alibi evidence. (Exhibit O: Zerface statement asking for verification of time and date of stalking)

148. Former City attorney Jackolyn Martin's false testimony under oath claiming she could not recall communications with Boydston regarding communication with Strunk regarding Plaintiff's movements on November 3rd 2021, directly contradicted by billing records later discovered showing precisely such communications.

149. The coordinated coaching of Defendant Strunk by Zerface to provide specific times for alleged incidents without any factual foundation, constituting the knowing facilitation of false testimony.

150. These coordinated acts were deliberately designed to neutralize Plaintiff's ability to challenge the fraudulent scheme by orchestrating his wrongful incarceration and systematically concealing financial records that would have exposed the full scope of the conspiracy. The involvement of both city attorneys and prosecutors demonstrates the extraordinary scope and reach of the Enterprise, extending to multiple components of the justice system.

151. Defendant Community Action Agency engaged in obstruction of justice by: a. Deliberately failing to investigate credible reports of fraud after direct notification from Plaintiff; b. Coordinating with Defendant Boydston to conceal rather than address fraudulent rental assistance applications with 634 Delhi and not alerting Plaintiff or paying him; c. Withholding documentation related to fraudulent payments in response to Plaintiff's Public Records requests; d. Continuing to process fraudulent applications even after being informed of their illegitimacy.

152. The coordination between CAA and Boydston following Plaintiff's court filing reveals a sophisticated obstruction scheme designed to protect the Enterprise's ongoing operations rather than address the documented fraud. This pattern of

concealment rather than correction demonstrates both entities' complicity in the underlying fraudulent scheme.

## H. Conversion and Theft of Personal Property (18 U.S.C. § 2314)

153.  Defendants Konza, LLC, Richard Boydston, and Lentine engaged in the conversion and theft of Plaintiff's personal property, including: a. A historic BMW motorcycle with significant monetary value (approximately $20,000); b. Four drawers of irreplaceable historic data about Sedamsville, which Plaintiff maintained as president of the Sedamsville Historical Society; c. Patent prototypes developed by Plaintiff; d. Historic fixtures intended for use in Plaintiff's historic rehabilitation efforts; e. Ice cream and other restaurant equipment

154.  Specific acts of conversion committed by each Defendant include:

155.  Defendant Joseph Lentine: a. Sold Plaintiff's BMW motorcycle without authorization in 2020; b. Discarded irreplaceable historic Sedamsville documents in 2020;

156.  Defendant Richard Boydston: a. Deliberately ignored Plaintiff's documented requests to retrieve personal property in 2020 (Exhibit P: Emails to Boydston requesting removal of property); b. Failed to ensure preservation of Plaintiff's personal items despite fiduciary obligation to do so; c. Authorized disposal of Plaintiff's property without permission.

157.  Defendant Konza, LLC: a. Failed to inventory and protect Plaintiff's personal property as required by fiduciary duty; b. Facilitated the conversion of Plaintiff's personal property through inaction and authorization; c. Failed to account for or return proceeds from rents of 634 Delhi.

## I. Coordinated Cover-Up and Obstruction

158.    The Enterprise engaged in a sophisticated cover-up operation when faced with potential exposure of their fraudulent schemes. This coordinated obstruction constitutes additional predicate acts under RICO and demonstrates the interconnected nature of the Enterprise.

159.    When Plaintiff discovered the fraudulent CAA rental assistance payment for 649 Sedam Street, he immediately contacted Matt Strauss, with whom he shared a position on the Santa Maria Board of Directors many years before. During this conversation, which occurred in approximately August 2020, Plaintiff explicitly detailed the fraudulent nature of that 649 Sedam application, providing specific evidence from the monthly management reports showing that: a. The tenant at 649 Sedam Street had consistently paid $795 monthly rent and was never late, directly contradicting the basis for rental assistance; b.The bench trial testimony revealed that 634 Delhi Avenue was not part of the receivership and Lentine had no legitimate authority to apply for assistance on this property as Plaintiff found in transcripts. TSO was paid and Lentine and Strunk allegedly split the fraudulent rental income that was the Plaintiffs.

160.    Strauss acknowledged that these facts "sound like mail and bank fraud" and committed to bringing this information to CAA administration and following up with Plaintiff. However, no follow-up ever occurred, and no corrective action was taken by CAA.

161.    When Plaintiff filed a court motion detailing these fraudulent activities, legal records show that Defendant Boydston—who had never previously communicated with CAA—contacted CAA officials to coordinate a response and containment strategy.

This communication, documented in Boydston's own legal billing records, demonstrates his active participation in concealing rather than addressing the fraud. The Cover-up was now verified by Plaintiff.

162.  Rather than terminating TSO and Lentine after discovering these fraudulent activities, Boydston adopted what can only be described as a "whack-a-mole" approach to damage control, addressing each exposed fraudulent activity individually while allowing the broader scheme to continue. Boydston's claimed inability to find replacement property management was pretextual, as evidenced by the fact that replacement management was ultimately secured after Lentine's eventual forced termination.

163.  This pattern of coordinated cover-up activities constitutes obstruction of justice under 18 U.S.C. § 1503 and demonstrates the Enterprise's continued operation even after partial exposure of its activities.

## J. Extension of the Enterprise to Prosecutorial and Legal Functions

161.  The Enterprise's operational reach extended to former City of Cincinnati attorney Jackolyn Martin, who together with Boydston drafted the extraordinary receivership order granting Defendant Boydston unprecedented powers and protections. Martin's participation was essential to establishing the legal framework through which the Enterprise could operate with minimal oversight, creating a receivership structure deliberately designed to facilitate the subsequent fraudulent activities.

162.  While Martin and Zerface and others are not named defendants in this action at this time, Plaintiff expressly reserves the right to add them and others as defendants in subsequent proceedings. Their participation in the Enterprise's pattern of racketeering

activity is detailed herein to demonstrate the extraordinary scope and reach of the criminal conspiracy that operated through the receivership, extending to the highest levels of legal authority in Hamilton County.

163. The involvement of attorneys Martin and Zerface in the Enterprise's pattern of racketeering activity brings their conduct within the scope of 18 U.S.C. § 1961(1)(A), which defines "racketeering activity" to include acts "involving" multiple forms of obstruction of justice. In United States v. Eisen, 974 F.2d 246, 254 (2d Cir. 1992), the court recognized that attorneys who participate in fraudulent litigation activities can be held liable under RICO when they act beyond their legitimate role as legal representatives. The fabrication of evidence, coaching of witnesses, and provision of false testimony are all conduct well beyond the legitimate role of prosecutors and city attorneys, bringing Martin and Zerface's actions squarely within the scope of RICO predicate acts.

## VII. RICO COUNTS

## COUNT I: VIOLATIONS OF 18 U.S.C. § 1962(c) - RICO DIRECT LIABILITY

166. Plaintiff realleges and incorporates by reference paragraphs 1 through 163 above.

167. Defendants conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c).

168. The Enterprise meets all requirements established in Boyle v. United States, 556 U.S. 938, 948 (2009), having "a purpose, relationships among those associated with the

enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose.

169.   The Enterprise meets all requirements established in Boyle v. United States, 556 U.S. 938, 948 (2009), having "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose."

170.   Each Defendant committed at least two predicate acts of racketeering activity, as specifically detailed in paragraphs 93-152 above, which are incorporated by reference herein. The predicate acts committed by each Defendant include:

a. Defendant Konza, LLC: - Wire fraud (18 U.S.C. § 1343) through filing 34 fraudulent monthly financial reports (¶97) - Mail fraud (18 U.S.C. § 1341) through submission of fraudulent billing statements (¶97) - Bank fraud (18 U.S.C. § 1344) through facilitating fraudulent financial activities (¶119) - Money laundering (18 U.S.C. § 1956) through processing improper payments (¶124) - Obstruction of justice (18 U.S.C. § 1503) through withholding financial records (¶137) - Conversion of personal property through failure to inventory and protect property (¶152);

b. Defendant Richard Boydston: - Wire fraud (18 U.S.C. § 1343) through drafting and transmitting fraudulent motions (¶98) - Mail fraud (18 U.S.C. § 1341) through filing misleading documents (¶98) - Obstruction of justice (18 U.S.C. § 1503) through providing false testimony (¶134) - Money laundering (18 U.S.C. § 1956) through structuring the engineered sale (¶125) - Conversion of personal property through authorizing disposal of Plaintiff's property (¶151);

c. Defendant TSO: - Wire fraud (18 U.S.C. § 1343) through creation of fraudulent property management reports (¶99) - Mail fraud (18 U.S.C. § 1341) through submission of false billing records (¶99) - Bank fraud (18 U.S.C. § 1344) through facilitating Lentine's fraudulent activities (¶113-114) - Money laundering (18 U.S.C. § 1956) through diversion of rental income (¶121);

d. Defendant Joseph Lentine: - Wire fraud (18 U.S.C. § 1343) through submission of fraudulent reports (¶100) - Mail fraud (18 U.S.C. § 1341) through transmission of false statements (¶100) - Bank fraud (18 U.S.C. § 1344) through PPP loan applications (¶117) - Money laundering (18 U.S.C. § 1956) through transfer of fraudulent proceeds (¶123) - Obstruction of justice (18 U.S.C. § 1503) and witness tampering (18 U.S.C. § 1512) through filing false police reports and suppressing evidence (¶135) - Conversion of personal property through sale of Plaintiff's BMW motorcycle (¶150);

e. Defendant Angel Strunk: - Wire fraud (18 U.S.C. § 1343) through creation of fraudulent rental assistance applications (¶101) - Mail fraud (18 U.S.C. § 1341) through filing false police reports (¶101) - Bank fraud (18 U.S.C. § 1344) through preparation of fraudulent PPP applications (¶118) - Obstruction of justice (18 U.S.C. § 1503) and witness tampering (18 U.S.C. § 1512) through false testimony (¶136);

f. Defendant Jennifer Donathan: - Wire fraud (18 U.S.C. § 1343) through transmission of fraudulent property valuations (¶102) - Mail fraud (18 U.S.C. § 1341) through communication of false information (¶102) - Money laundering (18 U.S.C. § 1956) through accepting commission for non-arm's length transaction (¶126) - Fraudulent property value manipulation through artificial devaluation of properties (¶35);

g. **Defendant Keller Williams:** - Wire fraud (18 U.S.C. § 1343) through transmission of fraudulent listing agreements (¶103) - Mail fraud (18 U.S.C. § 1341) through processing of commission payments (¶103) - Money laundering (18 U.S.C. § 1956) through accepting fraudulent commission (¶121);

h. **Defendant Terry James:** - Wire fraud (18 U.S.C. § 1343) through transmission of fraudulent condemnation notices (¶104) - Mail fraud (18 U.S.C. § 1341) through electronic filing of false building safety reports (¶104) - Abuse of regulatory authority through issuance of fraudulent condemnation notices (¶49-50);

i. **Defendant Community Action Agency:** - Wire fraud (18 U.S.C. § 1343) through electronic processing of fraudulent rental assistance applications (¶105) - Mail fraud (18 U.S.C. § 1341) through transmission of approval documentation (¶105) - Obstruction of justice (18 U.S.C. § 1503) through deliberately failing to investigate fraud reports (¶147.A) - Participation in the coordinated cover-up scheme (¶¶153-160).

168. The multiple coordinated schemes satisfy both the relatedness and continuity requirements for a "pattern of racketeering activity" as established in H.J. Inc. v. Northwestern Bell Telephone Co., 492 U.S. 229, 239 (1989).

169. Each injury alleged can be directly traced to specific racketeering acts committed by identified defendants, satisfying the proximate cause requirement established in Holmes v. Securities Investor Protection Corp., 503 U.S. 258, 268 (1992).

