Company"). The Earnest Money Deposit shall be applied to the Purchase Price at the closing on the sale of the Property by Seller to Buyer according to this Agreement ("Closing"). Notwithstanding anything herein to the contrary, the Earnest Money Deposit shall be non-refundable to Buyer.

b. Cash Component. At Closing, Buyer shall pay to Title Company the Cash Component less the Earnest Money Deposit by wire transfer of immediately available United States funds.

c. Refund of Cash Component. In the event that the sum of the Fees and Costs pursuant to a final order entered in the Foreclosure Case from which no appeal or further appeal can be taken (the "Final Fee and Expense Order") plus all adjustments and prorations as set forth herein (collectively, the "Adjustments and Prorations") is less than $800,000.00, then Title Company shall refund to Buyer the difference between said sum and $800,000.00.

4.      Sale of Church. The land and church at 637 Steiner (the "Church") will be sold in accordance with the terms of the Agreement, and subject only to the following conditions, taken and modified from the Further Revised Terms of Receiver's Sale of Klosterman Sedamsville Properties approved by order entered March 4, 2022, in the Foreclosure Case (the "Sale Procedure Order"):

a. Vacated Building Maintenance Standards. Buyer (including any affiliate of Buyer or any entity in which Buyer has any interest) shall bring the Church into compliance with the City's Vacated Building Maintenance Standards set forth in Cincinnati's Municipal Code §1101-79.4 within 730 days of the Closing (or as extended for good cause as agreed to by City). Buyer shall keep the Church in compliance for as long as it remains the owner.

b. Insurance. Buyer will obtain a general commercial liability insurance policy covering the Church as soon as reasonably possible after Closing.

5.      Title. Buyer's obligation to consummate the transaction contemplated by this Agreement is contingent upon Seller providing fee simple marketable title to the Property at Closing. For the purposes of this Agreement, "fee simple marketable title" means such title as is insurable by the Title Company under its standard ALTA Owner's Policy Form, at its standard rates, subject to real estate taxes not yet due and payable. Buyer shall obtain, at Buyer's cost, a title insurance commitment (the "Title Commitment") issued by Title Company, in which Title Company shall commit that, upon delivery and recording of the deed provided for in Section 9 and satisfaction of Title Company's requirements set forth therein, it will issue its policy of owner's title insurance (the "Title Policy") insuring in Buyer, in at least the total amount of the Purchase Price, fee simple title to the Property free of all liens, claims, charges and encumbrances (collectively, "Liens"), except for real estate taxes ("Permitted Exceptions") on the Property.



22316391.v1

**RESOLUTION N0. 2022-08**

**A RESOLUTION TO EXECUTE A TARGETED NEIGHBORHOOD HOUSING AND
REDEVELOPMENT STRATEGY IN SEDAMSVILLE**

**WHEREAS**, the Hamilton County Land Reutilization Corporation ("HCLRC") is uniquely situated to provide opportunities to support and encourage the rehabilitation and/or redevelopment of vacant or abandoned residential properties in targeted areas within Landbank neighborhoods; and

**WHEREAS**, within the neighborhood of Sedamsville, the HCLRC is poised to assist this community by executing a housing and redevelopment strategy, which is being developed upon consultation with community stakeholders; and

**WHEREAS**, this Board has determined that the critical first step is the acquisition/control of commercial and/or residential property within the key target areas identified by the neighborhood housing strategy; and

**WHEREAS**, following acquisition of properties within key target areas, the work of blight remediation, stabilization, rehabilitation, and redevelopment, as appropriate, will occur;

**NOW, THEREFORE, BE IT RESOLVED** by the Board of the Hamilton County Land Reutilization Corporation:

Section 1. This Board hereby authorizes the management company to take all necessary action to expend funds, in accordance with the annual budget as approved by this Board, to administer and execute a targeted housing and redevelopment strategy in Sedamsville. These actions include conducting initial intake, architectural and engineering assessments, stabilization and rehabilitation, demolition and related expenses including environmental assessments and remediation, property acquisition, property maintenance, contract and program compliance reviews, and all other activities relating to executing the neighborhood housing and redevelopment strategies.

Section 2. This Board hereby finds and determines that the execution of such strategies in neighborhoods is core to the mission of the HCLRC and will be critical to repurposing underutilized structures to productive use.

Section 3. This Board hereby authorizes the management company to expend all funds necessary, within the approved budget, to execute the strategy described above. Notwithstanding the requirements of Code of Regulations Sections 9.3 and 9.5, this includes entering into contracts and issuing payments in excess of $100,000.00 without requiring two authorized signatures.

Section 4. This Board finds and determines that all formal actions of this Board concerning and relating to the adoption of this resolution were taken, and that all deliberations of this Board that resulted in such formal actions were held, in meetings open to the public, in compliance with the law.

Section 5. This resolution shall be in full force and effect upon its adoption.

Adopted: __October 25, 2022__

Yeas: 5

Nays: 0

_____

Chairperson

Attest: _____

Secretary

*Formal Action Requested* – Before the Board today is proposed resolution 2022-07 entitled:

## A RESOLUTION TO AUTHORIZE THE HCLRC TO ENTER INTO CONTRACTS NECESSARY TO EXPEND OHIO DEPARTMENT OF DEVELOPMENT AND CITY OF CINCINNATI COMMUNITY DEVELOPMENT BLOCK GRANT FUNDS

Mr. Denning referred the Board to the packet and reviewed this resolution that would allow the Landbank to spend ODOD and City demolition funds.

**Motion:** Mr. Weidman moved to approve Resolution 2022-07. The motion was seconded by Mr. Honerlaw and was approved unanimously.

Mr. Denning reported the Ohio Land Bank Association continues advocacy efforts with the State for additional funds that could be dedicated to the Brownfield Remediation and Building Demolition and Site Revitalization Programs.

Mr. Denning noted the Landbank is preparing the transition and implementation of a new property software solution. A new comprehensive data solution will automate much of the manual data inputs, saving time, eliminating mistakes, and keeping operations efficient. The tool will also increase transparency with property ownership, including a new public-facing portal for interested purchasers of Landbank property.

## 5. INVENTORY REVIEW

Ms. Bancroft referred the Board to the packet and reviewed the Landbank's acquisition and disposition numbers. Ms. Bancroft highlighted the acquisition of 5965 Stewart Road in Silverton, 1317 William Howard Taft Road in Walnut Hills, and 7820 Harrison Avenue in Mt. Healthy.

## 6. PROGRAM REVIEW

### Homeowner Repair Program

Using slides, Ms. Bancroft gave an overview of the Home Repair Program and shared pictures and progress through the third quarter. To date the Landbank has allocated $192K of the budgeted $250K. The program is on time and on budget to assist 17 longtime Evanston homeowners with necessary exterior home repairs.

### Disposition Programs

Ms. Bancroft reviewed the number of dispositions through the third quarter and highlighted the residential sales at 3523 Wilson Avenue, 3577 Alaska Avenue, 6075 E. Miami River Road, and 6014 Farmdale Avenue; government partner sale at 5965 Stewart Road; and the side lot sales on Cook Avenue. Using slides, Ms. Bancroft highlighted 855 Blair Avenue and 1937 Fairmount Avenue.

### Structure Stabilization

Ms. Bancroft reviewed the structure stabilizations completed through the third quarter and gave an overview of the program schedule for the remainder of the year. Using slides, she highlighted 707 and 754 Delhi Avenue and 745 and 656 Sedam Street.

### Sedamsville

Mr. Denning reported Sedamsville has been advocating for increased housing and economic development. In September, the Landbank executed a funding agreement with the City of Cincinnati for the Sedamsville portfolio acquisition. Using slides, Mr. Denning shared a map, gave an overview, and reviewed the projections and assumptions of the portfolio. There are 39 vacant land parcels, and 23 homes are being purchased out of receivership. 18 of the 23 structures are occupied with tenants. Properties will be renovated and transitioned into homeownership using the CARE model.

Landbank and Port that will impact multiple neighborhoods, resulting in 50 new homeowner opportunities. Mr. Denning offered to circulate a list of all jurisdictions, showing the location of these homes. Board members and staff thanked the County for the investment.

Mr. Denning noted the acquisition of the Sedamsville portfolio in early May. The Landbank is nearly finished with the City-funded stabilization of four historic properties in Sedamsville. As a recipient of the County CDF awards, the Landbank will be able to accelerate the home ownership work being done in Sedamsville. Facilities Manager, Ron Shouse, has been in the neighborhood, accessing every vacant structure, trimming overgrown lots, coordinating with Code Enforcement to deal with abandoned vehicles, working with the Litter Office to quickly address new dumping, and communicating with CPD regarding break-ins and other criminal activity. Additionally, the City has granted money to Home Base to start a planning study for Sedamsville. Mr. Denning provided an update on the City legal actions against Mr. Klosterman, categorizing him a vexatious litigator.

Mr. Denning recapped the State of Ohio continued the 2021 Brownfield Remediation and Demolition programs in the 2023 budget, adding another $500 million to these programs. To make communities in Hamilton County as competitive as possible, we have begun a coordinated county-wide effort to solicit potentially eligible projects. The timing of this program is unclear, but the goal is to be prepared to move quickly as soon as the Ohio Department of Development (ODOD) opens the portal. The Board discussed projects for funds that were previously received, and ways to thank our state delegation.

Ms. Brunner announced an upcoming implosion of the head house at the Beekman Silos. Mr. Denning gave an overview of recent Landbank activities including a new partnership with the Realtists, and 28 staff-attended events since Q2, where staff have spoken on a variety of topics. A panel with 5/3rd, PNC, and Huntington bank recently gathered to discuss challenges that come with developing and selling homes.

Mr. Denning noted several new programs included in the most recent state budget, most of which focus on single-family housing. The Landbank is in the early stages of figuring out how these programs will tie to our work.

