JOHN KLOSTERMAN
5615 SIDNEY ROAD
CINCINNATI, OH 45238
(513)250-2610
johncklosterman@gmail.com



D136897074

**COURT OF COMMON PLEAS**

**HAMILTON COUNTY, OHIO**



CITY OF CINCINNATI

Plaintiff,

vs.

JOHN KLOSTERMAN, ET. AL.

Defendants

Case No.:A1905588
(Judge Wende C. Cross)
(Magistrate Anita P. Berding)

**DEFENDANTS OBJECTION TO PLAINTIFFS MOTION BY RECEIVER FOR APPROVAL OF FEES AND EXPENSES OF TRISTATE ORGANIZATION, INC. THROUGH NOVEMBER 30, 2022, ORDERING DIRECT PAYMENT and DEFENDANTS OBJECTION TO PLAINTIFFS MOTION BY RECEIVER FOR APPROVAL OF FEES AND EXPENSES THROUGH NOVEMBER 30, 2022, ORDERING DIRECT PAYMENT**

COMES NOW the Defendant in this matter, JOHN KLOSTERMAN, with his objection to the Plaintiff's Motion by the Receiver for Approval of Fees and Expenses of Tri-State Organization, Inc. through the date of November 30, 2022, with a request for Direct Payment immediately upon approval.

Simply put, Defendant objects to this Motion at the time being until (at least) all balance sheets and a full forensic accounting report is presented to this Court

**FACTUAL ALLEGATIONS**

8.    On or about March 1, 2020, Tri-State Organization Inc. (after being retained by the aforementioned court-ordered receiver, BOYDSTON) began managing Plaintiff's properties in

**EXHIBIT 10**

what was supposed to be a relatively standard process which would eventually result in the sale of said properties, in turn, allowing the Plaintiff to satisfy a judgment that the City of Cincinnati had obtained against him in case no. A1905588.

9. Tri-State began collecting unpaid rents that month and for the months following would collect just under $9,000 on said monthly basis. These funds were meant to be used to pay recurring bills, mortgages, and the balance used to prepare buildings for sale. That amount was considered the budget.

10. The stated agreement in a meeting with Tri-State, the Plaintiff and the Receiver, BOYDSTON, was that they would provide a team of skilled workers that would do the needed construction that would turn Plaintiff's properties into rentals in a relatively timely fashion.

11. At the time March 1, 2020 said properties were turned over to the Receiver and Tri-State, they were tasked with "flipping" seven of Plaintiffs units.

12. Plaintiff proceeded to meet with the President/Owner of Tri-State, JOE LENTINE, and both parties to devised a strategy to get the inventory turned over to maximize the properties' rental income.

13. At the time, none of the current tenants were in need of repairs, emergency or otherwise. BOYDSTON declared all the rented properties in "B" grade condition.

14. Plaintiff admits that the month of March, 2020, was a so-called "learning" month for Tri-State, but Plaintiff began to grow concerned once he received the second status report.

15. Plaintiff questioned why he was paying for everything Tristate reported on his expense report., including all equipment used, office material, and many other items that should have already been obtained by a rehab company before beginning work on a particular job. Even at that juncture, when Plaintiff inquired about the questionable expenditures, nothing was done to resolve the issue and no

questions were answered, complex, simple, or otherwise.

16.     Further, when the June, 2020 expenditures arrived, Plaintiff found these to be even more troubling…it was revealed through said report that Plaintiff was paying for all the equipment, including an actual truck that Tri-State was supposedly using to "operate" the business. Plaintiff alleges that the Receiver hired this company with the knowledge that they actually, had no tools, equipment, or otherwise to operate a proper construction/rehab company, and Receiver did not question any of the tools at all.

17.     Plaintiff alleges that Defendant LENTINE's point man on this job, a gentleman only known as KEITH, had seemed qualified to do this job upon their initial meeting in February, but after that one and only initial meeting, Plaintiff never saw him again or the personnel he had promised to bring onto the job. Plaintiff contacted LENTINE multiple times about where Keith was and where his personnel were, and why nothing was getting accomplished on the rehab projects. The Plaintiff was given no proper or reasonable explanation.

18.     Further, Plaintiff was personally in the area every day to watch the work being done and to inquire with the neighbors about the work being accomplished and the workers that they would come into contact with. The neighbors informed the Plaintiff that the "personnel" they were introduced to were employees from Defendant's Pizza operation called "Full Circle Pies" on North Bend Road, and not the experienced personnel as promised

19.     Plaintiff alleges that the workmanship done on truly historic homes, where all the Plaintiff's 29 units were on the National Register of Historic Places (some aged at 125 years) was totally unprofessional and done by "personnel" that was also unequivocally under qualified.