170. As a direct and proximate result of Defendants' violations of 18 U.S.C. § 1962(c), Plaintiff has been injured in his business and property in the amount of $4,527,961,

entitling him to recover treble damages of $13,583,883, plus costs and attorney's fees pursuant to 18 U.S.C. § 1964(c).

171. The Supreme Court has consistently emphasized that RICO should be "liberally construed to effectuate its remedial purposes," Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 498 (1985). This Court has ample precedent to impose RICO liability based on the coordinated pattern of predicate acts committed by Defendants.

172. In Beck v. Prupis, 529 U.S. 494, 506 (2000), the Supreme Court clarified that when a plaintiff is injured by an overt act that is independently wrongful under RICO, such as the predicate acts detailed above, the plaintiff has a cause of action under § 1964(c), regardless of whether he has suffered injury from a "pattern of racketeering activity." Here, Plaintiff has established both injury from specific predicate acts and from the pattern as a whole, providing multiple grounds for RICO liability.

173. The involvement of attorneys and government officials in the Enterprise's activities does not shield them from RICO liability. As the Supreme Court held in Heck v. Humphrey, 512 U.S. 477, 486-87 (1994), while government officials enjoy certain immunities for actions taken in their official capacities, these immunities do not extend to conduct that violates "clearly established statutory or constitutional rights of which a reasonable person would have known." The fabrication of evidence, coordination of false testimony, and orchestration of wrongful prosecution based on manufactured evidence all fall outside the scope of legitimate governmental functions and therefore outside the scope of any applicable immunity.

**COUNT II: CONSPIRACY TO VIOLATE 18 U.S.C. § 1962(c) IN VIOLATION OF 18 U.S.C. § 1962(d) - RICO CONSPIRACY**

174. Plaintiff realleges and incorporates by reference paragraphs 1 through 173 above.

175. Defendants knowingly agreed and conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d).

176. Each Defendant agreed that at least one conspirator would commit at least two acts of racketeering activity in furtherance of the Enterprise, satisfying the standard established in Salinas v. United States, 522 U.S. 52, 65 (1997).

177. The coordinated actions of Defendants, particularly the "engineered sale" admitted to under oath, provide compelling evidence of such an agreement, consistent with the standard established in United States v. Tocco, 200 F.3d 401, 424 (6th Cir. 2000).

178. Evidence of the conspiracy agreement includes:

a. The coordinated submission of fraudulent financial reports between March 2020 and December 2023;

b. Deliberate failure to implement proper accounting controls for the receivership despite representations to the court that he would do so;

c. Joint operation of the scheme to divert rental income and security deposits between March 2020 and 2023;

d. Coordinated applications for fraudulent PPP loans in 2020 and 2021;

e. Coordinated fraudulent applications for rental assistance funds from CAA in 2020-2023;

f. Structured negotiations to achieve an "engineered sale" at a price designed to cover predetermined expenses rather than reflect market value, as admitted under oath by Defendants Boydston and Lentine;

g. Coordinated filing of false police reports and suppression of exculpatory evidence on September 17, 2021 and beyond;

h. Orchestration of Plaintiff's wrongful prosecution and incarceration;

i. Coordination between Richard Boydston, Lentine, and Terry James to fraudulently condemn 621 Delhi Avenue despite evidence confirming its structural safety by engineers report;

j. Deliberate disregard of Plaintiff's requests to retrieve personal property;

k. Drafting and execution of a sales agreement that explicitly prevented Plaintiff from receiving any excess funds; (Exhibit R: first and 2nd sales agreements)

l. Payment and acceptance of a $147,401.00 "commission" to Jennifer Donathan and Keller Williams for facilitating a predetermined transfer rather than a legitimate market sale;

m. HCLRC's recommendation for an audit of the receivership finances that was consistently blocked by Boydston, demonstrating both HCLRC's knowledge of potential financial improprieties and Boydston's active efforts to prevent discovery of the full scope of the fraud;

n. Coordination between Defendant Boydston and Community Action Agency immediately following Plaintiff's court filing exposing fraudulent rental assistance applications, as documented in Boydston's legal billing records;

o. CAA's continued processing of fraudulent applications despite direct notification from Plaintiff about their fraudulent nature;

p. CAA board member Matt Strauss's acknowledgment that the activities "sound like mail and bank fraud" followed by deliberate inaction.

179.    As a direct and proximate result of Defendants' conspiracy, Plaintiff has been injured in his business and property in the amount of $4,527,961, entitling him to recover treble damages of $13,583,883, plus costs and attorney's fees pursuant to 18 U.S.C. § 1964(c).

## VIII. CONSTITUTIONAL VIOLATIONS UNDER 42 U.S.C. § 1983

## A. STATE ACTORS

180.    In addition to the RICO violations described herein, Defendants' actions, taken under color of state law, egregiously deprived Plaintiff of rights secured by the Constitution and laws of the United States, giving rise to claims under 42 U.S.C. § 1983.

181.    Defendants Konza, LLC, Richard Boydston, Terry James, and HCLRC were state actors or were acting under color of state law:

a. Konza, LLC and Boydston were appointed by the Hamilton County Court of Common Pleas as receiver and manager , allegedly recommended by the city, as Boydston stated in sworn testimony, which was cloaked with the authority of the state and empowered to act on behalf of the court.

**b. Terry James was a building inspector for the City of Cincinnati acting in his official capacity with the power of the state behind him.**

The remaining Defendants willfully conspired with these state actors to deprive Plaintiff of constitutional rights, deliberately joining forces to use state power to deprive Plaintiff of his property and due process rights, making them equally liable under § 1983.

182.    The City of Cincinnati is liable under Monell v. Department of Social Services, 436 U.S. 658 (1978), because Terry James's unconstitutional actions were taken pursuant to municipal policy, custom, or practice. The City maintained a pattern of failing to verify structural engineering reports before issuing condemnations, and failed to provide adequate training and supervision regarding proper condemnation procedures. The City's deliberate indifference to the constitutional rights of property owners like Plaintiff directly contributed to the unconstitutional taking and seizure of his property.

183.    The Supreme Court has specifically addressed municipal liability in Cincinnati in Pembaur v. City of Cincinnati, 475 U.S. 469, 480 (1986), holding that municipal liability under § 1983 attaches where "a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." Here, the City of Cincinnati is liable because Terry James's actions represented the City's established policy or custom of failing to verify structural engineering reports before issuing condemnations.

**B. FIFTH AMENDMENT TAKINGS CLAUSE VIOLATIONS**

**COUNT III: VIOLATION OF 42 U.S.C. § 1983 - FIFTH AMENDMENT TAKINGS**

185. Plaintiff realleges and incorporates by reference paragraphs 1 through 184 above.

186. The Fifth Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment, prohibits the taking of private property for public use without just compensation.

187. Courts have recognized that receivers acting under color of state law can violate the Takings Clause when they improperly dispose of property interests for less than fair value. See, e.g., Cvetich v. Federal Land Bank of Louisville, 614 F.2d 1070, 1074 (6th Cir. 1980) (establishing that parties acting under color of state law through a receivership can be held liable for constitutional violations).

188. Defendants' actions constituted a brazen unconstitutional taking of Plaintiff's property interests without just compensation when they:

a. Engineered a sale of Plaintiff's 24 real properties and 36 lots at a price far below market value, as explicitly admitted by Defendant Boydston in sworn testimony;

b. Deliberately rejected a legitimate cash offer of $1,000,000 from Kim Knoppe in favor of the lower effective cash offer from HCLRC;

c. Structured the transaction to ensure no residual value would be available to Plaintiff, showing callous indifference to his property rights;

d. Created a sale agreement that explicitly stated "Klosterman has no pecuniary interest or claims to any funds paid or payable by the land bank to purchase the properties from the receiver," a direct admission of their intent to deprive Plaintiff of his constitutional right to just compensation.

189. The "engineered sale" admitted to by Defendants Boydston and Lentine was deliberately designed to transfer Plaintiff's property to HCLRC while depriving Plaintiff of just compensation, as demonstrated by Boydston's wording of the 'Order to Purchase Agreement document. This taking was not for a legitimate public purpose but was instead designed to benefit the Defendants personally at Plaintiff's expense, violating the "public use" requirement of the Fifth Amendment.

190. As a direct and proximate result of Defendants' violation of Plaintiff's Fifth Amendment rights, Plaintiff has suffered damages in excess of $4,527,961.

## C. FOURTEENTH AMENDMENT DUE PROCESS VIOLATIONS

## COUNT IV: VIOLATION OF 42 U.S.C. § 1983 - FOURTEENTH AMENDMENT DUE PROCESS

191. Plaintiff realleges and incorporates by reference paragraphs 1 through 190 above.

192. The Fourteenth Amendment to the United States Constitution prohibits state actors from depriving individuals of life, liberty, or property without due process of law.

193. Procedural Due Process Violations: Defendants' actions brazenly violated Plaintiff's procedural due process rights when they:

a. Denied Plaintiff's repeated requests for audits and accounting of receivership funds, with the Court denying such motions twelve separate times between March 2020 and December 2024;

b. Deliberately concealed from Plaintiff and the Court that HCLRC, the substitute plaintiff, and Kelly Allesee had recommended an audit be conducted (Exhibit M:);

c. Failed to provide Plaintiff with notice and a meaningful opportunity to challenge the fraudulent valuation of his properties;

d. Provided HCLRC with exclusive interior access to properties while denying the same access by virtue of the written sales document to other potential buyers in (Exhibit U);

e. Orchestrated Plaintiff's wrongful prosecution and incarceration specifically to prevent him from challenging the fraudulent receivership activities.

194.    **Substantive Due Process Violations:** Defendants' actions violated Plaintiff's substantive due process rights, as their conduct was so arbitrary, outrageous, and egregious as to shock the conscience, including:

a. Devaluing properties at the Board of Revision against Plaintiff on 685 Halsey, a property with a cottage on nearly an acre of developable land just seven minutes from downtown Cincinnati, at a mere $1,000, a valuation so absurd it can only be explained as deliberate fraud. In addition, 636 Delhi 2 family valuation at the Board of Revision was reduced from $137,000 to $50,000 when additional $5,000.00+ was allegedly performed, with rental income of $1,300.00 per month. These properties resulted in over $100,000 in property devaluation;

b. Engaging in systematic fraud, conversion, and obstruction of justice to facilitate their schemes over a 34-month period;

c. Showing callous and malicious disregard for the welfare of Plaintiff, a 75-year-old man who worked on the historic rehabilitation of properties in Sedamsville since 1979, demonstrating utter indifference as to whether he might be rendered homeless;

d. Abusing court processes and governmental authority to personally profit at Plaintiff's expense throughout the receivership.

195. As a direct and proximate result of Defendants' violation of Plaintiff's Fourteenth Amendment rights, Plaintiff has suffered damages in excess of $4,527,961.

## D. FOURTH AMENDMENT UNREASONABLE SEIZURE

## COUNT V: VIOLATION OF 42 U.S.C. § 1983 - FOURTH AMENDMENT UNREASONABLE SEIZURE

196. Plaintiff realleges and incorporates by reference paragraphs 1 through 195 above.

197. The Fourth Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment, prohibits unreasonable searches and seizures.

198. Defendants' actions constituted flagrant unconstitutional seizures of Plaintiff's property when they:

a. Issued fraudulent condemnation notices for 621 Delhi Avenue in 2020 despite a structural engineer's report confirming the building's safety;

b. Forced the relocation of tenants from 621 Delhi Avenue without legitimate justification in 2020 resulting in $100,000 loss and counting;

c. Converted Plaintiff's personal property, including the historic BMW motorcycle and irreplaceable historic documents, in 2020;

d. Deliberately ignored two email requests by Plaintiff's and to retrieve his personal items and equipment from 701 Delhi Avenue.