With regards to investments in real estate, the Board discussed possible ways to proactively make the process streamlined by the Port, City, or County identifying good, developable, plots, and getting them zone in advance.

Software Transition
Mr. Stephens referred the Board to the packet and provided an overview of how Tolemi has improved internal workflows, as well as a preview of the public facing data portal.

Port Short
Mr. Millikin introduced a Port Short, which is a monthly video series, detailing how the Landbank is spending the first round of ODOD Demolition and Brownfield funding.

5.    *INVENTORY REVIEW*
      Ms. Bancroft referred the Board to the packet and reviewed the Landbank's acquisition and disposition numbers.

1          Did it include any part of the
2    operating deficit that Tri-State had been
3    reporting through the Receiver's 30th report?
4          A.    Well, just to correct, it wasn't
5    800.  It was 800,000.
6          Q.    The cash component?
7          A.    Yeah.
8          Q.    If I misspoke, it's $800,000.
9          A.    Well, it was my hope was that
10   everybody could be covered by that.
11         Q.    Okay.  So at that point, or
12   subsequently, December, Konza made an
13   application for $499,000, was that factored into
14   the $800,000 cash component?
15         A.    The 800,000 was a negotiated number,
16   and it took into account all the claims and
17   possible claims.
18         Q.    But it didn't take into account
19   $160,000 that TSO claimed?
20         A.    The negotiation That resulted in the
21   September 26th motion was in anticipation of a
22   haircut for Konza, and a haircut for TSO.
23         Q.    Was this purchase price the value
24   of the properties, or was this calculated to
25   satisfy the expenses of the Receivership?

EXHIBIT
B

1  that these are papers that you filed in the case

2  between March 2nd --

3       A.    Yes.

4       Q.    -- and March 23.

5       A.    Yes.

6       Q.    Is that correct?

7       A.    I would assume so, Yes.

8       Q..   Well, are they or are they not?

9       A.    Yes, I mean they are.  Yeah.

10      Q.    And what did you seek to achieve

11  from the Court with these?

12      A.    To be paid the money I was promised

13  from the beginning.

14      Q.    That was the sole intent?

15      A.    Oh, to stop the sale so I would be

16  paid.

17      Q.    You wanted the sale to stop?

18      A.    A hundred percent.  It was an

19  engineered sale.  It wasn't at the proper value

20  of the buildings.  It was not what you and I

21  discussed from the beginning and how we would do

22  this, and it wasn't the basis for me pouring the

23  money in that I did, and for putting the effort

24  forth that I did.

25            You got pushed by the city to sell

**EXHIBIT**

C

1   to the Land Bank. The Land Bank pushed you,

2   and that's what you did, and you took it for

3   under the value.

4           Q.    Were the leasing commissions that

5   you claim to be due to you reflected in writing

6   on any monthly report?

7           A.    I believe they were. And some of

8   them, at some point, they were requested to stop

9   I believe.

10              There was a constant revision,

11  according to what John Klosterman did, of

12  things going on in and out of that office.

13              You were present in the office

14  several times a week telling us we need to do

15  this and we need to do that, or don't do this

16  because Klosterman is doing this, and we can't

17  do that because of Klosterman doing this.

18              The only thing we didn't do with

19  Klosterman was keep him out of the buildings

20  like we were supposed to, because you didn't

21  want to take it to Magistrate Barrett. But

22  everything we did was reflective of his

23  flailing attempts to interfere.

24          Q.    If you'll take a look at Konza

25  Exhibit 40 and 41.

1　That would value the buildings at approximate low

2　.4 million.

3　　　　Q.　　Okay.

4　　　　A.　　1.5 million.

5　　　　Q.　　And, again, you had this discussion

6　with Konza?

7　　　　A.　　Yeah.

8　　　　Q.　　Okay.

9　　　　A.　　Yeah.　And I had the discussion, I

10　thought the Landbank's offer was terrible, and

11　that it should be more.　And that we would get

12　more money auctioning them off, individually, or

13　selling them in smaller portfolios.

14　　　　　　　But there seemed to be a

15　pre-desired thing, with everybody involved, for

16　the Landbank to get the properties.

17　　　　Q.　　All right.　Again, quickly, take a

18　look at TSO Exhibit S.

19　　　　A.　　Okay.

20　　　　Q.　　That's a rent roll that's got a

21　revised date of July 19th, 2021?

22　　　　A.　　I believe so.

23　　　　Q.　　If you flip over to the second

24　page.　Rent.

25　　　　　　　MR. BOYDSTON:　I'm sorry.　I didn't

# SEDAMSVILLE
# CINCINNATI, OHIO



## Sedamsville

is an historic neighborhood in Cincinnati, Ohio nestled above the banks of the Ohio River.

**RESIDENTIAL COMMERCIAL LAND**

ECONOMIC
DEVELOPMENT
OPPORTUNITIES IN

## HISTORY



EXHIBIT
D

Established in 1795 by Colonel Cornelius Sedam, a veteran of the Revolutionary War, who moved to the area to assist in the building of Fort Washington. This small, self-contained neighborhood occupies a steep hill that rises above the heavily traveled River Road and the Boldface Creek Valley. With its narrow streets, clustered houses, and a church atop the summit, Sedamsville evokes a unique urban image and exudes a strong sense of time and place. It maintains a high level of visual integrity and cohesiveness through retention of features such as mature trees, original stone retaining walls, steep hillsides, narrow lots and compact physical boundaries. Sedamsville also encompasses a cohesive array of mid-19th and early 20th century residential and institutional buildings, including many fine examples of building types and styles common in the city's oldest neighborhoods

Dept of Transportation & Engineering, Office of Architecture & Urban Design for Sedamsville Civic Association and the Dept of Community Development & Planning, City of Cincinnati



**Tim Hinde, CRS** P: 513.615.5850 E: Tim@HindeProperties.com
**Mark Dehler** P: 513.373.7922 E: Mark.Dehler@cbws.com

Photo: Tim Hinde

## OVERVIEW

- 65 Properties in Total
- Combination of Single Family, Multi-Family & Commercial
- Varied Architectural Styles
- Vacant Land to Build New
- All City Utilities
- Neighborhood Parks
- Walkability to a Small Neighborhood Commercial District



COLDWELL BANKER
WEST SHELL

Tim Hinde, CRS P: 513.615.5850 E: Tim@HindeProperties.com
Mark Dehler P: 513.373.7922 E: Mark.Dehler@cbws.com

## LOCATION

**7 MINUTES / 3.6 MILES TO THE CENTER OF DOWNTOWN CINCINNATI & FOUNTAIN**







SQUARE

**Tim Hinde, CRS** P: 513.615.5850 E: Tim@HindeProperties.com
**Mark Dehler** P: 513.373.7922 E: Mark.Dehler@cbws.com



Tim Hinde, CRS P: 513.615.5850 E: Tim@HindeProperties.com  Mark Dehler P: 513.373.7922 E: Mark.Dehler@cbws.com

## ADJACENT TO PARKS AND THE OHIO RIVER



**Sedamsville**
Statistical Neighborhood Approximation

COLDWELL
BANKER
WEST SHELL

COMPACT, COHESIVE NEIGHBORHOOD



Photo: Tim Hinde

# STIMULUS

TAX ABATEMENTS – RESIDENTIAL/NEW BUILDS & RENOVATIONS

The City of Cincinnati Department of Community and Economic Development Community Reinvestment Area (CRA) Tax Abatement Program stimulates revitalization, retains residents, and attracts new homeowners. The program provides a benefit for residents who improve their homes and encourages home shoppers to buy in the City of Cincinnati.



## TAX EXEMPTIONS – BUSINESS

The Ohio Enterprise Zone program is an economic development tool administered by municipal and county governments that provides real and personal property tax exemptions to businesses making investments in Ohio.

Tim Hinde, CRS P: 513.615.5850 E: Tim@HindeProperties.com
Mark Dehler P: 513.373.7922 E: Mark.Dehler@cbws.com

# AVAILABLE PARCELS

1 153-0001-0003-00  621 DELHI 32 153-0003-0055-00 773 DELHI 2 153-0001-0003-00 623 DELHI 33
153-0003-0052-00  787  DELHI  3  152-0042-0058-00  628  DELHI 34 153-0003-0051-00  787  DELHI 4
153-0002-0062-00  632  DELHI  35 153-0003-0050-00  789  DELHI 5 153-0002-0063-00 634  DELHI 36
153-0003-0048-00  793  DELHI  6  153-0002-0064-00  636  DELHI 37 152-0039-0150-00  794  DELHI 7
153-0002-0185-00  667  DELHI  38 153-0003-0148-00  801  DELHI 8 153-0002-0094-00  671 DELHI 39
153-0002-0154-00 679 FERNLAND
9 153-0002-0092-00 679 DELHI 40 153-0002-0155-00 677 HALSEY 10 153-0002-0037-00 700
DELHI 41 155-0048-0001-00 685 HALSEY 11 153-0002-0091-00 701 DELHI 42 153-0002-0182-00
646 SEDAM 12 153-0002-0090-00 703 DELHI 43 153-0002-0140-00 649 SEDAM 13
153-0002-0089-00 705 DELHI 44 153-0002-0145-00 659 SEDAM 14 153-0002-0088-00
707 DELHI 45 153-0002-0196-00 702 SEDAM 15 153-0002-0086-00 709 DELHI 46
153-0003-0089-00 739 SEDAM
16 153-0002-0082-00 714 DELHI 47 152-0042-0032-00 624 STEINER 17
153-0003-0040-00 728 DELHI 48 152-0042-0166-00 624 STEINER 18 153-0003-0075-00
729 DELHI 49 152-0042-0034-00 626 STEINER 19 153-0003-0038-00 730 DELHI 50
152-0042-0168-00 626 STEINER 20 153-0003-0036-00 732 DELHI 51 152-0042-0061-00
637 STEINER 21 153-0003-0073-00 733 DELHI 52 152-0042-0044-00 638 STEINER 22
153-0003-0072-00 735 DELHI 53 152-0042-0172-00 640 STEINER 23 153-0003-0070-00
737 DELHI 54 153-0002-0057-00 649 STEINER 24 153-0003-0028-00 740 DELHI 55
153-0002-0014-00 652 STEINER 25 153-0003-0027-00 742 DELHI 56 153-0002-0198-00



# PROPERTY LIST FOR SALE PRICING GUIDE

If people are interested in seeing any of the properties below it is recommended (required )  that they have pre-approved papers form a financial institution or a bank statement that shows that funds are available to purchase the property.