20.     After being presented with the two "padded" and/or fraudulent reports and never coming into contact with LENTINE's "team of experienced construction personnel", Plaintiff alleges

the rehab project turned into an "unmitigated disaster", not only to the properties physical well-being in general, but also the continue blatant misuse of the Plaintiff's funds in the amount of nearly $40,000.00

21.    Plaintiff alleges there was no budget presented to him by the Receiver, Tri-State, or any other affiliates, and there was also no itemized invoices stating how the labor cost was spent and what was accomplished with it.

22.    Plaintiff e-mailed the Receiver on multiple occasions stating his concerns with the Status reports and requesting the receipts to review, along with other pertinent questions he felt needed answered. Currently, these e-mails have gone unanswered.

24.    Plaintiff asserts Defendants failed to secure all the buildings initially which were always secured by the Plaintiff. Specifically, 649 Steiner, 652 Steiner, 638 Steiner, 654 Steiner ,707 Delhi, 793 Delhi and 685 Halsey. Many of these addresses have multiple times been unsecured and it was stated in emails that they continued to be not secured 4 , 5 and 6 months into the project .

25.    Plaintiff asserts Defendants failed to adhere to demand accounting systems be used by TSO after Plaintiff agreed to purchase and set up Quickbooks for the accounting and Job costing for the management company. TSO refused to use it even though there was a trained person on staff to input data for crucial and timely reports.  TSO had no accounting system which has been evident by reviewing the reports. They are negligent at best and fraudulent at worst.

26.    Plaintiff asserts Defendants failed to stop TSO from purchasing equipment tools and office supplies on the plaintiffs budget, when in fact any company that is hired to perform rehab of apartments would have all these tools and supplies in order to run a business. TSO had none as evidence of over $15,000.00 in tools, office supplies, repair of TSO old equipment before it

could be used were all billed to the Plaintiff. A clear violation of the Defendant's duties to prohibit it from happening., but it continues to today.

27. Plaintiff asserts Defendants failed to make accounting adjustment on double billing, false billing and fraudulent rental assistance pointed out to and documented in management reports.

28. Defendants failed to correct the fraudulent sale by TSO to the Receiver of a Ford F250 truck. It was verified by the Plaintiff that it was owned by TSO (verified by Hamilton County Title Agency). TSO stated fraudulently that he purchased it for the Receiver. In fact TSO/Joe Lentine Fraudulently sold it to the receiver for a much inflated price. No title has been seen. Plaintiff reported it but nothing was done. Emails support the claim. Receiver in a court motion clearly answered that he had not purchased it, but Plaintiff did not ask that question. It is alleged that Receiver is working hand-in-glove with TSO's fraudulent enterprise and is working against the Plaintiff to "run up" the expenses so TSO could purchase the properties at a reduced price. Plaintiff alleges that Receiver has knowledge that Defendant Lentine continues to launder illicit funds in order to have "equity" in the potential sale to himself where defendant Boydston will benefit with legal work. Over $200,000.00 is unaccounted for and Plaintiff alleges much of that sum is laundered money.

29. Plaintiff asserts Defendants failed to turn over records that were ordered by the court and requested by plaintiff after the order was mandated. Even after the first documents were delivered, the Plaintiff requested the balance of the records but Defendants slow walked the request and only provided 40 sheets of paper when in fact all the bank records which had the bulk of the alleged fraud contained in them were not turned over. That failure shows the allegation that Plaintiff makes here that Defendant Boydston, the receiver, should be criminally liable for his involvement in hiding of the records from TSO.

30. Plaintiff asserts Defendants failed to answer any legitimate concerns and questions when

he had explicitly stated in an email to contact him, and him alone with any problems from TSO and to report them directly to him and no one else. Obviously, it was to make sure it was only the Receiver that knew of the improprieties that Plaintiff was uncovering on a regular basis and it was the Receiver who participated and even commingled expenses with TSO. Only one, in over a year, was 10% of the items answered. Clear Obstruction from TSO.

31.    Plaintiff asserts Defendant Boydston, being a bankruptcy attorney, should have known to have better reporting systems in place. It is alleged that there is collusion with 3 or more parties namely Mr. Joe Lentine, the City of Cincinnati, the Receiver Richard Boydston.

32.    Receiver's co-mingling in the operation of TSO by the purchase of insurance policies for TSO and 3 other people who are independent subcontractors should be considered fraudulent business practices. In fact, they should have never been on any policy. Plaintiff alleges corporate fraud and Plaintiff has paid for the initial insurance and continues to pay for the insurance of these other parties on a monthly basis.