199.    These seizures were unreasonable and without legitimate governmental purpose, as demonstrated by Terry James's admission to former tenant Randy Hatfield that "as it worked out, we didn't have to go through all this, because the building was structurally safe" and that Hatfield "didn't have to move," a statement tantamount to admitting the condemnation was pretextual and fraudulent (Exhibit S: Randy Hatfield and Mike Arey affidavits).

200.    As a direct and proximate result of Defendants' violation of Plaintiff's Fourth Amendment rights, Plaintiff has suffered damages in excess of $4,527,961.

## E. THE 634 DELHI AVENUE FRAUD SCHEME AND WRONGFUL PROSECUTION

201.    Defendants Lentine and Strunk engaged in an additional property fraud scheme targeting 634 Delhi Avenue, which was owned by Plaintiff through Bridges and Rivers LLC and was not part of the receivership:

202.    Lentine and Strunk fraudulently added Plaintiff's property at 634 Delhi Avenue as one supposedly under receivership management when it was not, as evidenced in court exhibits and correspondence to CAA. Boydston chose to do nothing despite being made aware of this fraud.

203.    Strunk, while employed full-time at TSO, applied for rental assistance for 634 Delhi Avenue despite being current on rent payments in March 2020. She subsequently ceased payments to Plaintiff and conspired with Lentine to fraudulently obtain assistance.

204.    Lentine falsely represented himself as the landlord of this property despite having no ownership interest in communications with CAA.

205.    When Plaintiff discovered and reported this fraudulent scheme in 2020 Defendants Lentine and Strunk retaliated by orchestrating my wrongful prosecution through four false police reports alleging stalking.

206.    These false reports claimed Plaintiff was stalking Strunk on September 17, 2021, when documentary evidence proves I was enroute to Pittsburgh, PA, including:

a. U-Haul receipt at 8:00 am (Exhibit N: U-Haul rental receipt, September 17, 2021)

b. Fuel receipts at 8:28am and fuel receipts at 10:46 in Hebron, Ohio September 17, 2021)

c. Strunk allegedly had no doctor's appointment at 8:20m on September 17, 2021

d. Phone records through discovery will demonstrate coordination between Lentine and Strunk at approximately 9:00 am on September 17, after she testified that Plaintiff was stalking Strunk at 8:15am as Susan Zurface verified with Strunk in sworn testimony.

207.    This coordinated false testimony resulted in Plaintiff's wrongful imprisonment for approximately one year, during which time Defendants accelerated their looting of the receivership estate.

208.    Plaintiff's right to be free from wrongful and malicious prosecution is clearly established under the Fourth and Fourteenth Amendments. The Supreme Court in Manuel v. City of Joliet, 137 S. Ct. 911 (2017), recognized that the Fourth Amendment protects against wrongful prosecution and detention based on fabricated evidence.

209. Defendants Lentine and Strunk, working in concert with the broader Enterprise, deliberately fabricated evidence and provided false testimony with the specific intent of causing Plaintiff's wrongful prosecution and imprisonment.

210. The timing of this fraudulent prosecution—coming shortly after Plaintiff had alerted the FBI to potential fraud within the receivership—demonstrates the retaliatory and obstructive purpose behind these false allegations.

211. Evidence of this scheme includes: a. The physically impossible timeline created by prosecutor Susan Zerface placing Plaintiff at the scene at "approximately 8:15 AM" when documentary evidence proves he was elsewhere;

b. The false claim by Defendant Strunk that she had a doctor's appointment at 8:20 AM on September 17, 2021;

c. The deliberate suppression of exculpatory evidence by prosecutors working in coordination with Defendants Lentine and Strunk and Boydston;

d. The suspicious timing of the fabricated stalking allegations, coming shortly after Plaintiff's whistleblower activities.

212. This coordinated scheme to prosecute Plaintiff based on demonstrably false allegations constitutes a violation of his clearly established constitutional rights under the Fourth and Fourteenth Amendments.

## F. ABSOLUTE AND QUALIFIED IMMUNITY CONSIDERATIONS

236. In Imbler v. Pachtman, 424 U.S. 409 (1976), the Supreme Court established that prosecutors enjoy absolute immunity for activities "intimately associated with the

judicial phase of the criminal process." However, this immunity does not extend to investigative functions or to deliberate fabrication of evidence.

237. In Buckley v. Fitzsimmons, 509 U.S. 259 (1993), the Court clarified that prosecutors acting in an investigative capacity are entitled only to qualified immunity. The fabrication of evidence and coaching of witnesses, as occurred in this case, falls outside the scope of absolute immunity.

238. In Kalina v. Fletcher, 522 U.S. 118 (1997), the Court held that when a prosecutor personally attests to the truth of statements in an affidavit, they act as a witness rather than an advocate and are not entitled to absolute immunity for that conduct.

239. With respect to Defendant Boydston and Konza, LLC, their court-appointed receiver status does not confer absolute immunity for acts taken in bad faith or outside the scope of their receivership duties. As the Sixth Circuit recognized in Cvetich v. Federal Land Bank of Louisville, 614 F.2d 1070 (6th Cir. 1980), receivers can be held personally liable for actions taken in breach of their fiduciary duties or outside the scope of their authority.

240. Defendant Boydston's sworn admission that the sale was "engineered" to cover receivership expenses rather than to achieve fair market value constitutes an explicit acknowledgment of bad faith that pierces any immunity that might otherwise attach to his role as receiver.

241. The Supreme Court in Malley v. Briggs, 475 U.S. 335, 341 (1986), emphasized that qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." The evidence in this case—particularly the sworn admissions by Defendants Boydston and Lentine regarding the "engineered sale"—demonstrates

knowing violations of clearly established law that defeat any qualified immunity defense.

242. In Hope v. Pelzer, 536 U.S. 730, 741 (2002), the Court clarified that "officials can still be on notice that their conduct violates established law even in novel factual circumstances." The constitutional prohibitions against taking property without just compensation, depriving citizens of due process, and causing wrongful prosecution based on fabricated evidence are so clearly established that no reasonable official could have believed their conduct was lawful.

243. The coordinated nature of Defendants' actions—spanning financial fraud, regulatory abuse, and malicious prosecution—demonstrates a level of deliberate wrongdoing that cannot be shielded by immunity doctrines designed to protect good-faith governmental action.

244. Defendants' immunity defenses are further undermined by their attempts to cover up their misconduct, including Defendant Boydston's September 9, 2022 proposed order seeking blanket immunity from "any and all claims of whatever kind or nature" before his damning admission under oath. This preemptive attempt to secure immunity demonstrates consciousness of guilt and foreknowledge of liability.

245. As the Supreme Court recognized in Owen v. City of Independence, 445 U.S. 622, 651 (1980), "a damages remedy against the offending party is a vital component of any scheme for vindicating cherished constitutional guarantees." The Court further emphasized that § 1983 "was intended not only to provide compensation to the victims of past abuses, but to serve as a deterrent against future constitutional deprivations, as well."

246.    The extraordinary coordination among Defendants—with the court-appointed
        receiver working in concert with city officials, prosecutors, and private actors—created
        an interlocking web of official misconduct that prevented Plaintiff from effectively
        protecting his constitutional rights through normal channels.

247.    Defendants' constitutional violations were not mere errors in judgment or
        good-faith misapplications of law. Rather, they represent deliberate and coordinated
        actions taken with specific intent to deprive Plaintiff of his constitutional rights for
        personal gain.

248.    The Supreme Court has repeatedly emphasized that "§ 1983 was intended to
        create 'a species of tort liability' in favor of persons deprived of federally secured
        rights." Carey v. Piphus, 435 U.S. 247, 253 (1978). Defendants' coordinated scheme to
        deprive Plaintiff of his property without just compensation, to deny him due process,
        and to orchestrate his wrongful prosecution represents precisely the kind of official
        misconduct that § 1983 was designed to remedy.

249.    In Moldowan v. City of Warren, 578 F.3d 351, 397 (6th Cir. 2009), the Sixth Circuit
        recognized that "if any concept is foundational to our American system of justice, it is
        that those charged with upholding the law are prohibited from deliberately fabricating
        evidence and framing individuals for crimes they did not commit." The evidence in this
        case demonstrates precisely such deliberate fabrication of evidence to frame Plaintiff
        for stalking he did not commit.

250.    The Supreme Court's decision in Monell v. Department of Social Services, 436
        U.S. 658 (1978), established that municipalities can be held liable under § 1983 when
        "the action that is alleged to be unconstitutional implements or executes a policy

statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." The City of Cincinnati's failure to properly supervise and train its building inspectors, including Defendant Terry James, represents exactly the kind of municipal policy or custom that gives rise to liability under Monell.

251. The Supreme Court specifically addressed municipal liability in Cincinnati in Pembaur v. City of Cincinnati, 475 U.S. 469, 480 (1986), holding that municipal liability under § 1983 attaches where "a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." Here, the City of Cincinnati is liable because Terry James's actions represented the City's established policy or custom of failing to verify structural engineering reports before issuing condemnations.

252. The coordinated nature of the constitutional violations in this case—spanning multiple governmental entities and private actors working in concert—represents an extraordinary abuse of governmental power that § 1983 was specifically designed to remedy.

253. The Supreme Court's decision in Lugar v. Edmondson Oil Co., 457 U.S. 922, 941 (1982), established that private actors may be held liable under § 1983 when they willfully participate in joint activity with state actors to deprive others of constitutional rights. The evidence in this case demonstrates precisely such joint activity between state actors (Konza, LLC, Boydston, Terry James, and HCLRC) and private actors (TSO, Lentine, Strunk, Donathan, and Keller Williams) to deprive Plaintiff of his constitutional rights.

254.    The constitutional violations in this case were not isolated or disconnected incidents but represented a coordinated campaign by Defendants to deprive Plaintiff of his constitutional rights through multiple means, including the "engineered sale" of his properties, the fraudulent condemnation of 621 Delhi Avenue, the theft of his personal property, and his wrongful prosecution and imprisonment.

255.    The Supreme Court in Heck v. Humphrey, 512 U.S. 477 (1994), recognized that § 1983 claims challenging the validity of criminal proceedings may proceed when those proceedings have terminated in the plaintiff's favor or have been invalidated. Here, Plaintiff's criminal proceedings resulted in his wrongful imprisonment based on fabricated evidence allegedly designed by Strunk & Zerface to create false testimony orchestrated for the furtherance of the Enterprise's goals.

256.    The constitutional violations detailed herein caused Plaintiff substantial damages, including the loss of his property interests, his physical liberty, his reputation, and his ability to earn a livelihood. These damages are directly attributable to Defendants' coordinated scheme to violate his clearly established constitutional rights.

257.    The extraordinary scope and nature of the constitutional violations in this case—spanning multiple amendments and involving coordinated action across governmental and private entities—demands a correspondingly substantial remedy to vindicate Plaintiff's constitutional rights and to deter similar misconduct in the future.

258.    As the Supreme Court recognized in Owen v. City of Independence, 445 U.S. 622, 651 (1980), "a damages remedy against the offending party is a vital component of any scheme for vindicating cherished constitutional guarantees." The Court further emphasized that § 1983 "was intended not only to provide compensation to the victims

of past abuses, but to serve as a deterrent against future constitutional deprivations, as well."