A 24 hour notice will be required whose address have an ( * ) in front of it.

The comps used for these prices were arrived from the INCLINE DISTRICT where 3 streets long and 3 streets wide 3 years ago began. THERE ARE NO LEGITIMATE COMPS IN SEDAMSVILLE.

The low auditor values were obtained by the owner because he was the only one purchasing and rehaving buildings. They DO NOT REFLECT THEIR TRUE VALUE.

THIS PRICING LIST IS ONLY TO BE USED BY COLDWELL BANKER  PRICES ARE GIVEN FOR INDIVIDUAL PROPERTIES ONLY.

Please allow 45 days for closing.

## STEINER AVENUE

| | |
|---|---|
| 637 Steiner | $ 75.000.00 |
| 638 Steiner | $ 90,000.00 |
| *639 Steiner  (if asked) | $300,000.00 |
| 649 Steiner | $ 85,000.00 |
| 652 Steiner | $ 75,000.00 |
| 654 Steiner | $ 65,000.00 |

**\*621 Delhi (commercial)**     **$200,000.00**

**\*623 Delhi (commercial)**     **$ 75,000.00**

**NOTE: a permanent easement will be placed on the walkway between the two buildings. 4 foot wide by 100 feet. 621 and 623 Delhi.**

**\*628 Delhi**                    **$ 90,000.00**

**\*632 Delhi**                    **$ 85,000.00**

**\*634 Delhi**                    **$135,000.00**

**636 Delhi**                     **$100,000.00**

**667 Delhi (Commercial)**     **$125,000.00 ( with lot on sedam behind property at Sedam)**

**671/673 Delhi**                 **$ 50,000.00**

**679 Delhi**                     **$ 90,000.00**

**\*700 Delhi**                    **$125,000.00**

**701 Delhi**                     **$200,000.00**

**\*703 Delhi**                    **$ 65,000.00**

**705 Delhi**                     **$ 85,000.00**

**707 Delhi**                     **$125,000.00 ( includes 709 lot next to it)**

**\*742 Delhi**               **$ 75,000.00 (includes lot 740 Delhi)**

**\*787 Delhi**                  **$ 65,000.00 ( includes lot 789 Delhi)**

**793 Delhi**               **$150,000.00**

**794 Delhi**               **$ 90,000.00**

**\*649 Sedam**               **$ 75,000.00**

**\*659 Sedam**               **$125,000.00**

**685 Halsey**               **$200,000.00 (includes 2 lots)**

COURT OF COMMON PLEAS
HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| CITY OF CINCINNATI, | : | Case No. A1905588 |
| | : | (Judge Wende C. Cross) |
| Plaintiff, | : | (Magistrate Anita P. Berding) |
| | : | |
| v. | : | |
| | : | ORDER GRANTING MOTION BY |
| JOHN KLOSTERMAN, et al., | : | RECEIVER FOR APPROVAL OF |
| | : | PAYMENT OF FEES AND EXPENSES |
| Defendants. | : | FROM DECEMBER 1, 2022 THROUGH |
| | : | AUGUST 31, 2023 AND FOR ENTRY OF |
| | : | AN ORDER TERMINATING |
| | : | RECEIVERSHIP AND DISCHARGING |
| | : | AND RELEASING RECEIVER |

This case comes before the Court on the Motion by Receiver for Approval of Payment of Fees and Expenses from December 1, 2022 through August 31, 2023 and for Entry of an Order Terminating Receivership and Discharging and Releasing Receiver (the "Motion") filed by Konza, LLC as the receiver appointed in this judgment lien foreclosure action and the pleadings and papers of record and the docket entries. All capitalized terms in this Order not otherwise defined shall have the same meaning as given in the Motion.

The Court is of the opinion that the Motion is well taken and should be granted and therefore it is hereby

ORDERED, that the Motion is granted; and it is further

ORDERED, that the Receiver is entitled to payment of the Further Fees and Expenses and said payment is approved; and it is further

ORDERED, Prominent Title shall pay the sum of $85,960.83 to the Receiver being the Escrow Balance (the "Payment to the Receiver"); and it is further

ORDERED, that upon receipt by the Receiver of the Escrow Balance, th

pay the proceeds in the order and amounts listed in the Motion and file and serve notice of said receipt and payments (the "Receiver Notice of Payments"); and it is further

ORDERED, that upon the filing of the Receiver Notice of Payments, the Receiver is discharged and the receivership is terminated and this action is concluded and closed; and it is further

ORDERED, that the Receiver and its agents and legal counsel are acquitted, discharged and released from any and all claims of whatever kind or nature arising out of or related to this action, the Receivership, and the Properties; and it is further

ORDERED, that (1) all parties to this action and (2) all persons and entities who have filed any motion, notice or other paper in this action and (3) all persons and entities who receive notice of this Order are enjoined from filing or making or continuing any action to enforce or pursue any claim in this action, or in any other action in this Court or in any other Court, in any manner seeking any relief from the Receiver or any of its agents and legal counsel with respect to any matter addressed in this action or concerning the Receivership, the Properties (or any of them) save and except to enforce the provisions of this Order; and it is further

ORDERED, that any violation of the foregoing injunction shall be considered by the Court as in direct contempt of this Court and will be subject to any and all sanctions available to this Court for direct or indirect contempt of court; and it is further

ORDERED, that the Court expressly determines that there is no just reason for delay and this order is final and appealable.

SO ORDERED.

_____

Judge Wende C. Cross

22931821.v1

April 28, 2023

John Klosterman
5615 Sidney Road
Cincinnati, Ohio 45238

Dentons Bingham Greenebaum LLP
Bradley Arnett
312 Walnut Street #2450
Cincinnati, Ohio 45202
Via Email: bradley.arnett@dentons.com

RE: Richard Boydston double legal billing in case #A1095588

Dear Mr. Arnett:

I am writing this letter regarding a matter that requires your immediate attention. It came to my attention that Mr. Boydston has been caught double billing in the amount over $175,000.00. (enclosed) It is not alleged, it is on the enclosed document examples. The complete document is over 90 pages long.

## BACKGROUND

Mr. Boydston, created an LLC to shield himself as well as ready that LLC to be involved in real estate investment and management, as he stated in the filing in 2018. As you are aware, he made himself the manager of Konza, LLC in the above case.

When he submitted his invoice to the courts for payment several months ago, red flags were raised. Konza, LLC , on the same dates, memo's, as he Mr. Boydston, as the manager had, only the billing rate was reduced, were almost exactly the same. (enclosed) I set them side by side to show the false billing.   It's as though two attorneys were present for all that he billed for by himself and an associate. Legal law firms are responsible for the actions of their lawyers. In this case, it is clear that Mr. Boydston's actions have not only put your firm's reputation at risk but also exposed it to legal liability.

It is imperative that your firm takes swift action to address this issue. I, as the defendant in the case am+ required to pay the legitimate bills from the receivership. I would request that you perform an internal investigation to find the extent of the wrongdoing. I have received no answers from any of my requests via email. He has used obfuscation on every motions and not answered

EXHIBIT
F

any pertinent request via email in the past 3 years. Information that is required by ORC 1785 code. I understand in reading the code, that each partner or member of a professional association shall be responsible for the acts of any other partner or member of the association in the conduct of the professional business of the association. This means that a law firm and its partners are jointly and severally liable for the actions of each other in relation to their professional business.

Mr. Boydston is well aware that we are preparing a civil RICO action and the information listed below are for Discovery. We would like your cooperation now vs later.

1. The bank statements from TSO and Konza, LLC.
2. Mr. Boydston's bank records are required to show proof that he personally paid mortgages in the amount of nearly $35,000.00 over 33 months. Note: Warsaw Federal has not been paid in 4 months. Total amount due $5,251.58 (since Joseph Lentine was fired.) Defendant alleges Mr.Boydston had the payments of $1,022.02 slipped to him by Mr. Lentine monthly and was unreported. Why else would he refuse to show his personal accounts on where the $35K came from.
3. Explain why he billed essentially the same amounts as Konza, LLC did and then submitted them for payment. Totaling nearly $500,000.00.
4. Produce the real estate agent agreement as well as the sales offer from HCLRC and final sales document to the Land Bank.
5. Ask Mr. Boydston why he never made any adjustments totaling over $150,000.00 that were paid by the receiver to TSO, but in fact were falsely reported " paid".
6. Known insurance cancellations due to non payment.
7. The manage agreement with TSO and Joseph Lentine.( there were 2)

All these and many other records are too numerous to mention, were missing in the 4100 records submitted to me via the Land Bank from Mr. Boydston.

I am requesting that your office provide this information from Mr. Boydston. He refuses. Your office or I will provide it to the court. Your cooperation is greatly appreciated. There are many who colluded with Mr. Boydston, I am confident that with your cooperation, your firm was not complicit.

We understand that this situation may be difficult for your firm, but it is important to take responsibility for the actions of your partners and take the necessary steps to restore trust and confidence in your firm.

Thank you for your attention to this matter. We look forward to hearing from you soon.