33.    Plaintiff asserts there was failure by the receiver to recover from TSO the over $800.00 in purchases from U-Line Corporation through Mr. Lentine's now defunct company, Half Circle Pies. Invoices show material was billed to Receiver, and Paid. However, there were 3 invoices from Uline that were unpaid and turned over to a collection agency. The plaintiff in an email told the City of Cincinnati and the Receiver that he had documented proof of what had happened and asked the Receiver to pay Uline. Nothing was done.

34.    Plaintiff asserts Defendant Boydston failed to assure that TSO was maintaining tenant issues. In fact 3 original tenants were lost due to poor or incomplete maintenance causing a loss of $1,500 in rental income.

35.    Plaintiff asserts Defendant Boydston failed to initially verify TSO credentials. It was discovered that the required City contractor's license or liability insurance was not obtained

for five months. In addition, Plaintiff alleges TSO is not an active corporation and this has been verified by the Connecticut Secretary of State. They have no legal rights to operate as a corporation anywhere.

36. Plaintiff asserts Receiver and the city failed to require the management company TSO to have a budget and a plan on how they were to proceed to be able to get the 5 Apartments ready in order to sell the properties if a settlement was not reached.

37. Plaintiff alleges Defendant Boydston is attempting to sabotage the values by intercepting Plaintiffs' appeal to raise the property values of properties in Sedamsville. One example was 636 Delhi, that had been reappraised by the auditor to $137,000.00 due to the completion of the rehab. Receiver filed an appeal to reduce its legitimate value to $50,000. In another property, 685 Halsey, Receiver asked for the value to be reduced to $1,000 from over $100,000. Plaintiff asks why would a Receiver act contrary to his mission, which is to increase the values of the properties in this particular case.

38. As the 33 report states in its preamble once again "until there is improvement of cash flows from the operations......no request for fees....."

Defendant asks his court for a full audit of the books of TSO. There is a reason there is no improvement. Mr. Boydston refused to install the controls via QuickBooks that the Defendant up and paid for. How convenient for Mr. Boydston and TSO. a virtual free for all, as the final billing documents show. Even more importantly there is no pre-final report from TSO where Defendant can compare billing vs work vs legal fees.

39. Every month whether it makes any difference to this court or not is glaring fraud and perjury by Mr. Lentine, who has admitted to his crimes, but has not been indicted pending a plea deal. Ms. Strunk Mr. Lentines co-defendant has pleaded guilty and awaits sentencing is now

abruptly back on the job as there is a hurried addition to the payroll list. Worker #1 $2,351.25. How Defendant would love to see that time sheet with different inks marking the dates making up the time.

40. Defendant prays the court focus on the rental income where $900,00 was owed and collected. The court records show that Mr. Randy Williams was given a 3 day notice and was evicted at the court hearing (he did not attend) and the plaintiff TSO was awarded the eviction and judgment. We all know that the judge asks " have you accepted any rents after you filed this action" Mr. Lentine perjured himself by answering 'No". Mr Lentene continues to launder money and by padding the rent rolls covers his inaction in the management of the properties. How many more over the 33 months did he offer " come rent this unfinished unit for whatever you can pay and I will pay the balance or the full amount. ( " I'm a good guy giving convicted felons and 80% of the tenants have criminal or evictions that would disqualify them in any but C and D grade housing units.)

41. After checking the records of the now finally listed tenants, only 1 (one) would qualify under Defendants application rules. And given that over $550,000.00 was reported as spent by TSO, the units would be in Hyde Park shape.

42. Indeed, Mr. Boydston stated on more than one billing memo so far that he edited the rental income and many times stated in "charge memos' ' conference calls to edit the monthly reports before they were submitted to the court. Why all the conferences and editing? Because there was no accounting present. TSO was not certified as a Real Estate Management company as evidenced by the over $65,000.00 billing dollars spent by Mr. Boydston mopping up the sh…t show Mr Lentine made on a monthly basis until Mr Boydston refused to show the Bank and Employee records to Defendants Agents by court order. It is still alleged that Mr. Boydston

was and still is a Co-employee of Mr. Lentine.

43.    Mr. Boydston did most of the work that Lentine was hired to do as a management

company. Mr. Lentine in his opening paragraph states that there was "an agreement" and in

legal billings Mr. Boydston conferences with Lentine and Ms. Strunk about "budget" Was there

one or was it about the outlandish over budget amounts being submitted by TSO?