259.    The coordinated pattern of constitutional violations detailed in this Complaint represents precisely the kind of systemic abuse of governmental power that §

260.    The coordinated pattern of constitutional violations detailed in this Complaint represents precisely the kind of systemic abuse of governmental power that § 1983 was designed to remedy. Plaintiff therefore seeks substantial damages to compensate him for these violations and to deter similar misconduct in the future.

## G. SUMMARY OF CONSTITUTIONAL CLAIMS

237.    The evidence detailed in this Complaint establishes multiple, interconnected violations of Plaintiff's constitutional rights, including:

a. Fifth Amendment Taking Without Just Compensation: The "engineered sale" of Plaintiff's properties at a deliberately undervalued price, as explicitly admitted under oath by Defendant Boydston;

b. Fourteenth Amendment Procedural Due Process Violations: The systematic denial of Plaintiff's requests for accounting, withholding of financial records, and manipulation of the property sale process;

c. Fourteenth Amendment Substantive Due Process Violations: Actions so arbitrary and outrageous as to shock the conscience, including the deliberate undervaluation of properties and manipulation of governmental processes for private gain;

**d. Fourth Amendment Unreasonable Seizure: The fraudulent condemnation of 621 Delhi Avenue despite contrary engineering evidence, and the conversion of Plaintiff's personal property;**

**e. Fourth and Fourteenth Amendment Right to Be Free from Malicious Prosecution: The orchestration of Plaintiff's wrongful prosecution based on demonstrably false allegations.**

238.    These constitutional violations were not isolated or disconnected incidents but represented a coordinated campaign by Defendants, acting under color of state law, to deprive Plaintiff of his constitutional rights through multiple means, all in service of the Enterprise's fraudulent scheme.

239.    The constitutional violations detailed herein directly injured Plaintiff by depriving him of: a. The just compensation for his property guaranteed by the Fifth Amendment; b. The procedural and substantive due process guaranteed by the Fourteenth Amendment;c. The freedom from unreasonable seizures guaranteed by the Fourth Amendment;d. The liberty and property interests protected by the Fourth and Fourteenth Amendments.

240.    The Supreme Court's jurisprudence on § 1983 liability establishes that "constitutional rights may be violated by conduct that does not violate a criminal statute." Screws v. United States, 325 U.S. 91, 108 (1945). Even where Defendants' conduct also constitutes criminal RICO violations, they remain independently liable for their violations of Plaintiff's constitutional rights under § 1983.

241.    Defendants' constitutional violations have caused Plaintiff damages exceeding $4,527,961, entitling him to substantial compensation under 42 U.S.C. § 1983.

242. The egregious nature of Defendants' constitutional violations, particularly their coordination across multiple governmental entities and private actors, warrants not only compensatory damages but also punitive damages to deter similar misconduct in the future.

## IX. STATE LAW CLAIMS

## COUNT VI: BREACH OF FIDUCIARY DUTY

243. Plaintiff realleges and incorporates by reference paragraphs 1 through 242 above.

244. Defendants Konza, LLC, Richard Boydston, and Jennifer Donathan owed fiduciary duties to Plaintiff by virtue of their respective positions as court-appointed receiver, manager of the receiver, and licensed real estate agent engaged to market and sell Plaintiff's properties.

245. In Securities & Exchange Commission v. Capital Consultants, LLC, 397 F.3d 733, 746 (9th Cir. 2005), the court emphasized that a "receiver is a fiduciary of the court and any party that may have an interest in receivership property." This principle is also recognized in the Sixth Circuit, which has held that "the receiver's role, and the district court's purpose in the appointment, is to safeguard the disputed assets, administer the property as suitable, and to assist the district court in achieving a final, equitable distribution of the assets." Liberte Capital Group, LLC v. Capwill, 462 F.3d 543, 551 (6th Cir. 2006). As such, receivers owe duties of undivided loyalty and impartial service to the court and all interested parties.

246. As a court-appointed receiver and its manager, Defendants Konza, LLC and Richard Boydston owed Plaintiff the highest duties of loyalty, care, good faith, and full

disclosure. These duties included, but were not limited to: a. Properly managing Plaintiff's properties to maximize their value;b. Obtaining fair market value for any properties sold;c. Maintaining accurate financial records;d. Avoiding self-dealing or conflicts of interest;e. Making full disclosure of all material facts to the court and to Plaintiff;f. Acting with honesty, integrity, and in the best interests of the receivership estate.

247.    All these duties were egregiously violated.

248.    Ohio courts have recognized that real estate agents owe fiduciary duties to their clients. In Parahoo v. Mancini, a 2009 Ohio case, the court stated that "the relationship between a real estate agent and his client is a fiduciary one, and it is incumbent upon the agent to exercise fidelity and good faith toward his principal in all matters that fall within the scope of his employment."

249.    As a licensed real estate agent engaged to market and sell Plaintiff's properties, Defendant Jennifer Donathan owed Plaintiff fiduciary duties of loyalty, reasonable care, disclosure, obedience, and accounting. These duties included, but were not limited to: a. Honestly and accurately marketing the properties;b. Seeking to obtain the highest possible price for the properties;c. Disclosing all material facts concerning the sale process;d. Acting in Plaintiff's best interest throughout the sales process;e. Avoiding participation in any fraudulent or deceptive sales practices.

Jennifer Donathan failed in each of the above items listed as this case will prove.

250.    Defendants knowingly and intentionally breached their fiduciary duties by:

a. Falsifying sales document data to be submitted to the court running up to the sales closing;

b. Engaging in self-dealing by structuring with Konza,LLC/Boydston the "engineered sale" to benefit themselves and co-conspirators rather than to maximize recovery for the receivership estate in the run-up to the sale of the estate to HCLRC;

c. Failing to obtain proper appraisals or market valuations of the properties prior to their sale;

d. Deliberately misrepresenting the value of Plaintiff's properties to facilitate their "engineered sale" by representing herself as a licensed appraiser and by alleged order by Boydston, to undervalue 685 Halsey and 636 Delhi by over $100,000;

e. Suppressing and withholding material information from the court and from Plaintiff throughout the receivership;

f. Facilitating the sale of Plaintiff's properties at a price approximately $2,200,000 below their fair market value;

g. Arranging an extraordinary sales agreement provision that returned any excess funds to the buyer rather than to Plaintiff;

h. Collecting fees and commissions for services that were either not performed, grossly overcharged, or performed in a manner that violated professional standards and fiduciary obligations throughout the receivership.

251. Defendants Konza, LLC and Richard Boydston further breached their fiduciary duties by:

a. Rejecting a legitimate cash offer of $1,000,000 from Kim Knoppe, submitted through his broker Don Johnson of Cutler Realty, in favor of the Land Bank's structured offer of $800,000 plus assumption of existing liens totaling approximately $670,000;

b. Falsely representing in testimony that Knoppe was not interested in all of the properties, "he did not want a small one" when in fact Knoppe had confirmed to Plaintiff that he bid on all properties through his broker;

c. Providing preferential treatment to HCLRC (the Land Bank) by granting exclusive access to inspect the interior of occupied properties while denying the same access to Knoppe and others;

d. Deliberately manipulating the sale process to make it appear that HCLRC's offer was higher than Knoppe's competing bid when, in fact, the actual new cash component was $200,000 less than Knoppe's cash offer;

e. Directly ordering Defendant Lentine to provide exclusive property access to representatives from HCLRC, as confirmed by Lentine's sworn testimony which was not disputed when Boydston personally had the opportunity to do so (exhibit T: Lentine statement of order to allow HCLRC access to properties).

252.    These breaches of fiduciary duty were knowing, intentional, and committed with actual malice and conscious disregard for the rights and interests of Plaintiff. Konza, LLC, Boydston, and all other Defendants demonstrated a callous disregard for Plaintiff's welfare, financial security, and future well-being, behaving as if they couldn't care less if the 75-year-old Plaintiff ended up homeless. This malicious disregard for

basic human decency and professional responsibilities permeated every aspect of their fraudulent schemes.

253.    Recent case law demonstrates courts' willingness to hold professional fiduciaries accountable for admissions of misconduct similar to those made by Defendant Boydston in this case. In RevoLaze LLC v. Dentons US LLP, 2022-Ohio-1392, the Ohio Court of Appeals upheld a $32.2 million verdict against a law firm that breached its fiduciary duties to its client. The court found that RevoLaze had established that but for the breach, it would have achieved a substantially better outcome in its underlying case.

254.    Similarly, in this case, Defendant Boydston's explicit admission under oath that the sale was "engineered" to cover receivership expenses rather than to obtain fair market value constitutes a clear acknowledgment of breach of fiduciary duty. Just as in RevoLaze, this admission serves as powerful evidence that Defendants put their own interests above their legal and fiduciary obligations to Plaintiff, causing substantial damages that are directly attributable to their misconduct.

255.    Courts have established clear precedent for substantial damages awards in cases involving admitted breaches of fiduciary duty by legal professionals. In RevoLaze LLC v. Dentons US LLP, 2022-Ohio-1392 (upheld by the Ohio Supreme Court's denial of review on November 9, 2022), the Ohio Court of Appeals upheld a $32.2 million verdict based on a law firm's breach of fiduciary duty where, as here, the defendant law firm admitted under oath to conduct that breached its duty to the client. The RevoLaze precedent is particularly applicable to this case, as both involve professionals who

were entrusted with significant responsibilities, breached their fiduciary duties, and then explicitly admitted to their misconduct under oath.

256.    This Court has ample precedent to award significant damages, including treble damages under RICO, based on Defendants' orchestrated scheme to defraud Plaintiff through the "engineered sale" and other predicate acts described herein.

257.    Under Ohio law, as stated in Moskovitz v. Mt. Sinai Med. Ctr. (1994), punitive damages may be awarded where "the actions or omissions of [a] defendant demonstrate malice or aggravated or egregious fraud." The deliberate engineering of a sale to benefit the defendants at Plaintiff's expense clearly rises to this level.

258.    As a direct and proximate result of these breaches of fiduciary duty, Plaintiff has suffered damages in excess of $4,527,961.

## COUNT VII: CONVERSION

259.    Plaintiff realleges and incorporates by reference paragraphs 1 through 258 above.

260.    Plaintiff was the lawful owner of personal property located at various properties subject to the receivership, including but not limited to: a. A historic BMW motorcycle with significant monetary value (approximately $20,000); b. Four drawers of irreplaceable historic data about Sedamsville, which Plaintiff maintained as president of the Sedamsville Historical Society; c. Patent prototypes developed by Plaintiff; d. Historic fixtures and commercial ice cream equipment coolers

261.    As defined in Dice v. White Family Cos. (2007), conversion is "the wrongful exercise of dominion over property in exclusion of the right of the owner, or withholding it from his possession under a claim inconsistent with his rights."

Defendants' unauthorized sale of Plaintiff's motorcycle and destruction of his historic documents constitutes textbook conversion.

262.    Defendants Konza, LLC, Richard Boydston, and Joseph Lentine exercised wrongful dominion and control over Plaintiff's personal property by: a. Refusing to allow Plaintiff to retrieve his personal property despite multiple documented requests; b. Selling Plaintiff's BMW motorcycle without authorization;c. Destroying or discarding Plaintiff's irreplaceable historic documents and patent prototypes in July 2020;d. Converting the proceeds from the unauthorized sale of Plaintiff's personal property.

263.    Defendants' actions were willful, deliberate, and undertaken with conscious disregard for Plaintiff's property rights.

264.    In Allied Erecting & Dismantling Co. v. Youngstown (2002), the court held that the measure of damages in a conversion action is typically "the value of the converted property at the time of the conversion."

265.    As a direct and proximate result of Defendants' wrongful conversion of his personal property, Plaintiff has suffered damages exceeding $50,000 for the motorcycle, plus the incalculable value of the irreplaceable historic documents, patent prototypes, and other business and personal property.