Sincerely,

John Klosterman

enclosures

Cc: Feroon Yi, FBI

Christian Donovan Esq

1      A.    It was hoped that that would cover
2  the expenses of the Receivership with agreed
3  reductions.
4      Q.    Okay.
5      A.    That was my belief at the time.
6      Q.    Did Tri-State agree to a reduction?
7
8      A.    Pardon?
9      Q.    Did Tri-State agree to a reduction?
10     A.    Mr. Lentine was not part of this
11 process.
12     Q.    Okay.
13     A.    He had involved himself several
14 months earlier with having out of his office an
15 objection to the sale by his friends or
16 colleagues, the Colemans.
17         And I believe that he was, I'll
18 say, bad mouthing the Land Bank at this point.
19         THE COURT:  I think we've gone
20     really far afield of the claims that are
21     actually before the Court.
22         Mr. Lentine asserts that he's owed
23     money by Konza, and, of course, the
24     amount of money available as a result of
25     the sale is what you're talking about.



EXHIBIT
G

COURT OF COMMON PLEAS
HAMILTON COUNTY, OHIO

| | |
|---|---|
| CITY OF CINCINNATI,<br>an Ohio municipal corporation,<br><br>Plaintiff,<br><br>v.<br><br>JOHN KLOSTERMAN a/k/a<br>JOHN C. KLOSTERMAN a/k/a<br>JOHN CAMPBELL KOSTERMAN, *et al.*,<br><br>Defendants. | Case No. A 1905588<br><br>Judge Wende C. Cross<br><br>Chief Magistrate Judge Anita P. Berding |

## SUBSTITUTE PLAINTIFF HAMILTON COUNTY LAND REUTILIZATION CORPORATION'S MEMORANDUM IN OPPOSITION TO TRI-STATE ORGANIZATION, INC. AND JOSEPH LENTINE'S APPLICATION FOR PAYMENT OF COSTS, EXPENSES, AND FEES

Now comes Substitute Plaintiff Hamilton County Land Reutilization Corporation ("HCLRC"), and submits the following Memorandum in Opposition to the *Application for Payment of Costs, Expenses, and Fees* ("Application") filed on May 1, 2023, by nonparties Tri-State Organization, Inc. ("TSO") and Joseph Lentine ("Lentine"). HCLRC also submits Affidavits in support contemporaneously herewith.

Respectfully submitted,

*/s/ Cynthia M. Fischer*
Cynthia M. Fischer (0073761)
DINSMORE & SHOHL LLP
255 East Fifth Street, Suite 1900
Cincinnati, Ohio 45202
Tel: (513) 977-8163
Fax: (513) 977-8141
Email: cynthia.fischer@dinsmore.com
*Counsel for Substitute Plaintiff Hamilton
County Land Reutilization Corporation*

1



view of the interest involved, the amount of skill necessary to conduct the business, and the time and labor given to the business.'" *Nat'l City Bank v. Semco, Inc.*, 183 Ohio App. 3d 229, 243 (3d Dist. 2009) (emphasis added) (quoting *Nozik v. Mentor Lagoons, Inc.*, 11th Dist. No. 97-L-004, 1998 Ohio App. LEXIS 3013, at *3–4 )); *see also Jardine v. Jardine¸* 8th Dist. No. 110670, 2022-Ohio-1754, ¶¶ 31–34.

TSO and Lentine's Application is devoid of any evidence that payment would be reasonable here. Indeed, all of the available evidence actually points to the opposite—that TSO and Lentine inflated the "time and labor" they reported and, in many cases, actually damaged the Properties due to their action or inaction. TSO and Lentine misrepresented their actual expenses to inflate their compensation. TSO's substandard recordkeeping has deprived the Court of any meaningful documentation of the work they claim to have done. In this case, it would be a clear abuse of discretion to award TSO and Lentine the costs, fees, and expenses they request in their Application.

> **1. TSO and Lentine Misappropriated Rents, Security Deposits, and Other Receivership Assets. Compensating TSO for this Conduct Would Be Unreasonable and Unconscionable.**

TSO and Lentine misappropriated rents, security deposits, and other assets of the Receivership. Compensating them under these circumstances is improper. Compensation for a receiver and any professionals assisting the receiver "is left to the sound discretion of the trial court." *Nozik v. Mentor Lagoons*, 11th Dist. No. 97-L-004, 1998 Ohio App. LEXIS 3013, at *10. While the trial court does have considerable latitude, it cannot approve compensation in an "arbitrary, unconscionable, or unreasonable" manner. *Jardine v. Jardine¸* 8th Dist. No. 110670, 2022-Ohio-1754, ¶ 11. "The trial court may exercise its discretion in controlling these costs such that the receivership does not jeopardize the financial viability of the businesses." *Id.* ¶ 34.

In this case, the most shocking aspect of TSO and Lentine's demand for payment is that they have kept all of the rents collected from the Properties from the start of the Receivership to January of 2023. This Receivership involved sustaining the Properties as rental businesses. (Order ¶ 3). The collection of rent is a core function of that duty. (*Id.* ¶ 6). Indeed, TSO and Lentine *collected* that rent, but they never deposited it or otherwise turned it over to the Receivership.

Based on their monthly reports to the Receiver, TSO and Lentine claim to have collected $425,194.42 in rents. Without submitting supporting records, TSO and Lentine claim that they should receive *more* money, despite receipt of hundreds of thousands of dollars from the Receivership. Compensating TSO and Lentine for this conduct would shock the conscience.

Additionally, TSO and Lentine have misappropriated other property of the Receivership. They claim to have collected $12,605.00 in security deposits but, as with TSO's rent collection, TSO never tendered these deposits to the Receiver or deposited these funds into an account accessible by the Receivership. (Boydston Aff. ¶ 14). TSO and Lentine also occupied the Receivership property at 671–673 Delhi Avenue, repurposing it for use as the TSO offices. They have never paid the Receivership rent for their use of the property or included the property on the monthly rent roll. (*Id.* ¶ 16).

In their own words, TSO and Lentine claim that the Receiver retained them "to manage the Properties, to collect rents, to respond and remedy tenant complaints, and to put units in shape to be rented, on time and materials basis." ("Application," *City of Cincinnati v. Klosterman*, Hamilton Cnty. C.P. No. A1905588, at 2). Far from fulfilling these duties on behalf of the Receivership, TSO's and Lentine's misappropriations of Receivership assets indicate serious self-dealing throughout their relationship with the Receiver. To compensate them under these circumstances would be unreasonable and unconscionable.

14

## 2. TSO and Mr. Lentine Misrepresented Their Expenses to the Receiver and to the Court. Compensating Them for This Conduct Would be Unreasonable.

In addition to flagrant misappropriation of Receivership property, TSO and Lentine have drastically misrepresented their expenses to the Receivership and the Court. While compensation for professionals assisting a receiver remains within the sound discretion of the trial court, the trial court must at least have *some* reliable evidence to arrive at a reasonable sum of expenses. *See Nozik*, 1998 Ohio App. LEXIS 3013, at \*10–11; *Semco*, 183 Ohio App. 3d at 233–35.

Throughout their involvement, TSO and Lentine have exhibited dismal recordkeeping practices, and they have done little to document their supposed expenses. It should be noted that their Application comes with **no documentation** as to how they arrived at the sums they demand from the Receivership. But even based on all of the available evidence, TSO and Lentine's expenses simply do not add up.

First, TSO and Lentine billed the Receivership for overhead and other expenses that simply are not eligible for compensation. This includes TSO's phone, internet, and utility bills; purchases of tools; TSO's liability insurance premiums; payroll and unemployment taxes; and office supplies solely used for TSO's operations. (*See* Section I.B, *supra*). All of these charges reflect expenditures for the personal and individual benefit of only TSO or Lentine, not legitimate expenses on behalf of the Receivership.

Second, TSO and Lentine have billed the Receivership for expenses that seem extremely high given the circumstances without any explanation. Most obviously, TSO and Lentine have used an astounding amount of fuel—$941.16 in a single month, in one example—for the relatively small area of Sedamsville. (*See* Section I.B.1, *supra*). None of their reports breaks down mileage driven or the purpose for the trip, nor do they specify if and when these charges relate to gas-powered tools. In addition to the exorbitant fuel charges, none of the charges for hardware and

15

supplies specify what they were used for or, in many cases, what was purchased at all. Similarly, TSO and Lentine fail to explain their labor charges. While *some* of TSO's monthly reports contain a general breakdown of tasks completed, the reports never relate these tasks to labor costs by time spent on each job or any other sensible metric for valuing labor.

Finally, TSO and Lentine submitted many of their expenses to the Receivership without any form of documentation. In the three example months discussed above, TSO submitted **$7,253.04** in expenses without any form of documentation—about 35% of its reported expenditures. Moreover, when TSO and Lentine did provide receipts, their accounting was riddled with duplicates and contained a number of illegible documents. (*E.g.*, Boydston Aff. at Ex. C). TSO failed to provide documentation of alleged labor costs, including when the work was performed, on what property, the duration of the work, and by whom. Given the foregoing, it would be unreasonable to compensate TSO and Lentine for these inaccurate and artificially inflated expenses.

> **3.** **TSO Failed to Maintain the Properties, Resulting in Deterioration and Waste. Compensating TSO for These Deficiencies Would Be Unreasonable.**

TSO and Lentine's failure to competently perform the most basic maintenance on the Properties has resulted in extensive damage, leading to deterioration in value and waste. Their conduct flouts the entire principle underlying a receivership. "It is well-established that a receiver 'is appointed to maintain the status quo regarding the property in controversy and to safeguard said property from being dissipated while the plaintiff is pursuing his remedy.'" *Fontain v. Sandhu*, 1st Dist. No. C-200011, 2021-Ohio-2750, ¶ 23 (internal quotation marks omitted) (quoting *Milo v. Curtis*, 100 Ohio App. 3d 1, 9 (9th Dist. 1994)). Indeed, the entire reason Ohio law permits a receiver to apply for compensation as a court cost or administrative expense is to offset "the costs and expenses necessary to preserve the value of the assets held in receivership." *P.M.D. Corp. v.*

16

*Hyland-Helstrom Enters.*, 63 Ohio App. 3d 681, 683 (10th Dist. 1990); *see also Brown v. Winterbottom*, 98 Ohio St. 127, 133 (1918).