- Mr. Boydston wrote and billed for writing leases.
- Wrote 30 day notices to be given to tenants
- Meeting with potential buyers
- Met with, called, emailed Community Action Agency to disprove the fraudulent submissions of rental assistance (and pocketed by Mr. Lentine) discovery in a future action will uncover all the missing information that Defendant alleges in this passage.
- Constantly edited the rental and other issues presented in the management reports
- Constantly drove by properties. Why? The highly documented job costing that should have been in place was absent. A judge makes rulings all day without stepping out of the courtroom. Why did Mr. Boydston visit over 30 times and counting. More after the arrest. ( it verifies that Mr. Boydston knew early on that Lentine should have been Fired, but did nothing )
- Allowing the fraudulent tax filing and reporting that it was paid, to stand not once but it continued to be reported and not paid.
- Mr Boydston was careful not to mention the arrest by the FBI in any of his billings or emails after the arrest. But Billing records show multiple (daily) calls to Lentine and Strunk, drive bys, talks with attorneys, etc. Defendant was fraudulently billed by Mr Boydston, it is alleged and will be proven in later Discovery.
- What were the "operations charts" that Mr. Boydston refers to and edits constantly? *Now Mr. Boydston had to justify the Merry-go-round of repairing the same units time and time again. Where were the 36 ghost employees, the work made up. The Plaintiff and its agents had to hurry and get this job done before it crashed. The Defendant saw for over 2 years that it would crash. And very soon the investigations will begin.

44.    We all know now that for over 2 years the Lentine/Strunk criminal enterprise was in

operation. Bank statements will show that the receiver did nothing to stop it after he reviewed

them because the legal fees justified his doing nothing about the operation and then unfortunately

had to go behind nearly every action made by TSO to be cleaned up. (with the generous legal

fees for tasks that would have been done professionally if a licensed Real Estate Company had

been employed.

45.    Mr Boydston  continually had conferences, meetings and Email correspondence with the Building Department to explain why no permits were being pulled, and the work upon inspection (I have been told) was poor and had to be redone, (at Defendants expense) without supervision. Mr. Lentine was busy with PPP fraud.

46.    Legal billings even show Mr Boydston looking into TSO. He had to find what Defendant found and reported to this court that Lentine did not have a corporation and that is why Mr. Boydston/Konza had to purchase the liability insurance policy for TSO to operate in the City of Cincinnati. The application was found to be fraudulent and Mr. Boydston had to fix that as well. Unnecessary Billings.

## ARGUMENT

I.    **Because Plaintiffs improperly Claim Fees and Expenses on Work for Which They Have Not been Awarded Recovery, their entire Claim should be disallowed.**

Plaintiff's Motion presents one of the increasingly common instances in which a fee application has been calculated so incredibly and blatantly under improper circumstances, that this Court should deny it in its entirety. In *Environmental Defense Fund v. Reilly,* the Court stated the following in regards to fee requests and applications:

> *"We may deny in its entirety a request for an "outrageously unreasonable" amount, lest claimants feel free to make "unreasonable demands, knowing that the only unfavorable consequence of such misconduct would be reduction of their fee to what they should have asked for in the first place..."*

In the aforementioned case, the Court overseeing the matter disallowed the entire fee claimed by one of the Attorney's for the applicant (but not the others), because of an excessive amount of time claimed on certain tasks . The Court also noted that, as an alternative to

disallowance of the entire fee request , a court may "impose a lesser sanction, such as awarding a fee below what a "reasonable" fee would have been in order to discourage fee petitioners from submitting an excessive request.

Plaintiff's Motions fits within the "outrageously unreasonable" standard described in *Environmental Defense Fund v. Reilly.* Even putting aside the fact that the overall amount suggested by the Plaintiffs "Report" is grossly excessive considering no deep-diving forensic accounting has been mandated by this Court, Plaintiff's Motions is also outrageously unreasonable because Plaintiff's have claimed substantial amounts on work that has been purely and seemingly created out of "thin air" so to speak. Plaintiff's had no basis to believe , and could not have reasonably believed that they were entitled to the fees presented in their current submitted motions without a court mandated forensic accounting by an uninvolved third-party. Their conduct is aggravated by the fact they have already tried this procedure of "padding" fees before. A substantial sanction is appropriate to ensure that this does not happen again.

## CONCLUSION

Defendant, JOHN KLOSTERMAN, requests an immediate injunction on this matter, halting any payments until a forensic accounting is done on the Receivers bookkeeping, as well as Tri-State Organizations bookkeeping, and all payments involving real estate contracts and other applicable fees are revealed to the Defendant and this Court. Mr. Klosterman also requests an immediate hearing on the matter, and such other and further relief as the court may deem proper.

DATED THIS 14TH DAY OF DECEMBER, 2021

PRO-SE LITIGANT, JOHN KLOSTERMAN
5615 SIDNEY ROAD
CINCINNATI, OH 45238
(513)250-2610
johncklosterman@gmail.com