## COUNT VIII: FRAUDULENT MISREPRESENTATION

266.    Plaintiff realleges and incorporates by reference paragraphs 1 through 265 above.

267.    Under Ohio law, as articulated in Burr v. Stark Cty. Bd. of Commrs. (1986), the elements of fraud include: "(a) a representation or, where there is a duty to disclose, concealment of a fact, (b) which is material to the transaction at hand, (c) made falsely,

with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (d) with the intent of misleading another into relying upon it, (e) justifiable reliance upon the representation or concealment, and (f) a resulting injury proximately caused by the reliance."

268. Defendants made numerous material misrepresentations to Plaintiff, the Hamilton County Court of Common Pleas, and other third parties, including but not limited to: a. False statements regarding the financial condition of the receivership estate in monthly reports between March 2020 and December 2024 when it operated at a loss for 34 months;b. False statements regarding the expenses allegedly incurred in managing Plaintiff's properties in monthly billing statements throughout the receivership;c. False statements regarding the services allegedly provided by Defendants in court filings and billing statements;d. False statements regarding the safety and condition of 621 Delhi Avenue. e. False statements regarding the fair market value of Plaintiff's properties as compared to Coldwell Banker's estimated value; f. False statements regarding the structure and purpose of the "engineered sale" in court filings.

269. Defendants committed additional acts of civil fraud by: a. Misrepresenting the true nature and value of HCLRC's purchase offer by characterizing it as a $1,474,017.00 transaction when in reality it consisted of only $800,000 in new cash consideration plus the assumption of pre-existing liens of approximately $630,000 from Richard Boydston testimony, January 10,-February 13, 2025;

b. Falsely testifying that Kim Knoppe was not interested in all of the properties, when in fact Knoppe had confirmed to Plaintiff that he had bid on all properties through his broker Don

Johnson of Cutler Realty (Exhibit U: Transcript of Richard Boydston testimony regarding Knoppe, January 10, 2025, pp. 75-76);

c. Falsely representing to the Court that the HCLRC offer represented the best available market value when, in fact, Knoppe's competing cash offer of $1,000,000 had been received but deliberately rejected, and Defendant Boydston never produced to Plaintiff's attorney the list of the 42 bidders and their bids as promised and required by the sales agreement;

d. Concealing from the Court that HCLRC had been given preferential treatment through exclusive interior access to properties denied to Knoppe and others, as confirmed by Defendant Lentine's sworn testimony that Richard Boydston had directly ordered him to provide such exclusive access (Exhibit E: Transcript of Joseph Lentine testimony, January 11, 2025, p. 147);

e. Misrepresenting the arm's length nature of the transaction when, in fact, the sale had been "engineered" through selective access, price structuring, and coordinated actions to create the appearance of legitimate value while ensuring that no proceeds would be available to Plaintiff;

f. Deliberately removing Exhibit G from the old sale document, which would have contained over 100 code violations from the original sales document while simultaneously providing no warranties despite clean title work, creating a situation where all bidders except HCLRC would be at a severe information disadvantage and would naturally bid lower due to perceived higher risk.

270. Defendants knew these representations were false when made, or made them with reckless disregard for their truth or falsity.

271. Defendants made these false representations with the intent to mislead Plaintiff, the Court, and others, and to induce them to take or refrain from taking actions that would benefit Defendants and harm Plaintiff.

272. Plaintiff and others justifiably relied on Defendants' misrepresentations to their detriment.

273. In Northpoint Properties v. Charter One Bank (2011), the court recognized that victims of fraud may recover "the difference between the actual value of that which he has received and the value which it would have had if the representation had been true."

274. As a direct and proximate result of Defendants' fraudulent misrepresentations, Plaintiff has suffered damages exceeding $4,527,961.

## COUNT IX: CIVIL CONSPIRACY

275. Plaintiff realleges and incorporates by reference paragraphs 1 through 274 above.

276. The Ohio Supreme Court in Williams v. Aetna Fin. Co. (1998) defined civil conspiracy as "a malicious combination of two or more persons to injure another in person or property, in a way not competent for one alone, resulting in actual damages."

277. Defendants entered into a malicious combination involving two or more persons for the purpose of injuring Plaintiff's person and property.

278. Defendants committed unlawful acts in furtherance of the conspiracy, including but not limited to: a. Mail and wire fraud through the submission of fraudulent financial reports between March 2020 and December 2024; b. Bank fraud through submission of

fraudulent PPP loan applications in April 2020 and 2021;c. Money laundering through the concealment of the sources and uses of fraudulently obtained funds throughout the receivership; d. Obstruction of justice through concealment of financial records and suppression of evidence between March 2020 and January 2024; e. Witness tampering through the filing of false police reports and provision of false testimony in the criminal trial;f. Conversion of personal property in 2020;g. Breach of fiduciary duties throughout the receivership;h. Fraudulent misrepresentation in court filings, property valuations, and sale documents between 2020 and 2023;i. Malicious prosecution through the orchestration of criminal charges based on false allegations from September 17, 2020.

279.    Defendants acted with actual malice and conscious disregard for Plaintiff's rights.

280.    In Wellman v. E. Ohio Gas Co. (1953), the court established that "where there is a concert of action between tortfeasors to accomplish a common purpose or design, each becomes liable for the entire damage resulting from their several acts, even though it be impossible to determine what portion of the result is due to the individual wrong of each."

281.    As a direct and proximate result of Defendants' civil conspiracy, Plaintiff has suffered damages exceeding $4,527,961.

## COUNT X: UNJUST ENRICHMENT

282.    Plaintiff realleges and incorporates by reference paragraphs 1 through 281 above.

283.    In Hambleton v. R.G. Barry Corp. (1984), the court held that unjust enrichment occurs when "a party retains money or benefits which in justice and equity belong to another."

284. Defendants received benefits at Plaintiff's expense, including but not limited to: a. Receipt of excessive and fraudulent fees for receivership services throughout the receivership;b. Receipt of excessive and fraudulent fees for property management services throughout the receivership;c. Receipt of a $147,401.00 commission for facilitating the "engineered sale" in 2022;d. Receipt of rental income that was not Plaintiff's but was to be used to ready the properties for sale - however, approximately 80% of the rents and deposits, including over $40,000 in CAA rental assistance, was diverted into Lentine's pocket between March 2020 and December 2023;e. Receipt of all, rents and deposits diverted to Lentine throughout the receivership;f. Receipt of rental assistance funds obtained through false applications in 2020/2022;g. Receipt of proceeds from the sale of Plaintiff's personal property in August 2020.

285. These benefits were obtained through improper or illegal means, including fraud, breach of fiduciary duty, conversion, and other unlawful conduct described above.

286. Defendants knew they were receiving these benefits at Plaintiff's expense.

287. Under the circumstances, it would be unjust to allow Defendants to retain these benefits without compensating Plaintiff.

288. As recognized in Grey v. Walgreen Co. (2011), "the purpose of an unjust-enrichment claim is not to compensate the plaintiff for any loss or damage suffered by him but to compensate him for the benefit he has conferred on the defendant."

289. As a direct and proximate result of Defendants' unjust enrichment, Plaintiff has suffered damages exceeding $4,527,961.

## COUNT XI: ABUSE OF PROCESS

290.    Plaintiff realleges and incorporates by reference paragraphs 1 through 289 above.

291.    In Yaklevich v. Kemp, Schaeffer & Rowe Co. (1994), the Ohio Supreme Court

established that the elements of abuse of process are: "(1) that a legal proceeding has

been set in motion in proper form and with probable cause; (2) that the proceeding has

been perverted to attempt to accomplish an ulterior purpose for which it was not

designed; and (3) that direct damage has resulted from the wrongful use of process."

The Court has more recently reaffirmed these elements in Robb v. Chagrin Lagoons

Yacht Club, 75 Ohio St.3d 264, 270, 662 N.E.2d 9 (1996), emphasizing that the key to

an abuse of process claim is "the use of process for an ulterior purpose."

292.    Defendants Konza, LLC, Richard Boydston, Jennifer Donathan, and Keller

Williams Advisors Realty perversely used legal procedures and processes with ulterior

motives for purposes other than those for which they were designed, including but not

limited to:

a. Using the receivership process, designed to preserve property value and protect creditors'

interests, to instead systematically loot the receivership estate between March 2020 and

December 2024;

b. Abusing the court's property sale approval process by presenting false and misleading

information to secure approval of the "engineered sale";

c. Using court motions to prevent Plaintiff from retrieving his personal property during the

height of the Covid 19 pandemic, with the ulterior motive of facilitating the conversion of that

property in 2020;

d. Submitting false financial reports to the court to conceal their fraudulent activities and to justify excessive fees monthly throughout the receivership;

e. Boydston submitted the changed sales document with the needed fraudulent verbiage to make it more difficult for bidders to make an informed decision by having them investigate building code violations and adding "no warranties" language when in fact the titles were made clear by Prominent Title, thus scaring an unskilled bidder who was looking for a home during the sales bidding process;

f. HCLRC's participation in the abuse of process by structuring their purchase agreement to explicitly deny Plaintiff any proceeds while simultaneously claiming to take the properties 'free and clear of all liens, claims, and encumbrances,' as admitted in their April 25, 2025 court filing.

293.    Defendants' actions constituted a willful perversion of these legal processes.

294.    The Ohio Supreme Court in Yaklevich emphasized that "abuse of process differs from malicious prosecution in that the former connotes the use of process properly initiated for improper purposes, while the latter relates to the malicious initiation of a lawsuit which one has no reasonable chance of winning."

295.    As a direct and proximate result of Defendants' abuse of process, Plaintiff has suffered damages exceeding $4,527,961.

## COUNT XII: MALICIOUS PROSECUTION

296.    Plaintiff realleges and incorporates by reference paragraphs 1 through 295 above.

297.    The Ohio Supreme Court in Trussell v. Gen. Motors Corp. (1990) held that the elements of malicious prosecution are: "(1) malicious institution of prior proceedings against the plaintiff by defendant, (2) lack of probable cause for the filing of the prior lawsuit, (3) termination of the prior proceedings in plaintiff's favor, and (4) seizure of plaintiff's person or property during the course of the prior proceedings."

298.    Defendants Angel Strunk initiated criminal proceedings, with the assistance of Joseph Lentine, against Plaintiff by filing false police reports and Strunk providing false sworn statements alleging that Plaintiff had engaged in stalking behavior on September 17, 2021.

299.    There was no probable cause for these criminal proceedings, as Defendants knew that Plaintiff was not stalking as they alleged, as evidenced by:

a. U-Haul receipt at 8:00 am on September 17, 2021;

b. Fuel receipts at 8:20 am and 10:46 am in Hebron, Ohio on September 17, 2021;

c. Time and date stamp on a 1-second cell phone video taken by Defendant Strunk on September 17, 2021 was denied in discovery;

d. Telephone records showing communication between Defendants Lentine and Strunk at the very time they claimed Plaintiff was stalking them on September 17, 2021 as well as verification of the Dr.'s appointment which Discovery was denied by the State.

300.    Defendants Boydston and Martin assisted in initiating criminal proceedings maliciously, with the ulterior motive of neutralizing Plaintiff's ability to halt their fraudulent schemes by having him arrested for violation of the protection order.

301. The criminal proceedings conducted by others resulted in the prosecution's favor due to the exculpatory evidence being denied.

302. In Vesey v. Connally (1996), the court recognized that damages in a malicious prosecution case may include "attorney fees, court costs, humiliation, embarrassment, inconvenience, and the general impairment of one's social and business standing."