Costs incurred which result in depletion of receivership assets, and which are not necessary to preserve the value of the assets in the receivership are not compensable. *Wilkens v. Boken, Inc.*, 8th Dist. No. 64230, 1993 Ohio App. LEXIS 6202, at *15-19 (Ohio Ct. App. Cuya. Dec. 23, 1993). It follows, then, that neither a receivership nor the parties to a receivership action should pay for costs or expenses that do not "preserve the value of the assets" or, as in this case, actually **diminish the value of the assets.**

There are extensive concerns with TSO and Lentine's performance. They neglected the Properties for extended periods of time, and they ignored orders from Code Enforcement to remediate issues affecting the integrity of the Properties. (Cunningham Aff. at Ex. A, p. 2-5; Reisenberg Aff. at Ex. A). They also placed tenants into Properties subject to "Keep the Building Vacant" orders. (Cunninham Aff. at p. 17, 85-103). Aside from being unsafe and unconscionable, Lentine's preference to rent these Properties rather than make repairs subjected the Properties to ongoing deterioration and further diminished their value.

Far from "preserv[ing] the value of" the Properties in Receivership, TSO's and Lentine's actions have diminished the value of the Properties. Therefore, they should not be able to tax their supposed fees, costs, and expenses as court costs or administrative expenses.

**D. TSO's Demand for a "Commission on Rentals" Is Barred by the Statute of Frauds.**

Any agreement between TSO and the Receivership for a "Commission on Rentals" could not have been completed within a year and, therefore, is barred by the statute of frauds. Under the statute of frauds, "an agreement that is not to be performed within one year from the making thereof" must be in writing. R.C. 1335.05. TSO and Lentine claim they are entitled to a 10%

17

"Commission on Rentals," but they executed many of the leases subject to this "Commission" for twelve-month terms. (*E.g.*, Ex. 8; Ex. 9). Any agreement to pay a "Commission" could not be completed within one year and, therefore, needed to be in writing. The Recever requested that TSO and Lentine sign a written contract memorializing the agreement between them, but Lentine refused. (Boydston Aff. ¶ 7). Neither TSO nor Mr. Lentine executed a written agreement with the Receiver, and this Commission is barred by the statute of frauds.[4]

III.  **CONCLUSION**

TSO and Lentine, failed to fulfill even the most basic functions of their unwritten agreement with the Receiver and left the Receivership assets in worse condition than when they began. TSO has improperly retained all of the rents and security deposits without turning anything over to the Receivership. TSO and Lentine have no standing to bring this Application, but even if they did, they have failed to present documentation to support their claims. Compensating them in these circumstances would be unreasonable and unconscionable.

For the foregoing reasons, Plaintiff Hamilton County Land Reutilization Corporation respectfully requests the Court deny Tri-State Organization, Inc. and Joseph Lentine's Application for Payment and, accordingly, deny any compensation sought in that Application be taxed as court costs or administrative expenses.

---

[4] Even if there were a written agreement to pay a commission, which there is not, the commission would be calculated based upon rents collected rather than rents projected.



G·E·I
engineering

● ● client centered engineering solutions

September 18, 2020

John Jennagans, LLC
Attn: John Klosterman
5615 Sidney Rd.
Cincinnati, OH 45238

**Reference:** **621 Delhi Ave (45204) – Structural Investigation**
**GEI Project Number 20-371**

Mr. Klosterman,

At your request, I visited the site earlier this month to review the general structural condition of the two building on this property. For the purpose of this report, the front of the building face east, see Photo #1.

There are two separate building on this parcel: the north building (623 Delhi Avenue) and the south building (621 Delhi Avenue), see Photo #2 and #3, respectively. The buildings are structurally independent.

<u>621 Delhi Avenue</u>

The footprint of this building includes the original area and an addition. The original, L-shaped, brick portion of the area of the building was reportedly built in 1880. The age of the addition is not known. I did not observe any structural deficiencies in the original L-shaped portion of the building. The addition is wood framed and is located on the exterior of the original brick building located at the rear left (southwest) area of the building, see Photo #4. The northern portion of the addition is two stories tall plus a basement. The southern portion of the addition is one story tall plus a basement. The first-floor level nearly aligns with the exterior sidewalk elevation. The basement at the southwest corner of the building aligns with the exterior grade.



EXHIBIT
I

Along the south wall of the wood-framed addition, the basement wall and areas of the first level floor framing are deteriorated, see Photo #5. At the west end of the south wall of the addition and south ends of the first level floor joists of the one-story portion of the wood framed addition are in poor structural condition and need to be repaired or replaced. Part of the basement wall framing was not accessible or reviewed due to the temporary shoring and a temporary wall that was installed near the south wall, see Photo #6.

The temporary shoring and temporary wall were installed to help support the deteriorated members. The existing temporary shoring is not adequate to support the code required loads. I recommend adding additional temporary shoring and repairing the deteriorated structural elements, which includes the south basement wall and first-floor joists. Additional repairs may be required once all of the existing conditions are exposed. Structural repair detail SK-1 is attached to this report.

623 Delhi Avenue

During my walkthrough of this building, I did not observe any structural deficiencies. The elevation of the first floor at the front of the building was several feet above the sidewalk elevation. The elevation of the basement floor aligns with the grade on the exterior of the building. There does not appear to be any additions to the existing building. In the basement, the wood floor framing in the unoccupied basement is in poor condition and is in the process of being replaced, see Photo #7 (north side) and Photo #8 (south side).

I reviewed the City paperwork (dated 09/01/2020) that was presented to us during our site visit. From a structural perspective, I did not observe any structural deficiencies in the 623 Delhi Avenue building or in the original L-shaped brick portion of the 621 Delhi Avenue building. The review of non-structural items is beyond the scope of this report.

This evaluation of the existing framing was based on my evaluation of the accessible and visible floor framing and my application of generally accepted principles of structural engineering. My analysis was limited to the scope outlined in this memo. No material testing was performed as a part of this investigation. This report is not to be considered a guarantee of condition, and no warranty is implied. There is no claim, either stated or implied, that all conditions were observed. GEI Engineering, Inc. is not responsible for the

621 Delhi Ave (45204) – Structural Investigation
GEI Project Number 20-371
September 18, 2020
Page 3 of 6

conclusions, opinions, or recommendations made by others based on the information included in this report.

Thank you for the opportunity of assisting you on this project. If you have any questions, or if we may be of further assistance, please do not hesitate to contact us.

Sincerely,
GEI Engineering, Inc.



09/18/2020

Richard A. Graman, P.E.
Principal/Owner

Attachments:          Photos
                      Sketch S-1

# SANTEN & HUGHES

**A Legal Professional Association**
**600 Vine Street, Suite 2700**
**Cincinnati, Ohio 45202**
**www.santenhughes.com**

J. Robert Linneman, Esq.
jrl@santenhughes.com

Telephone: (513) 721-4450
Facsimile: (513) 852-5994

May 25, 2022

*VIA ELECTRONIC MAIL – johncklosterman@gmail.com*
*AND REGULAR U.S. MAIL*

John Klosterman
5615 Sidney Road
Cincinnati, Ohio 45238

      Re:   *City of Cincinnati v. Klosterman*

Dear John:

      I'm writing in response to your message concerning the receipt of purchase offers by the Receiver and the other recent events in the Receivership.

      As previously ordered by the Court in the Terms of Sale (attached as **Exhibit A)**, all offers for properties offered for sale by the Receiver were due yesterday at 9:00am. There is now a five (5) day period by which any offeror on each Receivership Property may make a "topping bid."

      Following receipt of all topping bids, the City of Cincinnati must approve all offerors before formal conveyance of any Receivership Property may be made. Upon approval by the City of Cincinnati, the Court must formally approve the sale of the Receivership Properties. Closing must occur within fifteen (15) days of Court approval.

      My associate Alexander Foxx has spoken with counsel for the receiver to check on the status of the bids received. In that call, the following information was conveyed:

1.   **The receiver had not yet reviewed the offers.** This suggest that acceptance and final conveyance of the Receivership Properties is not imminent and may still be weeks away.

2.   **The City of Cincinnati will not approve certain offerors.** The receiver's attorney indicated that the City of Cincinnati would only approve offerors which, in the City's determination, demonstrated a history of compliance with all local laws, ordinances, and which would, hopefully, revitalize the Receivership Properties.



John Klosterman
May 25, 2022
Page 2

3. **An accounting will occur.** Counsel for the receiver indicated that before any proceeds of the sales are allocated, a final accounting of all funds must occur, and will be submitted to the Court.

At this late stage of the litigation, we consider that there is no viable prospect to stop the sale of the properties. However, you have the right to be represented in the litigation to protect your interests. Alexander and I are ready and willing to represent you in the litigation, but we must be clear about our objectives. At this point, we can closely monitor: the sale of the properties; the accounting of the administration of the properties during the receivership; and eventual disbursement of the proceeds.

Please let me know if you'd like to proceed. Thanks.