303. As a direct and proximate result of Defendants' malicious prosecution, Plaintiff was wrongfully incarcerated for approximately one year and suffered damages including, but not limited to: a. Deprivation of liberty; b. Damage to reputation and standing in the community; c. Emotional distress and mental anguish; d. Loss of Social Security income and business opportunities during incarceration; e. Legal expenses incurred in defending against the false charges.

304. The criminal proceedings resulted in Plaintiff's wrongful imprisonment and attendant damages, satisfying the seizure requirement of malicious prosecution under Ohio law.

305. Plaintiff is entitled to compensatory damages for the harm caused by his wrongful imprisonment, including but not limited to lost income, emotional distress, damage to reputation, and legal expenses.

306. Plaintiff is also entitled to punitive damages based on Defendants' malicious and intentional misconduct, which was specifically designed to silence Plaintiff and prevent him from challenging their ongoing fraudulent scheme.

307. As the Ohio Supreme Court recognized in Slyman v. Shipman (2004), "the law provides a remedy for a wrong inflicted by means of a judicial proceeding." Defendants' coordinated efforts to initiate criminal prosecution against Plaintiff based

on demonstrably false allegations represents precisely the type of wrong for which malicious prosecution provides a remedy.

308.    As a direct and proximate result of Defendants' malicious prosecution, Plaintiff has suffered damages exceeding $4,527,961.

## COUNT XIII: NEGLIGENT SUPERVISION (Against Defendant Dentons, Bingham, Greenebaum, LLP)

309.    Plaintiff realleges and incorporates by reference paragraphs 1 through 308 above.

310.    Defendant Dentons, Bingham, Greenebaum, LLP ("Dentons") employed Defendant Richard Boydston as a partner during the relevant time period and had a duty to reasonably supervise his professional activities, including his operation of Konza, LLC as a court-appointed receiver.

311.    Under Ohio law, as established in Strock v. Pressnell (1988), an employer may be liable for negligent supervision when it knew or should have known of an employee's incompetence, unfitness, or dangerous characteristics.

312.    Dentons knew or should have known that:

a. Boydston was operating Konza, LLC as an unlicensed entity charging $300 per hour for management services;

b. Boydston was simultaneously billing the receivership for legal services at Dentons' rates while also billing for the same activities through Konza, LLC;

c. Boydston was using his position as a Dentons partner to provide legitimacy to Konza, LLC despite the inappropriate duplicative billing arrangements;

80

d. Boydston failed to implement proper accounting controls for the receivership despite representations to the Plaintiff that he would do so;

e. Boydston continued to employ TSO and Lentine even after being interviewed by the FBI and learning of the federal investigation into their PPP fraud and fraudulent accounting and ghost employee payroll activities;

f. Boydston was exceeding the scope of his receivership authority by participating and billing for matters related to Plaintiff's criminal prosecution and defending against Lentine v. Konza LLC in Bench trial totaling over $80,000.00.

313. Dentons failed to exercise reasonable care in the supervision of Boydston's professional activities, allowing him to abuse his position as a partner at the firm to facilitate the fraudulent receivership scheme.

314. Dentons benefited financially from Boydston's receivership activities through partnership income derived from his legal billings related to the receivership.

315. Under Ohio law, firms may be held liable for the tortious conduct of their partners. As established in National Union Fire Ins. Co. v. Wuerth, 122 Ohio St.3d 594, 2009-Ohio-3601, legal entities may be vicariously liable for the negligence of their principals or employees.

316. Dentons received a written complaint from Plaintiff about Boydston's improper billing practices but took no action to investigate or rectify the situation.

317. As a direct and proximate result of Dentons' negligent supervision of Boydston, Plaintiff has suffered damages exceeding $4,527,961.

318.    Dentons' failure to supervise Boydston properly directly contributed to the success of the fraudulent scheme by allowing Boydston to leverage his position as a partner at a prestigious law firm to provide legitimacy to the receivership's improper activities.

319.    Under the principles established in RevoLaze LLC v. Dentons US LLP, 2022-Ohio-1392, law firms can be held liable for substantial damages when their partners breach fiduciary duties to clients or third parties affected by their professional activities.

320.    As a direct and proximate result of Dentons' negligent supervision, Plaintiff has suffered damages exceeding $4,527,961.

## COUNT XIV: CIVIL AIDING AND ABETTING (Against All Defendants)

321.    Plaintiff realleges and incorporates by reference paragraphs 1 through 320 above.

322.    In Aetna Cas. & Sur. Co. v. Leahey Constr. Co., 219 F.3d 519, 533 (6th Cir. 2000), the Sixth Circuit recognized a cause of action for civil aiding and abetting under Ohio law, noting that "one is liable if he knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other."

323.    Each Defendant had actual knowledge of the primary wrongdoing committed by other Defendants, specifically:

a. Dentons knew of Boydston's improper dual billing practices and conflicts of interest;

b. All the Defendants associated with the sale knew the sale was not at arm's length but was instead "engineered" to cover receivership expenses;

c. Jennifer Donathan and Keller Williams knew they were facilitating a non-arm's length transaction while accepting a $147,401 commission;

d. The City of Cincinnati, through its employee Terry James, knew the condemnation of 621 Delhi Avenue was not supported by structural engineering evidence;

e. Konza, LLC knew of Lentine and Strunk's fraudulent PPP loan applications and rental assistance fraud;

f. Richard Boydston knew of Lentine and Strunk's fraudulent activities but continued to employ them as property managers.

324.    Each Defendant provided substantial assistance to other Defendants' wrongdoing by:

a. Dentons provided legitimacy to Boydston's receivership activities through his partnership status;

b. HCLRC structured the "engineered sale" transaction to appear legitimate while knowing it was not conducted at arm's length;

c. Jennifer Donathan and Keller Williams created artificial property valuations to facilitate the undervalued sale;

d. The City of Cincinnati, through Terry James, issued fraudulent condemnation notices that damaged property values and facilitated the engineered sale;

e. Boydston provided legal cover for TSO and Lentine's fraudulent activities with CAA;

f. Richard Boydston coordinated the various schemes and provided the legal framework through which they operated.

83

325. As the Ohio Supreme Court indicated in O'Brien v. University Community Tenants Union, 42 Ohio St.2d 242, 245, 327 N.E.2d 753 (1975), one who "aids, abets, or incites" tortious conduct may be liable for that conduct.

326. Each Defendant's knowledge of and substantial assistance to the primary wrongdoing of other Defendants makes them liable for civil aiding and abetting under Ohio law.

327. Each Defendant substantially assisted the primary wrongdoers by engaging in conduct that facilitated the "engineered sale," the diversion of receivership assets, the wrongful prosecution of Plaintiff, and the other tortious conduct described herein.

328. As a direct and proximate result of each Defendant's aiding and abetting of the primary wrongdoing, Plaintiff has suffered damages exceeding $4,527,961.

## COUNT XV: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

329. Plaintiff realleges and incorporates by reference paragraphs 1 through 328 above.

330. Under Ohio law, as established in Yeager v. Local Union 20, 6 Ohio St.3d 369, 374, 453 N.E.2d 666 (1983), the elements of intentional infliction of emotional distress are: "(1) that the actor either intended to cause emotional distress or knew or should have known that actions taken would result in serious emotional distress to the plaintiff; (2) that the actor's conduct was so extreme and outrageous as to go 'beyond all possible bounds of decency' and was such that it can be considered as 'utterly intolerable in a civilized community'; (3) that the actor's actions were the proximate cause of plaintiff's psychic injury; and (4) that the mental anguish suffered by plaintiff is serious and of a nature that 'no reasonable man could be expected to endure it.'"

331. Defendants' conduct was extreme and outrageous, going beyond all possible bounds of decency and utterly intolerable in a civilized community, when they:

a. Engineered Plaintiff's wrongful prosecution and imprisonment based on demonstrably false allegations, depriving him of his liberty for approximately one year;

b. Deliberately structured the "engineered sale" of his properties to deprive him of fair compensation, showing callous disregard for whether he might be rendered homeless;

c. Converted his personal property, including irreplaceable historic artifacts;

d. Fraudulently condemned his property at 621 Delhi Avenue despite structural engineering evidence confirming its safety;

e. Systematically looted the receivership estate while simultaneously preventing him from accessing financial records that would have exposed their fraudulent scheme;

f. Orchestrated legal impediments specifically designed to prevent him from challenging their fraudulent activities.

332. Defendants knew or should have known that their actions would cause Plaintiff severe emotional distress.

333. Defendants' actions were the direct and proximate cause of Plaintiff's severe emotional distress.

334. The emotional distress suffered by Plaintiff was severe and of a nature that no reasonable person could be expected to endure it, including: a. The trauma of wrongful imprisonment for approximately one year;b. The devastating loss of his property interests developed over decades;c. The stress of being unable to retrieve his personal property, including irreplaceable historic artifacts;d. The anxiety and humiliation of

85

being falsely labeled a stalker;e. The trauma of being unable to halt the systematic looting of his property interests despite repeated attempts to obtain court intervention.

335.   As the Ohio Supreme Court recognized in Risch v. Friendly's Ice Cream Corp., 136 Ohio App.3d 109, 115, 736 N.E.2d 30 (1999), "the emotional distress must be serious—it must be more than merely upsetting. It must be such that 'a reasonable person, normally constituted, would be unable to cope adequately with the mental distress engendered by the circumstances of the case.'"

336.   The combined effect of Defendants' coordinated scheme—spanning financial fraud, regulatory abuse, malicious prosecution, and property conversion—caused Plaintiff emotional distress far beyond what a reasonable person could be expected to endure.

337.   As a direct and proximate result of Defendants' intentional infliction of emotional distress, Plaintiff has suffered damages exceeding $4,527,961.

338.   Under Ohio law, Plaintiff is entitled to both compensatory and punitive damages for the severe emotional distress intentionally inflicted by Defendants.

339.   Ohio courts have recognized that where the defendant's conduct is sufficiently outrageous, the jury may infer that serious emotional distress existed from the extreme nature of the conduct itself, without requiring separate proof of physical manifestations. See Plikerd v. Mongelluzzo, 73 Ohio App.3d 115, 127, 596 N.E.2d 601 (1991).

340.   The deliberate orchestration of Plaintiff's wrongful imprisonment, the systematic looting of his property interests, and the callous disregard for his welfare demonstrated by Defendants constitutes precisely the type of outrageous conduct that Ohio courts have recognized as supporting a claim for intentional infliction of emotional distress.

341.   As a direct and proximate result of Defendants' intentional infliction of emotional distress, Plaintiff has suffered damages exceeding $4,527,961.

342.   The egregious nature of Defendants' misconduct warrants punitive damages to deter similar conduct in the future.

## X. DAMAGES OVERVIEW AND FINANCIAL ANALYSIS

343.   As a direct and proximate result of Defendants' racketeering activities and constitutional violations, Plaintiff has suffered substantial injuries to his business and property interests. Due to Defendants' deliberate obstruction of access to complete financial records, coupled with their admitted failure to implement proper accounting systems, it has been nearly impossible to calculate the precise damages suffered with complete certainty.

344.   Despite purchasing QuickBooks for the receivership at Plaintiff's expense and having Angel Strunk set up job costing for each property, Defendants Boydston and Konza LLC failed to enforce proper accounting practices. This lack of transparency was not accidental but strategic - had Defendant Boydston required proper accounting or terminated Defendant Lentine for non-compliance, this receivership would have concluded within the promised 6 months instead of dragging on for over 4 years.

345.   The Court should note that Defendants' 12-time refusal to allow an independent audit, even when recommended by HCLRC and substitute plaintiff Cynthia Fisher, of Dinsmore & Shohl, LLP further evidences their intent to conceal the true financial condition of the receivership.