Sincerely,

SANTEN & HUGHES

*J. Robert Linneman*

J. Robert Linneman

JRL/sla
Enclosure
691825.1

454

```
1      A.    After me, but yes.
2      Q.    Okay.  And about how far back was
3  he at that time?
4      A.    About the same distance.
5      Q.    Okay.  And how did you feel at that
6  moment?
7      A.    That's when I started to feel
8  uneasy.  So, I'm like, okay, am I imagining this?
9  That's really what I was thinking, you know, is
10 this my imagination, or is this a coincidence,
11 what is this?
12     Q.    Okay.  So what did you do next?
13     A.    So as I got onto the parkway -- or
14 Fort washington way --
15     Q.    Did you shift back into the left
16 lane at some point?
17     A.    I did.
18     Q.    Did you do that before you got onto
19 Fort Washington way?
20     A.    About right as I was getting on.
21     Q.    And what did Mr. Klosterman do?
22     A.    He then went also back to the left
23 lane.
24     Q.    So he stayed behind you?
25     A.    Correct.
```

455

```
1      Q.    And, so, now you exited onto Fort
2  Washington way, what did you do next?
3      A.    Stayed in the right lane to get off
4  71-North.
5      Q.    And you would come through the
6  tunnel then?
7      A.    Correct.
8      Q.    And what was your exit you needed
9  to make to get off 71-North?
10     A.    It's the first exit on the left,
11 which is Eden Park Drive, Reading Road exit.
12     Q.    Okay.  So were you in the proper
13 lane when you came off the turn, were you in the
14 proper lane to make that exit?
15     A.    when I came out of the tunnel, yes.
16     Q.    And where was Mr. Klosterman?
17     A.    He was directly behind me at that
18 point.
19     Q.    And what did do you next?
20     A.    I moved to the right lane.
21     Q.    Okay.  And then what?
22     A.    Kind of slowed down again, I was
23 wanting him to pass me.  I didn't know what was
24 going on at that point, and I didn't want to --
25     Q.    So you kind of slowed down, about
```

*(handwritten note "NO" with bracket next to lines 13-16)*
*(handwritten note next to lines 21-23)*

456

```
1  how fast would you say you were going at that
2  time?
3      A.    50, 55.  I would say I slowed -- I
4  hit my brake for sure.  So probably dropped down
5  -- I didn't look at my speedometer, but
6  definitely reduced my speed, maybe ten miles per
7  hour from what I was going.  So --
8      Q.    And what did you do next?
9      A.    At that point I did feel like he was
10 following me, so I picked up my phone and turned
11 on the video.
12     Q.    I'm going to direct your attention
13 to the screen, do you recognize what's on the
14 screen right now?
15     A.    Yes.
16     Q.    Okay.  what is this?
17     A.    This is what I was able to capture
18 on the video.
19     Q.    Okay.  And what are we looking at
20 right there?
21     A.    That's John's pick-up truck.
22     Q.    And did you take this video?
23     A.    I did.
24     Q.    And did you turn this video over to
25 police at some point?
```

457

```
1      A.    I did.
2      Q.    Okay.  And is this a true and
3  accurate depiction of the events as they
4  happened in this moment on September 17th at
5  about 8:15 in the morning?
6      A.    Yes.
7            (Playing video.)
8  BY MS. ZURFACE:
9      Q.    So, I notice that you -- did you
10 get back over in front of him?
11     A.    I did.
12     Q.    why did you get back in front of
13 him if your goal was for him to pass you?
14     A.    I wanted to just continue on to my
15 doctor's appointment at that point.
16     Q.    when you moved over to the right
17 lane and slowed down, what did he do?
18     A.    He did not pass me, he kind of
19 stayed, as you can see in the video, kind of
20 behind me.
21     Q.    So he never came around you?
22     A.    No.
23     Q.    On 71?
24     A.    No.
25     Q.    You had to get back in that lane?
```



EXHIBIT

L

THE **PORT**
Making Real Estate Work

CINCINNATI BUSINESS COURIER

B | P | ? | W

*2022 BEST PLACES TO WORK*

February 20, 2023

Mr. Richard Boydston
Dentons, Bingham, Greenebaum, LLP
312 Walnut Street, Suite 2450
Cincinnati, OH 45202
Via Email: richard.boydston@dentons.com

Dear Mr. Boydston,

I am in receipt of the most recent Receiver's Report filed on February 17, 2023, including the final financial details from TriState Organization, Inc. ("TSO").

The enclosed spreadsheet is a rough glance at a limited selection of vendor charges taken from the monthly Receiver's Reports filed in Case No. A1905588. My office utilized the hard copy files of the monthly receipts, invoices, documents, ect. you kindly provided some weeks back. As you are aware, my office does not provide accounting or auditing services. The information enclosed was performed by my paralegal and myself for internal or unofficial use. With self-imposed limitations on scope, the undertaking still proved to be difficult and time consuming because of what I would categorize, at best, as the 'haphazard bookkeeping practices' of TSO.

I have no doubt, if an official audit by an accounting firm becomes necessary, the figures will look bleaker for TSO.

For this discussion, we didn't look at the _____ records provided, nor have I gone back to the serious concern of Mr. Lentine's pending _____ on alleged PPP fraud and unemployment benefits fraud.

As you can see from the calculations provided in the enclosed spreadsheet, it is HCLRC's position that TSO owes the Receivership money. There has been a persistent miscalculation of 10% of the 'rent roll', the amount TSO retains as its management fee per month. TSO has enjoyed rent and utility free use of 671/673 Delhi, charging what appears to be all costs associated with any business conducted at the address back to the receivership including internet service, phone service, and even the company's liability insurance premiums. The company has submitted receipts for tens of thousands of dollars for fuel, tools, equipment, supplies, etc., that are wholly insufficient for reimbursement consideration. Most lack a reference to the property or project the expense(s) are attributable to, some are from retailers that don't list the item that was purchased, and others, the amount claimed is exorbitant and merits further investigation, i.e., office supplies.

Office: 513.621.3000 | Email: kallesee@cincinnatiport.org
East Fourth Street, Suite 300
Cincinnati, OH 45202



EXHIBIT
M

# THE PORT

Making Real Estate Work

Mr. Lentine has also charged his negligent payroll / tax withholding practices back to the receivership.

Where are the security deposits of the current tenants?

What about the pre-paid rents for February?

When a property management company wraps up a project, there is usually detailed, accurate reporting of receivables, deposits, payables. When you and I met with Mr. Lentine at my office in January, he blamed these same concerns on his staff performing the bookkeeping. I reminded him that he signed each report prior to sending them to you for filing.

Mr. Lentine repeatedly stated how difficult and sometimes dangerous this project had been. As well, his desire to be a "team player" over the last few years during TSO's time as property management company for the receivership. I do not doubt any of this. However, none of these reasons alleviate the requirements established for proper bookkeeping.

I will bring two hard copies of this correspondence to the hearing on February 21, 2023.

Sincerely,

Kelley J. Altases,
Attorney for Hamilton County Land Reutilization Corporation
Substitute Plaintiff,
Real Estate Counsel for The Port

Enclosures
Cc Philip Denning
Chris Recht
Joseph Lentine – hand delivery

# U-HAUL Receipt

In-Town Return (In)

**Contract No:** 99370202
Saturday, September 19, 2020 11:42 AM

U-HAUL MOVING & STORAGE AT
GLENCROSSING WAY
770028

5131 GLENCROSSING WAY
CINCINNATI, OH 45218

(513) 322-5165

**Customer Name:**
JOHN KLOSTERMAN
5615 Sidney Road
CINCINNATI, OH 45238

**Cust Ph - EMail:**
(513) 250-2610
worldwidemobile@hotmail.com

**Authorized Driver(s):** JOHN KLOSTERMAN

**Rental Date/Time:** 9/12/2020 8:00 AM
**Return Date/Time:** 9/19/2020 11:40 AM
**Chargeable Rental Periods:** 3

| Equipment | Coverage | Missing/Damage Charge | Rental Rate | Rental Charge | Actual Charges |
|---|---|---|---|---|---|
| RV  6' x 12' Van Trailer RV2817D 65477R - TN | No Coverage. $0.00 | $0.00 | $29.85 | $89.85 | $89.45 |

|  |  |  |  |  | Subtotal: | $89.85 |
|---|---|---|---|---|---|---|
| **Card Type:** | **Account:** | **Type:** | **Ref No.:** | **Approved:** | Rental Tax: | $6.29 |
| Visa | XXXX-XXXX-XXXX-8250 | PAYMENT | | 080054 | **Total Rental Charges** | $96.14 |
| **Entry Method:** MAG | **Application Label:** Visa | **Merchant ID:** 4445013037820 | | **Term ID:** 003 | Credit Card Payment: | $96.14 |
|  |  |  |  |  | **Net Paid Today** | $96.14 |

- I confirm that during the term of my rental there was not an accident involving the rented U-Haul equipment and no incidence where this equipment struck or otherwise caused damage to any person or property either while on a public road or private property. There was no injury or damage sustained by me or any other drivers or passengers of this equipment.

Antonie Rucker >

x _____

JOHN KLOSTERMAN

U-Haul Signature - (Antoine Rucker jr.)