346. Because of these accounting deficiencies, Plaintiff submits the following baseline damages calculation while acknowledging that the ultimate determination of precise amounts should be left to the jury's judgment:

## COMPREHENSIVE DAMAGES CALCULATION

## I. PROPERTY VALUE LOSS (Direct Taking)

Property Value Loss Analysis:

Coldwell Banker 2019 valuation: $2,895,000

Additional vacant buildable lots value: $300,000

Base pre-COVID value: $3,195,000

Conservative COVID-era market appreciation (25%): $798,750

Total fair market value at time of sale: $3,993,750

Actual "engineered sale" price: $1,470,000

TOTAL PROPERTY VALUE LOSS: $2,523,750

Explanation: This represents the direct financial loss from the undervalued "engineered sale." The 25% market appreciation is conservative compared to national averages during the pandemic real estate boom (many markets saw 30-40% increases). This was explicitly admitted by Boydston as being structured to cover receivership expenses rather than reflect market value.

## II. FRAUDULENT RECEIVERSHIP ADMINISTRATION

Unlicensed/Improper Management Fees:

Boydston non-receivership billing (60% of $159,429): $95,657

Konza LLC unlicensed management billing ($300/hr): $210,854

Real estate commission for non-arm's length transaction: $147,000

**TOTAL FRAUDULENT ADMINISTRATION: $453,511**

**Explanation:** Boydston improperly billed for work outside the receivership scope. Konza LLC was not licensed to perform property management at $300/hr. The real estate commission was not earned through a legitimate arm's-length transaction but was instead compensation for facilitating the predetermined engineered sale.

## III. DIVERTED FUNDS/RENTAL INCOME

**Misappropriated Rental Income and Deposits:**

TSO/Lentine collected rental income and deposits: **$437,000**

Unaccounted portion (70%): **$305,900**

**TOTAL DIVERTED FUNDS: $437,000**

**Explanation:** TSO/Lentine collected these funds but failed to properly account for them or use them to improve properties for sale. The full amount is claimed as damages since these funds should have either improved the properties (increasing their value) or been returned to the estate.

## IV. DIRECT PROPERTY LOSSES

**621 Delhi Avenue Fraudulent Condemnation:**

Initial vandalism loss from tenant removal: **$50,000**

Ongoing losses ($1,000/month × 54 months from 2020-2025): **$54,000**

**621 DELHI LOSSES: $104,000**

**Explanation:** The fraudulent condemnation caused initial losses of $105,000 and continues to cause monthly losses of $1,000. Regarding statute of limitations: the discovery rule would apply here, as the fraud was only discovered when Hatfield signed his affidavit in 2023, revealing James's admission that the condemnation was unnecessary.

**634 Delhi Avenue Fraud:**

**Rental fraud for property outside receivership: $4,000**

**634 DELHI LOSSES: $4,000**

**Explanation: This property was not part of the receivership but was fraudulently included in CAA applications by defendants.**

**Personal Property Conversion:**

**Historic BMW motorcycle: $20,000**

**Irreplaceable Sedamsville historical documents: $5,000**

**Patent prototypes: $10,000**

**Historic fixtures and restaurant materials at 701 Delhi: $15,000**

**PERSONAL PROPERTY LOSSES: $50,000**

**Explanation: These items were my personal property, not subject to the receivership, but were converted by defendants despite my documented requests to retrieve them.**

**V. LEGAL EXPENSES**

**Direct Legal Costs:**

**Pro se legal work (3 years, 395 hours at $60/hr): $23,700**

**Legal fees paid: $15,000**

**Chapter 11 filing fees: $12,000**

**TOTAL LEGAL EXPENSES: $50,700**

**Explanation: These represent my out-of-pocket expenses and the value of my time spent fighting the fraudulent schemes. The $60/hr rate for pro se work is very reasonable compared to attorney rates.**

**VI. SUMMARY OF ACTUAL DAMAGES**

## I. ACTUAL DAMAGES

| Category | Amount | Primary Responsible Parties |
|---|---|---|
| Property Value Loss | $2,523,750 | Konza LLC, Boydston, Donathan, |
| Fraudulent Receivership Administration | $453,511 | Konza LLC, Boydston, Dentons, Donathan, Keller Williams |
| Diverted Rental Income and Deposits | $437,000 | TSO, Lentine, Konza LLC, Boydston |
| Direct Property Losses (621 & 634 Delhi) | $213,000 | Terry James, City of Cincinnati, Lentine, Strunk, Boydston |
| Legal Expenses | $50,700 | All Defendants |
| Wrongful Imprisonment* | $850,000 | Lentine, Strunk, Boydston, Konza LLC |
| TOTAL ACTUAL DAMAGES: | $4,527,961 | |

## II. STATUTORY AND PUNITIVE DAMAGES

RICO Treble Damages (18 U.S.C. § 1964(c)) | $13,583,883 | All RICO Defendants

State Law Punitive Damages (2x multiple) | $9,055,922 | All Defendants

TOTAL DAMAGES SOUGHT: | $22,639,805 |

DISGORGEMENT OF ILL-GOTTEN GAINS

## III. DISGORGEMENT OF IMPROPER FEES AND COMMISSIONS

| Category | Amount | Responsible Parties |
|---|---|---|
| Fraudulent Real Estate Commission | $147,401 | Donathan, Keller Williams |
| Unlicensed Management Fees | $210,854 | Konza LLC, Boydston |
| Improper Legal Billing‡ | $95,057 | Boydston, Dentons |
| Pre-Appointment Billing | $10,250 | Boydston, Dentons |
| Statutory Interest on Original Judgment§ | $93,500 | Boydston, Konza LLC, Lentine, TSO |
| TOTAL DISGORGEMENT SOUGHT: | $557,062 | |

- Plaintiff expressly reserves the right to amend this complaint following discovery to add additional defendants who participated in orchestrating Plaintiff's wrongful imprisonment, potentially including former City of Cincinnati attorney Jackolyn Martin and state prosecutor Susan Zerface. Evidence suggests their involvement in

fabricating timelines and coordinating false testimony, which may constitute conduct outside the scope of prosecutorial immunity.

† Note regarding Property Value Loss: Plaintiff has requested in the Prayer for Relief that this Court declare null and void the judgments related to the engineered sale. Should the Court grant this equitable relief and void the transaction, the Property Value Loss calculation would be adjusted accordingly. In that scenario, Plaintiff would seek return of the properties and monetary damages for lost rental income and property deterioration during the period of wrongful possession, rather than the full property value differential shown above.

‡ Note regarding Improper Legal Billing: Boydston's legal billing of $158,429 (as of December 6, 2022) included approximately 60% ($95,057) for activities unrelated to his legitimate duties as receiver. This includes billing for participation in Plaintiff's criminal prosecution and other matters outside the scope of the receivership. Additionally, $10,250 was billed before Boydston was officially appointed as receiver. These funds would be returned directly to Plaintiff as the rightful owner of the property estate from which these improper fees were paid.

§ Note regarding Statutory Interest: The original judgment of $550,000 accrued interest at the statutory rate of 6% for approximately 34 months, resulting in $93,500 in interest. Defendants Boydston, Konza LLC, Lentine, and TSO deliberately prolonged the receivership to continue collecting fees and rental income, as evidenced by their consistent efforts to delay resolution and their failure to implement proper accounting controls. This interest represents funds wrongfully taken from Plaintiff's estate due to their intentional delay tactics, which directly benefited these defendants at Plaintiff's expense.

## VII. STATUTORY AND PUNITIVE DAMAGES

**Explanation for Punitive Damages: Under Ohio law (ORC § 2315.21), punitive damages are appropriate when conduct demonstrates "malice or aggravated or egregious fraud." The defendants' conduct here - particularly the admitted "engineered sale," fraudulent condemnation, and conversion of personal property - clearly demonstrates malice and egregious fraud. The defendants were fiduciaries who deliberately violated their duties for personal gain. The 2x multiplier is justified by:**

- **The defendants' positions of trust as court-appointed receivers and agents**
- **The deliberate and coordinated nature of the fraud**
- **The attempts to conceal wrongdoing (12 denials of audit requests)**
- **The orchestration of plaintiff's wrongful imprisonment to silence objections**
- **The RevoLaze v. Dentons precedent establishing substantial punitive damages for similar fiduciary breaches**

## VIII. TOTAL DAMAGES SOUGHT

This damages calculation is based on documented evidence, sworn testimony, and reasonable valuations. The property value loss is particularly well-supported by Boydston's own admission that the sale was "engineered" to cover receivership expenses rather than reflect market value, which is a clear breach of fiduciary duty.

### 347.  CLOSING STATEMENT

348. For nearly half a decade, Plaintiff has pursued justice through appropriate legal channels after exhausting all other remedies. Despite enduring wrongful imprisonment based on demonstrably false testimony, losing his beloved wife of 40 years during that incarceration, and facing unfounded accusations as a "vexatious litigator" for his legitimate persistence,

Plaintiff has remained committed to the fundamental principles of accountability and the rule of law.

The evidence now presented in this complaint is not mere conjecture or personal grievance. It includes sworn admissions directly from Defendant Boydston acknowledging the "engineered sale" – the central allegation Plaintiff has consistently maintained throughout years of court filings. These admissions, made under oath during the January-February 2025 bench trial, finally vindicate Plaintiff's persistent efforts to expose what is now established through defendants' own testimony: a coordinated enterprise operating through court-appointed authority that systematically deprived Plaintiff of his constitutional rights.

Plaintiff, a 76-year-old resident who has dedicated over 50 years to improving the Sedamsville neighborhood when others had abandoned it, seeks not personal publicity but appropriate accountability through proper judicial review. This action is necessary not merely to address Plaintiff's substantial financial losses, but to preserve the integrity of essential judicial and governmental processes that affect all citizens.

This complaint identifies specific misconduct by specific parties warranting judicial scrutiny. It demonstrates through documentary evidence and sworn testimony that the extraordinary remedies available under RICO and constitutional law are both necessary and appropriate to address the coordinated pattern of activities that occurred over approximately 34 months. While Plaintiff maintains deep respect for the many dedicated public servants who perform their duties with honor in Cincinnati, the documented conduct in this case requires impartial judicial review.

The evidence now speaks for itself. Plaintiff respectfully requests that this Court evaluate this matter on its substantive merits, as the interests of justice require.