MobileContractClose



EXHIBIT
N



09/01/2020 thru 09/30/2020
Account Number: 921797

## ID 80 - SHARE CHECKING (Continued)

| Date | Withdrawal | Deposit | Balance | Transaction Description |
|---|---|---|---|---|
| 09/05/2020 | -19.94 | | 3,499.92 | Withdrawal POS #701639<br>UNITED DAIRY FAR CINCINNATI OH |
| 09/05/2020 | -74.99 | | 3,424.93 | Recurring Withdrawal Bill Payment #022328<br>SPECTRUM 855-707-7328 OH |
| 09/06/2020 | -31.65 | | 3,393.28 | Withdrawal POS #079527<br>PILOT #0242 SHELBYVILLE IN |
| 09/07/2020 | -64.99 | | 3,328.29 | Recurring Withdrawal Bill Payment #014381<br>SPECTRUM 855-707-7328 OH |
| 09/07/2020 | -600.00 | | 2,728.29 | Withdrawal Debit Card CHECK CARD<br>09/07 04492150000049618496180 PP*GEIENGRGR 402-935-2244 OH |
| 09/08/2020 | | 650.00 | 3,378.29 | Deposit ACH VENMO<br>TYPE: CASHOUT CO: VENMO |
| 09/08/2020 | | 750.00 | 4,128.29 | Deposit ACH VENMO<br>TYPE: CASHOUT CO: VENMO |
| 09/09/2020 | | 730.00 | 4,858.29 | Deposit ACH Square Inc<br>TYPE: * Cash App CO: Square Inc |
| 09/09/2020 | -8.39 | | 4,849.90 | Withdrawal POS #163511<br>THE HOME DEPOT #3822 CINCINNATI OH |
| 09/10/2020 | | 500.00 | 5,349.90 | Deposit ACH VENMO<br>TYPE: CASHOUT CO: VENMO |
| 09/10/2020 | -38.66 | | 5,311.24 | Withdrawal Debit Card CHECK CARD<br>09/09 04610430000002718027180 THE HOME DEPOT #3822 CINCINNATI OH |
| 09/14/2020 | | 651.30 | 5,962.54 | Deposit XXSOC SEC |
| 09/14/2020 | -185.00 | | 5,777.54 | Withdrawal ACH STATE FARM RO 27<br>TYPE: SFPP CO: STATE FARM RO 27 |
| 09/16/2020 | -36.03 | | 5,741.51 | Withdrawal Debit Card CHECK CARD<br>09/15 04270740000070034700340 DEPS FINE WINE & SPIRI COVINGTON KY |
| 09/16/2020 | | 736.00 | 6,477.51 | Deposit |
| 09/16/2020 | -100.00 | | 6,377.51 | Withdrawal |
| 09/17/2020 | -29.57 | | 6,347.94 | Withdrawal POS #132408<br>SPEEDWAY 05268 5 595 ANDE CINCINNATI OH |
| 09/17/2020 | -24.74 | | 6,323.20 | Withdrawal POS #195271<br>BP#3747110HEBRON TRAVEL 10679 LANCASTR RD HEBRON OH |
| 09/18/2020 | -53.11 | | 6,270.09 | Withdrawal POS #516652<br>SPEEDWAY 09271 P 1711 HIL PICKERINGTON OH |
| 09/19/2020 | -10.00 | | 6,260.09 | Recurring Withdrawal Bill Payment #068018<br>TWP*SUB28626861 WAPO.COM DC |
| 09/20/2020 | -13.90 | | 6,246.19 | Recurring Withdrawal Bill Payment #091645<br>Amazon Prime*M45J830F2 Amzn.com/bill WA |
| 09/20/2020 | -15.01 | | 6,231.18 | Withdrawal POS #632479<br>KROGER FUEL #443 2310 FERGUSON RD CINCINNATI OH |
| 09/20/2020 | -96.14 | | 6,135.04 | Withdrawal Debit Card CHECK CARD<br>09/17 04137460000037038370380 U-HAUL MOVING & STORAGE A CINCINNATI OH |
| 09/21/2020 | -10.51 | | 6,124.53 | Withdrawal POS #898020<br>THE HOME DEPOT #3822 CINCINNATI OH |
| 09/23/2020 | -2.00 | | 6,122.53 | Withdrawal Debit Card CHECK CARD<br>09/22 04055220000040512405120 CINCINNATI PARKING FEE CINCINNATI OH |
| 09/25/2020 | -8.02 | | 6,114.51 | Withdrawal POS #466678<br>Lyft *Ride Fri 2pm SAN FRANCISCO CA |

*handwritten annotations:* 8:20 AM (next to 09/17/2020 -29.57 row); 10:46 (next to 09/18/2020 -53.11 row)

COURT OF COMMON PLEAS
HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| CITY OF CINCINNATI, | : | Case No. A1905588 |
| | : | (Judge Ethna M. Cooper) |
| Plaintiff, | : | (Magistrate Anita P. Berding) |
| | : | |
| v. | : | |
| | : | MOTION FOR ORDER DIRECTING |
| JOHN KLOSTERMAN, et al., | : | DEFENDANT JOHN KLOSTERMAN TO |
| | : | REMOVE PERSONAL PROPERTY |
| Defendants. | : | |

Comes now Konza, LLC as Receiver appointed for properties owned or controlled by

Defendant John Klosterman in the Sedamsville neighborhood of Cincinnati (collectively, the

"Properties") and moves the Court to enter an order in the form of that tendered herewith

directing Mr. Klosterman to remove all personal property on the Properties as to which he (1)

claims and (2) gives proof of ownership by a date certain or forfeit and relinquish any right to all

personal property not removed from the Properties by that date and in support thereof says as

follows.

The Properties consist of 24 buildings including the former church of Our Lady of

Perpetual Help at 637 Steiner (collectively, the "Buildings") as well as numerous parcels of

vacant land. Half of the Buildings are at least partially occupied by tenants. Many of the

Buildings contain furniture, building materials and or other personal property (collectively, the

"Personal Property"). Some of the Personal Property appears to have be part of the Buildings or,

perhaps, other buildings owned by Mr. Klosterman or one of the other defendants whom he

controls and are owners of record of certain of the Properties, namely Boldface Properties, LLC;

Emily Vets, LLC; Sedamsville Heritage Properties, LLC; Sedamsville History Society; and

Global Sanitation Systems, Inc. (collectively, the "Klosterman Entities"). The presence of the

Personal Property poses a health and safety problem in many of the Buildings a

**EXHIBIT**
**P**

21129144.1

422

1     A.   John asked me if I would also stay

2  on.

3     Q.   And did he ask you that

4  specifically?

5     A.   Yes.

6     Q.   Did he ask you for anything in

7  exchange for staying on with the receivership?

8     A.   Um, no -- no.

9     Q.   Were you still working for John at

10  all after you started working for the

11  receivership?

12     A.   Yes.

13     Q.   Okay.  About how frequently?

14     A.   Maybe a couple of times a month.  It

15  was for a very short time that that -- that that

16  crossed.

17     Q.   Okay.

18     A.   So --

19     Q.   Okay.  And at some point did that

20  stop then?

21     A.   It did.

22     Q.   Do you remember about when that

23  was?

24     A.   Um, I would say by the end of March

25  or early April of 2020.

---

423

1     Q.   So, in that period of time how

2  would you describe your relationship with John,

3  that short period of time before the end of

4  March?

5     A.   In that short period of time he was

6  coming into the office and working with myself

7  and with Joe, together, and that was kind of, I

8  believe, just to like get things in place for the

9  receivership as far as like how things were going

10  to move forward.  Um, he had provided me with a

11  copy of QuickBooks, and had --

*[handwritten annotation: Quick Books]*

12     Q.   Okay.

13     A.   I'm sorry, I don't mean to keep

14  elaborating. Maybe I should just --

15     Q.   No, it's fine.  So that was early

16  on until about the end of March.  At some point

17  did that change?

18     A.   It did, yes.

19     Q.   In what way did it change?

20     A.   I no longer worked for John.  I was

21  strictly working for the receivership.  It was

22  just the lines were blurry there because the --

23  Rick Boydston and Joe didn't have the same path

24  in mind for the receivership that John had

25  initially wanted.

---

424

1     Q.   Okay.  And did that cause some

2  conflict?

3     A.   It did.

4     Q.   Okay.  And what was your role then

5  as far as how that conflict affected Tri-State

6  Organization?

7     A.   So, I felt pretty much in the

8  middle.  I, you know, was trying to do my job for

9  Tri-State, and then I was also trying to answer

10  questions that John had without violating any

11  confidentiality.  So, it was a very awkward

12  situation to be in.

13     Q.   How was John seeking that

14  information from you?

15     A.   He would ask me to provide

16  information either verbally, or to see documents,

17  he would stop in the office, stop by my house.

18     Q.   Okay.  Let's just start by stopping

19  in the office.  How frequently would he do that?

20     A.   Initially it was almost daily, in

21  the mornings usually when Joe would not be there,

22  and it was just myself there.

23     Q.   Okay.  So was it a pretty set

24  schedule on when Joe would come in to the

25  office?

---

425

1     A.   At that point, yeah.  It seemed like

2  he would come in maybe after 10:00 a.m.

3     Q.   Okay.  So John would come into the

4  office before that time?

5     A.   Yes.

6     Q.   Okay.  Did he ever come into the

7  office to meet with Joe after Joe was there

8  during this period?

9     A.   No.

10     Q.   Okay.  And did you complain about

11  that?

12     A.   I did.

13     Q.   To whom?

14     A.   I complained to Joe and to Rick.

15     Q.   If you know, did anything happen as

16  a result of that?

17     A.   I believe in April there was a

18  letter sent to John Klosterman from Rick Boydston

19  asking him to -- to -- instead of talking to me,

20  all of his questions and requests should be sent

21  through either Joe or Rick.

22     Q.   Okay.  So you complained to Joe and

23  to Rick? Did you at any point in time ask John

24  to stop?

25     A.   Not verbally.  I felt really

EXHIBIT
Q

10/15/21
revision

the Properties will then have five calendar days after such notification is sent to make an additional offer.

13. <u>Sale of Lots</u>. In the event no offer is accepted by the Receiver on any set of Grouped Vacant Lots or on any Single Vacant Lot, then the Grouped Vacant Lots and the Single Vacant Lots without an accepted offer will be sold to the winning offeror of the building set forth in the list marked Exhibit F (collectively, the "Added Lots") or as the Receiver may otherwise specify after the end of the Offer Period. The sale of the Added Lots shall be a requirement for the sale of the building to the winning offeror on the Building.