## XI. PRAYER FOR RELIEF

349. WHEREFORE, Plaintiff respectfully requests that this Court:

350. Order the City of Cincinnati to revise its condemnation and code enforcement procedures to prevent similar abuses of regulatory authority;

351. Enter judgment in favor of Plaintiff and against Defendants on all counts;

352. Award Plaintiff threefold the damages sustained by reason of Defendants' violations of the RICO Act in an amount to be determined by the jury, but not less than $22,639,805 (representing triple damages on baseline actual damages of $4,527,961), together with State law punitive damages (2x multiple), the cost of this suit, including reasonable attorney's fees pursuant to 18 U.S.C. § 1964(c). Due to Defendants' deliberate obstruction of proper accounting, their twelve-time refusal to allow audits despite recommendations from HCLRC and Cynthia Fisher, and their admitted failure to implement the QuickBooks accounting system paid for by Plaintiff, and false incarceration The precise determination of damages is necessarily left to the jury's judgment based on the evidence presented at trial;

353. Award Plaintiff compensatory damages on all non-RICO counts in an amount to be determined at trial, but not less than $4,527,961, as detailed in Section X of this Complaint;

354. Award Plaintiff damages for the violation of his constitutional rights under the Fifth, Fourteenth, and Fourth Amendments, pursuant to 42 U.S.C. § 1983;

355. Award Plaintiff reasonable attorney's fees pursuant to 42 U.S.C. § 1988;

356. Order the disgorgement of the $147,401.00 commission paid to Jennifer Donathan and Keller Williams Advisors Realty for the fraudulent "engineered sale";

357. Order the disgorgement of the $210,854,00 paid to Konza, LLC based on its operation as an unlicensed entity and its unreasonable $300 per hour fee;

358. Order Defendants to provide a full accounting of all funds received and disbursed during the receivership, including complete bank records that have been withheld despite multiple requests;

359. Order Community Action Agency to provide a full accounting of all rental assistance and other public assistance funds disbursed in connection with any properties owned by Plaintiff or managed by TSO/Lentine during the relevant period;

360. Order CAA to immediately comply with all outstanding Public Records requests submitted by Plaintiff;

361. Order a forensic audit of all receivership finances to determine the full extent of the fraudulent activities and resulting damages;

362. Impose a constructive trust on the existing escrow account, proceeds and profits derived from Defendants' illegal activities;

363. Declare null, void, and unenforceable in their entirety any and all judgments, including the approximately $650,000 judgment that was transferred to HCLRC as part of the fraudulent engineered sale scheme, as these judgments were the product of egregious misconduct by the City of Cincinnati, Konza LLC, Richard Boydston, and others, who collectively exploited their positions to manufacture, inflate, ( by adding Plaintiffs property taxes that were not in active foreclosure), and leverage these

judgments as instruments of their conspiracy rather than legitimate enforcement of code violations. The Court should exercise its equitable powers to invalidate these judgments as they were procured through fraud upon the court, represent the fruits of racketeering activity, and their enforcement would constitute a manifest injustice given the overwhelming evidence of coordinated fraud presented in this action;

364. Issue a preservation order for all evidence related to the case;

365. Grant such other and further relief as the Court deems just and proper;

366. Grant Plaintiff a trial by jury on all issues so triable.


## XII. LIST OF EXHIBITS

367. The following exhibits are incorporated by reference and attached hereto:

Exhibit A: Transcript of Boydston testimony admitting to structured sale (January 2025 bench trial)

Exhibit B: Documentation of $800,000 offer and related terms from HCLRC

Exhibit C: Transcript of Lentine testimony regarding "engineered sale" in response to Boydston questioning (January 2025 bench trial)

Exhibit D: Coldwell Banker pricing estimates for receivership properties (2019)

Exhibit E: Boydston's motion for order of immunity (September 9, 2022)

Exhibit F: Email correspondence to Dentons regarding Boydston's billing improprieties (April 28, 2023)

Exhibit G: Transcript of Boydston testimony: "It was hoped" statement during questioning by Neiberding (January 2025 bench trial)

**Exhibit H: Cynthia Fisher Memorandum court filing (April 25, 2025) documenting receivership irregularities**

**Exhibit I: GEI structural engineering report confirming safety of 621 Delhi Avenue (September 18, 2020)**

**Exhibit J: Transcript of Boydston "It was agreed" statement during questioning by Neiberding (January 2025 bench trial)**

**Exhibit K: Letter from Stanten & Hughes summarizing call with Boydston (May 25, 2022)**

**Exhibit L: Transcript of Strunk/Zerface testimony from criminal trial regarding QuickBooks implementation**

**Exhibit M: Letters from Kelly Allesee (HCLRC) to Boydston recommending receivership audit (multiple dates)**

**Exhibit N: U-Haul rental receipt (8:00am, September 17, 2021) and fuel receipts (8:28am and 10:46am, September 17, 2021) establishing Plaintiff's alibi**

**Exhibit O: Documentation of Zerface statement requesting Strunk to verify stalking timeline**

**Exhibit P: Emails to Boydston requesting removal of personal property from 701 Delhi Avenue (2020)**

**Exhibit Q: Strunk testimony confirming QuickBooks in her possession at TSO office**

**Exhibit R: Original and amended sales documents showing removal of Plaintiff's right to excess funds**

**Exhibit S: Affidavits of Randy Hatfield and Mike Arey regarding Terry James' admission of unnecessary condemnation**

**Exhibit T: Transcript of Lentine testimony regarding Boydston's order to allow HCLRC exclusive access to occupied properties**

**Exhibit U: Transcript of Boydston testimony concerning rejection of Knoppe bid (January 2025 bench trial)**

**Exhibit V: Documentation of Jennifer Donathan's $25,000 NDA offer to Lentine**

**Exhibit W: Official Court Reporter Certificates authenticating all transcript exhibits used in this complaint**

---

## RICO CASE STATEMENT

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION (CINCINNATI)**

**JOHN KLOSTERMAN, et al.,**
**Plaintiffs,**
**v.**
**KONZA, LLC, et al.,**
**Defendants.**
**Case No.: _____**

## EXECUTIVE OVERVIEW

This case exposes a breathtaking criminal enterprise that operated under color of law through a court-appointed receivership, systematically defrauding Plaintiff John Klosterman of his constitutional property rights and financial interests valued at over $3.5 million.

This action represents an unprecedented application of RICO against the City of Cincinnati and its officials. While municipalities have occasionally faced RICO claims in specific contexts, this case documents how multiple city departments and officials - from building inspectors to city attorneys to prosecutors - coordinated their activities to deprive Plaintiff of his constitutional property rights. The extraordinary scope of this enterprise, spanning regulatory, legal, and prosecutorial functions, necessitates the comprehensive remedies that only RICO can provide.

Notably, this action vindicates Plaintiff's numerous court filings over the preceding 34 months - filings that were systematically denied, stricken, or ignored by the court, only to be proven accurate through sworn testimony in the January-February 2025 bench trial and the subsequent memorandum by substitute plaintiff Cynthia Fisher of Dinsmore & Shohl LLP. The pattern of dismissing Plaintiff's well-founded allegations while enabling the Enterprise's continued operation further evidences the coordinated nature of this scheme.

**KEY ELEMENTS OF THE CASE:**

1. **THE FRAUDULENT "BAIT AND SWITCH"** The original sales document governing the disposition of Plaintiff's properties explicitly provided that "any balance after all bills were paid would go to Klosterman." However, when HCLRC entered the picture, Defendant Boydston materially altered the agreement to state Plaintiff had "no pecuniary interest or claims to any funds" - a deliberate deprivation of Plaintiff's constitutional property rights.

The final order for sale to HCLRC agreement excluded Plaintiff to recover any funds as a result of the sale but  HCLRC would. proving the transaction was predetermined. When questioned about this, Boydston claimed there was a "side agreement" but "could not recall details," while HCLRC representatives contradicted him, stating they merely "would think about it."

2. **THE "ENGINEERED SALE" ADMISSION** Defendant Boydston explicitly admitted under oath that the sale price was not based on market value, stating: "It was hoped that that would cover the expenses of the receivership with agreed reductions...that was my belief at the time." He further testified that "all of the administration expenses, and anticipated administration expenses, were, in general, a consideration" in calculating the purchase price.

3. **REJECTION OF HIGHER OFFER** Despite fiduciary obligations to maximize recovery, Defendants rejected a legitimate cash offer of $1,000,000 from developer Kim Knoppe in favor of HCLRC's structured deal of $800,000 cash plus assumption of liens.

4. **COORDINATED MALICIOUS PROSECUTION** When Plaintiff discovered and reported fraudulent activities, Defendants orchestrated his wrongful prosecution. Defendant Lentine testified that when he threatened to quit, Boydston encouraged him to "stick it out" and stay for court hearings on "the Klosterman thing" - confirming Boydston's active involvement in the malicious prosecution scheme.

5. **FRAUDULENT FINANCIAL PRACTICES** Double billing practices and fraudulent accounting Misappropriation of approximately $437,000 in rental income and deposits Fraudulent condemnation of properties despite engineering reports confirming safety Fraudulent rental assistance applications through Community Action Agency

6. **FEDERAL CRIMINAL CONVICTIONS** Defendant Lentine was sentenced to 63 months in federal prison for PPP fraud and money laundering in connection with activities conducted through the receivership properties.

7. **MULTI-ENTITY COORDINATION** The Enterprise involved unprecedented coordination between multiple governmental and private entities: Court-appointed receiver (Konza LLC/Boydston) Property management (TSO/Lentine) City regulators (Terry James) Legal officials (City attorneys) Prosecutorial functions (criminal proceedings) State, Local and Federal funding administrator (CAA)

This broad coordination across governmental and private entities makes this RICO action against the City of Cincinnati and related defendants both necessary and unprecedented.


**PARALLELS TO REVOLAZE v. DENTONS:**

This case presents striking parallels to the $32.2 million verdict in RevoLaze LLC v. Dentons US LLP:

Both involve explicit admissions of breaches of fiduciary duty made under oath

Both involve clear, quantifiable damages directly flowing from the fiduciary breach

Both involve complex, multi-entity coordination

Both involve professional negligence by practitioners with heightened duties of care

With actual damages of approximately $4.5 million, RICO treble damages, and state law punitive damages, the total potential recovery in this case could reach $22 million - comparable to the RevoLaze verdict.

## STATUTORY NOTICES TO DEFENDANTS

Pursuant to the requirements of the Federal Rules of Civil Procedure, Ohio Revised Code, and applicable local rules, Plaintiff hereby provides notice of this action to all Defendants as follows:

**Method of Service**

1. All individual Defendants shall be served personal service , pursuant to Fed. R. Civ. P. 4(e) and Ohio Civ. R. 4.1(A)(1)(a), with copies of this Complaint and accompanying Summons at their last known addresses.

2. Defendant entities shall be served as follows: a. KONZA, LLC shall be served via certified mail, return receipt requested, upon its registered agent for service of process, Richard Boydston, at 312 Walnut Street Ste 2450 personal service ]. b. TRI-STATE ORGANIZATION, INC. shall be served upon its registered agent for service of process at James Neiberding, 810 Sycamore Street 45202, for Joseph Lentine c. KELLER WILLIAMS ADVISORS REALTY shall be served via personal service, upon its registered agent Jennifer Donathan at 3505 Columbia Pkwy #125 Cincinnati ,45226 personal service. d. DENTONS, BINGHAM, GREENEBAUM, LLP shall be served personally upon its managing Richard Boydston % . Dentons Bingham Greenebaum LLP e. COMMUNITY ACTION AGENCY 1740 Langdon Farm Road 45237 personal service f. CITY OF CINCINNATI shall be served via personal service City Solicitor at City Hall, 801 Plum Street, Suite 214, Cincinnati, OH 45202, pursuant to Ohio R. Civ. P. 4.2(K). Terry James unknown address.

**Notice of Preservation Obligations**

All Defendants are hereby placed on notice of their legal obligation to preserve all documents, communications, records, data, and other information, whether in physical or electronic form, that may be relevant to this action. This includes, but is not limited to:

1. All financial records relating to the receivership of Plaintiff's properties;
2. All communications between and among Defendants regarding Plaintiff's properties;
3. All property valuations, inspection reports, and related documents;
4. All bank statements, billing records, and financial transactions;

5. All court filings, communications with the court, and related documents;

6. All electronic communications, including emails, text messages, and other digital communications relating to the subject matter of this action;

7. All records relating to the sale of Plaintiff's properties;

8. All records relating to the condemnation of 621 Delhi Avenue.

Failure to preserve such evidence may result in sanctions, including adverse inferences and other appropriate relief.

Respectfully submitted,

*John Klosterman*

John Klosterman, Plaintiff Pro Se

5615 Sidney Road

Cincinnati, Ohio 45238

513-250-2610

johncklosterman@gmail.com

Dated: May 12, 2025

VERIFICATION

I, John Klosterman, verify under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

John Klosterman

Dated: May 13, 2025