14. <u>Back Up Offers</u>. In the event that the sale of any of the Properties with an offer accepted by the Receiver does not close by the deadline stated above, then the Receiver may declare that acceptance of the offer is rescinded and thereupon the offeror shall have no right to purchase the Property and the Receiver may accept another offer previously made and the offeror of that other previous offer will be obliged to purchase the Property.

15. <u>Current Building Code Violations</u>. All pending Cincinnati Building Code violations for each of the buildings, to the best of the Receiver's knowledge, are listed in the attached Building Code Violation List marked Exhibit G.

16. <u>City Approval of Purchasers</u>. All purchasers of all of the Properties must be approved by the City and that approval is primarily conditioned on the absence of any violation of the Cincinnati Building Code, either open or closed, on property owned or managed by the prospective purchaser or any person or entity in which the prospective purchaser has, or had, any interest, direct or indirect.

17. <u>Purchase Contracts</u>. Purchase contracts for all accepted offers will be prepared by the Receiver.

18. <u>Title Work</u>. All title work in connection with the closing on all sales of all of the Properties will be performed by one title agent chosen by the Receiver and approved by the City.

19. <u>Receiver Goals</u>. The Receiver seeks to recover the highest possible price for all of the Properties and to sell all of the Properties as soon as possible. The Receiver will select the winning offer based on those two goals.

20. <u>Sale Free and Clear/Disbursement of Proceeds</u>. All sales of all of the Properties will be free and clear of all claims, liens, mortgages and encumbrances of any kind or nature which could be removed by payment of money. Sale proceeds will be aggregated and paid pursuant to subsequent order of the Court, first for the costs of sale and closing including a reasonable commission to the Listing Realtor, second to the Treasurer of Hamilton County, Ohio (the "Treasurer") for unpaid real estate taxes and assessments on all of the Properties sold, third to Warsaw Federal Savings and Loan Association ("Warsaw Federal") on its mortgage claims on the Properties sold, fourth to the Receiver for fees and expenses approved by the Court, fifth to the City toward its judgment lien and for fees, fines and other amounts due by defendants to the City, and last the remaining balance to John Klosterman. The foregoing notwithstanding, in the event of the sale of any of the Properties subject to a mortgage to Warsaw Federal, to the extent the sale price is for, and only for, a specific one of the mortgaged Properties (

**EXHIBIT R**

Affidavid

Randy Hattfield,
1936 Maple Avenue 1st floor
Norwood, Ohio 45212

I randy hatfield state the following:

I moved into 621 Delhi in 2018. I had been Mr. Klosterman's painter for over 20 years. I have lived in many of his buildings 659, 701 Sedam and 649 Steiner over the years. Many times for security purposes. All have been safe and I enjoyed my stay.

In all the units I painted in exchange for rents. I rarely paid rent over the years for the continual painting that Klosterman had for me.

Sometime in 2020 I called Klosterman and said there was a notice on the window stating that I had to move. No reason. Just vacate. I kept the notice and Mr Klosterman said he disagreed with the order by the Cincinnati Building Department and that he would hire a structural engineer to assess the building and send it to the building inspector which he did. He showed me the report.

In early September, 2020, Klosterman, Mike our maintenance man and the engineer went through my 2 room unit and Mr. Graman said everything was OK. But, the city kept putting notices on the door to move after he would have received the report tha Klosterman said he sent the day after he received it on September 20, 2020. The orders to move kept coming and I did not want to fight with the City, nor did the lady and her daughter on the 2nd floor. I called Mr James and I met him at his office where he told me that the building was going to be condemned. I wondered why because he had never wanted to come into my unit. I would have gladly showed him. I was told to find an apartment and that the City would pay the deposit and the first month's rent. I found a unit in Norwood that I did not prefer over where I was but life is like that.

EXHIBIT

S

I met the new landlord and Terry James to inspect 2015 Four Acres Avenue, Norwood, Ohio 45212, where I would move in the next day if approved . At the start of the inspection of the new apartment, Terry James said casually in front of me, the new landlord Mr. Parks "as it worked out, we didn't have to go through all this, because the building was structural safe" "you didn't have to move" I said "are you kidding me " I'm all packed and ready to go" I moved.

I ran into Mr Klosterman in late 2023 at the Norwood White Castle on Montgomery Road. We sat and I told him what had happened 3 years earlier. He was visibly upset. He is a calm person normally but you could see his face was beet red. I gave him my new number and left.

Recently he asked me to guard the unit in my retirement, so it would not get broken into again. So I stay there for free from time to time to let the neighborhood thieves know someone lives there.

"I declare under penalty of perjury under the laws of the State of Ohio, that the foregoing is true and correct."


_____ on file _____

Randy Hatfield                Date


Notary


_____  _____

Affidavid

Miichael Arey Jr.
4160 East Miami River Road
Cleaves, Ohio 45002

Reference: 621 meeting with Richard Graman structural engineer

I have been in the construction business for over 35 years and my skills are in electrical and structural rough framing and reconstruction of old buildings.

I have done most of Mr. Klosterman's electric and skilled construction when needed for over 25 years.

Mr. Klosterman asked me to participate in a meeting where Mr.Klosterman had hired a structural engineer to evaluate the south western portion of a frame addition of 621 Delhi. This portion of the old addition had a first floor near empty storage area with a 8 foot shingled roof. The meeting was held on or about Septwmber 10 , 2020 in the basement of 621 Delhi with Richard Graman of GEI. structural engineering, myself and Mr. Klosterman.

We discussed and agreed on what was necessary to rebuild the framing for the basement and 1st floor where there were no finished living spaces. They were old abandoned bathrooms from the late 1920's . He would include the recommendations in his report.

We all walked into the brick side of the building where the 2 tenants resided to get Mr. Graman's opinion of the structural integrity of the 2 tenants living in the original historical building. The three of us walked though each room in both 621 and 623 Delhi. The tenant on the 2nd floor of 621 was not home but was given notice of the visit. I had done most of the work in the building, so was familiar with the unit. Mr.Graman stated the unit was fine



EXHIBIT

and that it had nothing to do with the frame addition issues in the old addition in the basement.

We all entered Randy Hatfields unit on the first floor. He was Mr Klosterman's painter unit. His large efficiency was on the North side of the original brick building. Mr Graman introduced himself and stated he wanted to walk through his unit. He stated to Randy that his unit was OK. It took less than 5 minutes.

We then went to 623 Delhi and walked the entire building and it was fine as the report stated.

Mr Klosterman, received the report dated September 18, 2020 Klosterman told me he emailed the report the day he received it to the building department and handed me a copy, which I have here today. Both tenants were forced to move.

After the report which was approved as a temporary support wall , I constructed a more permanent temporary wall 18 about inches from the deteriorated foundation wall for approximately 15-18 feet with 2x4 studs with ½ in plywood for added support. I performed this task while Klosterman was incarcerated. This action was due to the inability to take the old existing wall out and ready it for rehabilitation all due to the lack of maintenance issues from the previous owner. Since that time and to this day there has been no additional reduction of out of level. The wall is stable and ready for rehabilitation.

Nothing has been done in that area except a gutter repair to stop water from running into the adjacent property's basement.

The building has been vandalized multiple times since it was vacated. I have been making repairs for the last 8 months as funds are available from Mr Klosterman.

"I declare under penalty of perjury under the laws of the State of [Your State] that the foregoing is true and correct."

_____          _____

Miichael Arey Jr.                       date


Notary


_____  _____

1    properties, and that's why we're in the

2    situation we're in.

3                But it was an expedient thing and

4    it's what the city wanted.  It was not the plan

5    that we started from the beginning.

6                They were given all sorts of

7    special treatment and everything else.

8        Q.    So do you know when the Landbank

9    submitted their offer to purchase?

10       A.    No.  I was kept out of that.  I know

11   about the time.  Because I was asked to walk

12   around with people and let them into houses and

13   open units for them.  No other bidder got that.

14   I was specifically told this.

15               I had other parties interested in

16   the properties.  But I was specifically told,

17   no, there would be no preview of sale.  That's

18   part of the conditions.  But the Landbank got

19   it.

20       Q.    All right.  Take a look at TSO

21   Exhibit GG.

22               THE COURT:  You said GG?

23               MR. NIEBERDING:  GG, yes, Your

24       Honor.

25       A.    Okay.  Yes, sir.

EXHIBIT

T

1  possible. And that Ms. Donathan even

2  was -- was on the Internet, such that we

3  had bidders from California and on the

4  west coast.

5    The difficulty was, for the

6  receivership, that a sale less than all

7  the properties was going to require the

8  receivership to continue. So there was a

9  real great importance to me of having

10 somebody bid for all of it.

11    That nearly happened with Kim

12 Knoppe of Columbus, a developer who's

13 been very successful in Franklin County

14 and adjoining areas. And it did --

15 bought up a lot of property on River

16 Road. But his bid excluded one small

17 property. But he didn't follow the

18 bidding terms and made it contingent on

19 city financing. He would have been a

20 good developer if he not made that

21 stipulation.

22    The second other alternative was

23 the Serenelli Project, a project formed

24 out of the diocese -- or Archdiocese of

25 Cincinnati, Roman Catholic Church, n

EXHIBIT

234

1

2

3                          CERTIFICATE

4              I, Sharlene D. Hall, RMR, the

5    undersigned, Official Court Reporter for the

6    Hamilton County Court of Common Pleas, do

7    hereby certify that I did transcribe from Audio

8    Recording the within 233 pages, and that the

9    foregoing Transcript of Proceedings is a true,

10   complete, and accurate transcript of said Audio

11   Recording.

12             IN WITNESS WHEREOF, I hereunto set my

13   hand this 22nd day of January, 2025.

14

15

16

17            _Sharlene D. Hall_____

18                 Sharlene D. Hall, RMR
                   Official Court Reporter
19                 Court of Common Pleas
                   Hamilton County, Ohio
20

21

22

23

24

25



EXHIBIT