UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

JOHN KLOSTERMAN, et al.,
   Plaintiff,

v.

KONZA, LLC, RICHARD BOYDSTON,
DENTONS BINGHAM
GREENEBAUM LLP, CITY OF
CINCINNATI, et al.,
   Defendants.

Case No. 1:25-cv-00312-SJD-KLL
Judge Susan J. Dlott
Magistrate Karen L. Litkovitz

**PLAINTIFF'S REPLY TO CITY DEFENDANTS' OPPOSITION TO MOTION FOR LEAVE TO ADD EXTORTION CLAIMS**

## I. INTRODUCTION

The City's opposition fundamentally mischaracterizes the facts and law governing Plaintiff's motion. The City attempts to justify retroactive billing for a building it forcibly emptied through fraudulent condemnation, then blames the victim for lacking funds to maintain the very property from which the City illegally removed income-producing tenants. This circular logic exemplifies the extortionate conduct at the heart of Plaintiff's claims.

Plaintiff is not intimidated by the City's procedural gamesmanship or its attorneys' misrepresentations. Make no mistake: Plaintiff is neither unsophisticated nor willing to abandon his pursuit of justice regardless of time or expense required. Plaintiff has over 250

documented evidence files ready for depositions, engineering reports, sworn witness testimony, and—critically—insider knowledge of the City's revenue-driven enforcement regime. This case will proceed to its conclusion, and the full scope of the City's connection to others misconduct will be exposed through discovery and trial. The plaintiff will prepare all the files for one of the four outside legal firms under consideration, who will proceed from discovery to summary judgment on individual liability and finally to jury trial to determine damages.

## II. THE CITY'S CAUSATION ARGUMENT IS LEGALLY INSUFFICIENT

### A. The City Created the Financial Impossibility It Now Exploits

The City's entire opposition rests on a fundamental logical fallacy: it forcibly removed Plaintiff's tenants through fraudulent 2020 condemnation orders, thereby eliminating Plaintiff's rental income, and now claims Plaintiff should have maintained the property with funds the City's own illegal actions prevented him from earning.

Had the City not illegally removed Plaintiff's tenants, Plaintiff would have possessed the rental income necessary to fund any required repairs to the addition's exterior wall. The City cannot: (1) fraudulently condemn a structurally sound building (confirmed by GEI engineering reports); (2) force evacuation of income-producing tenants with financial bribes of deposit and first months rent; (3) eliminate the property owner's revenue stream; (4) demand retroactive fees for maintaining the vacant building the City itself created; and (5) claim the property

owner's financial inability to comply justifies the extortion. This is precisely the "wrongful use of official right" that constitutes Hobbs Act extortion.

**B. The Addition Issue Does Not Affect Tenant Safety in the Main Structure then or now.**

The City conspicuously fails to address that any alleged issues with the addition's exterior wall have no bearing on the habitability or safety of tenants residing in the original brick L-shaped portion of the building. GEI engineering reports confirmed the structural integrity of the main building. The City's forced vacancy of the entire property—including the structurally sound portions—was unnecessary, pretextual, and designed to financially destroy Plaintiff.

**C. The July 2, 2025 "Collapse" Allegation Is Irrelevant and Misleading**

The City's dramatic references to a July 2, 2025 "building collapse" are both legally irrelevant and factually misleading: The outside wall supported 2 long abandoned bathrooms, vacant since the 1920's.

**1. TEMPORAL IRRELEVANCE:** The alleged July 2025 incident occurred AFTER the fraudulent 2020 condemnation orders, years of forced vacancy, the filing of this federal lawsuit, and the August 6, 2025 VBML invoice that forms the basis of the extortion claim.

**2. CAUSATION:** Any structural deterioration in 2025 resulted directly from the City's 2020

3

actions forcing vacancy and eliminating the rental income that would have funded maintenance.

## III. THE CITY FAILS TO REFUTE THE EXTORTION ELEMENTS

### A. "Under Color of Official Right" Is Clearly Established

The City does not—and cannot—dispute that the VBML invoice was issued under color of official right by Building Department officials exercising governmental authority. The invoice explicitly invokes City code enforcement powers and threatens liens and additional penalties.

### B. The Retroactive Billing Constitutes "Obtaining Property"

The City argues it has not yet "obtained" payment, but this argument misunderstands Hobbs Act jurisprudence. Extortion is complete upon the demand itself when made under color of official right. See United States v. Green, 350 U.S. 415, 420 (1956). The demand for payment, backed by official enforcement power, constitutes the extortionate act regardless of whether payment has been remitted.

### C. The Fees Are Not "Lawfully Due"

The City claims the VBML fees are authorized by municipal code, but this argument ignores the crucial element: fees imposed on a building the City itself fraudulently forced vacant are not "lawfully due" under Hobbs Act analysis. The fees are extortionate because: (1) they

4

penalize Plaintiff for a vacancy the City wrongfully created; (2) they were never billed during the alleged accrual period (2020-2023); (3) the first invoice appeared only after Plaintiff filed federal civil rights claims; and (4) the building was structurally sound per engineering reports when condemned. When official acts creating the underlying obligation are themselves fraudulent, subsequent fee demands based on those acts constitute extortion under color of official right.

## IV. THE RETALIATORY TIMING DEMONSTRATES BAD FAITH

The City's opposition carefully avoids addressing the elephant in the room: Why did the first VBML invoice appear in August 2025—more than five years after case B202006417 was opened—and only after Plaintiff filed this federal lawsuit?

The City claims it issued prior notices in December 2020, but conspicuously provides no evidence of any actual invoices or billing statements sent to Plaintiff between 2020 and August 2025. The December 2020 notice (Ex. B) was a condemnation order, not a fee invoice. If these fees accrued since January 2020, why was the first invoice demanding payment not sent until August 6, 2025—after the federal lawsuit was filed? This timing alone establishes retaliatory intent and transforms otherwise legitimate administrative billing into extortionate conduct.

## V. THE VBML PROGRAM IS A REVENUE-GENERATING ENTERPRISE

The City's opposition attempts to portray VBML billing as routine code enforcement, but Plaintiff has evidence that exposes the true nature of this program: a revenue-generating

5

machine that produced $8 million for the City. This figure was verbalized by a City official, and Plaintiff will present witness testimony to establish this fact at trial.

A. The Financial Motive Behind Fraudulent Condemnations

The VBML program's $8 million revenue generation provides the critical motive element for the extortion and RICO claims. The City's Building Department does not merely enforce safety codes—it systematically targets properties for condemnation to force them into the VBML fee structure as James did with 793 Delhi creating a perpetual revenue stream from property owners who: (1) are forced to vacate structurally sound buildings; (2) lose rental income that would fund repairs and compliance; (3) cannot afford to bring properties into compliance without that income; (4) face escalating annual fees, penalties, and interest; and (5) eventually lose properties to liens, demolition, or forced sale. This is not code enforcement—it is a racket. When a City official describes the VBML program as simply a revenue generator. That official is confessing to the enterprise's true purpose.

B. Plaintiff's Property Exemplifies the Scheme

Plaintiff's experience demonstrates the VBML revenue model: 2020: City condemns structurally sound building (per GEI engineering reports); 2020: City forces removal of income-producing tenants; 2020-2025: Property generates no rental income due to forced vacancy; 2020-2025: City accrues VBML fees but sends no invoices; 2025: Plaintiff files

6

federal civil rights lawsuit; 2025: City immediately sends first invoice demanding $15,015.00 in retroactive fees; Future: City will add annual renewal fees, additional penalties, and interest; Endgame: City places lien on property or forces demolition, eliminating Plaintiff's property rights entirely.

### C. The Witness Testimony Will Prove Financial Motive

Plaintiff will present witness testimony from individuals with direct knowledge of: (1) City officials' statements regarding VBML revenue generation; (2) the $8 million figure acknowledged by a City official; (3) the targeting of properties for condemnation to feed the VBML system; and (4) the Building Department's awareness that many condemned properties are structurally sound. This testimony will establish that the VBML program operates as a criminal enterprise designed to extract money from property owners through abuse of governmental enforcement powers.

### D. The City Cannot Hide Behind "Authorized by Code"

The City argues that fees authorized by municipal code cannot constitute extortion, but this argument fails when: (1) the underlying condemnation creating VBML eligibility is fraudulent; (2) the program is operated as a revenue generator rather than a safety measure; (3) An official acknowledge it as revenue generator; (4) billing is weaponized and timed for retaliation; and (5) the fees are imposed on vacancies the City itself wrongfully created. A

7

facially legitimate fee structure becomes extortionate when deployed in bad faith to extract money through fraudulent enforcement actions. The City's $9 million revenue generation proves the financial motive behind the systematic abuse of enforcement powers.

E. The VBML Ordinance Contains Impossible Insurance Requirements

The extortionate nature of the VBML program is further demonstrated by its insurance requirements, which the City designed to be nearly economically impossible to satisfy while selectively enforcing to target disfavored property owners like Plaintiff.

1. THE INSURANCE IMPOSSIBILITY SCHEME: The VBML ordinance requires property owners to obtain comprehensive insurance on vacant buildings as a condition of licensure. However, as demonstrated in Hamilton County Case No. A1905588 against Plaintiff Klosterman: (a) Richard Boydston testified under oath at trial that he could not obtain comprehensive insurance on the properties; (b) the substitute plaintiff (HCLRC) stated in court filings that obtaining insurance for vacant properties was nearly impossible to procure; (c) despite these sworn and memorandum statements acknowledging insurance unavailability, the City's Building Department would "look the other way" if VBML fees were paid—even without the required insurance in place; (d) Plaintiff was forced to purchase the VBML license at full $5000.00 price and denial of a waiver despite attempting to procure, demonstrating targeted enforcement. This creates an impossible Catch-22: the ordinance requires insurance as a condition of the license, but comprehensive insurance for vacant properties is admittedly

8

nearly impossible to obtain and extremely costly when available. Yet the City selectively enforces this requirement—waiving it for some property owners who pay fees while denying licenses to targeted individuals like Plaintiff.

**2. PLAINTIFF'S DOCUMENTED COMPLIANCE EFFORTS:** Anticipating that Richard Boydston would target Plaintiff's alleged inability to obtain insurance at the initial Chapter 11 hearing, Plaintiff's bankruptcy counsel advised proactive action. Months before the first hearing, Plaintiff contacted multiple insurance companies and obtained obtain policies for both occupied and unoccupied vacant properties. At trial, Plaintiff will demonstrate that: (a) insurance policies were in force and current for months; (b) insurance policies remained current for months after withdrawing from the filing; (c) Plaintiff successfully obtained coverage that defendants claimed was "nearly impossible to procure." Despite Plaintiff's compliance, the City continued its targeting enforcement.

**3. THE COST OF SELECTIVE ENFORCEMENT: THREE FIRES UNDER KONZA'S RECEIVERSHIP:** The consequences of the City's selective enforcement became catastrophically apparent when Defendants allowed Defendant receiver Konza, LLC to operate without comprehensive insurance. Three fires occurred at historic buildings under Konza's control, resulting in over $300,000 in losses to historic structures. Konza maintained only liability coverage—precisely the inadequate insurance that the City's VBML ordinance supposedly exists to prevent. This selective enforcement proves the VBML program's true purpose: not building safety or insurance compliance, but revenue extraction from targeted

9

property owners while favoring connected parties like Konza, LLC who have a fiduciary duty to protect properties under its care , as though they were their own, a free pass.

4. HAMILTON COUNTY CASE A1905588: VBML FEES AS PRIMARY BASIS FOR RECEIVERSHIP: The Hamilton County receivership case against Plaintiff (Case No. A1905588) was based nearly entirely on unpaid VBML fees. The license required a compliance plan, which Plaintiff will present at trial. However, the case reveals the extortionate leverage the City creates through the VBML program: (a) unpaid VBML fees become the basis for receivership petitions; (b) receivers like Boydston claim they can't obtain insurance that property owners must obtain; (c) receivers then operate without the required insurance, causing catastrophic losses; (d) the City uses VBML non-compliance to strip property owners of their rights; and (e) the entire scheme generates millions in fees while destroying property values.

F. Arbitrary and Selective Enforcement in Sedamsville Historic District

Plaintiff will present evidence at trial of systematic selective enforcement in the Sedamsville Historic District, where 15 vacant buildings currently exist: (1) TWO properties are owned by attorneys; (2) ONE property is owned by police officers; (3) EIGHT of the 15 buildings have been vacant for over 6 years; (4) the Building Department is either aware of these properties or willfully blind to their vacancy status. The plaintiff will call the permit department and determine whether VBML licenses were required, obtained, or enforced. This evidence will

demonstrate that the City arbitrarily selects which property owners to target for VBML enforcement while ignoring violations by connected individuals—attorneys and police officers—who face no consequences for identical or worse violations. The ordinance was written to be expensive enough to make vacant building ownership financially impossible, but with sufficient ambiguity to permit arbitrary selective enforcement against disfavored property owners.

G. The Scheme's Impact: Property Forfeiture Under Duress

Plaintiff has been contacted by dozens of property owners who lost their properties through this VBML scheme. Faced with: (1) VBML fees exceeding $5,000 or more; (2) impossible insurance requirements; (3) threats of jail time for non-compliance; and (4) escalating annual fees, penalties, and interest creating unpayable debt; many property owners simply surrendered their properties to the City or Land Bank rather than face continued persecution and potential incarceration. The common refrain among victims: "You can't fight City Hall." But if Plaintiff doesn't fight this systematic abuse of power, who will? Plaintiff has committed hundreds of hours to prosecuting this case and is prepared to spend whatever time is necessary to achieve justice—not just for himself, but for the hundreds of property owners over 15 years who were forced to surrender their properties under this extortionate scheme.

VI. THE CITY'S "BAD FAITH" ARGUMENT IS PROJECTION

11

The City accuses Plaintiff of bad faith while simultaneously: (1) omitting that it forcibly removed Plaintiff's income source; (2) failing to explain five years of non-billing before the lawsuit; (3) characterizing normal amendment practice as "bad faith"; (4) pointing to deterioration it caused as justification for its initial wrongful acts; (5) demanding Plaintiff maintain with funds the City's actions prevented him from earning; and (6) operating an $8 million VBML revenue-generating enterprise while claiming fees are merely "routine code enforcement." The City's opposition exemplifies bad faith argumentation. Plaintiff, by contrast, has consistently pursued his claims through proper legal channels, provided engineering documentation, obtained expert reports, and maintained detailed records of the City's misconduct. Plaintiff's determination to see this case through to completion—regardless of the City's intimidation tactics or the time and expense required—demonstrates commitment to justice, not bad faith.

## VII. THE MOTION IS NOT FUTILE

### A. The Extortion Claims Are Independently Viable

Contrary to the City's assertions, the extortion claims satisfy all Hobbs Act elements: (1) PUBLIC OFFICIAL: Current Building Department administrators acting under official authority; (2) OBTAINING PROPERTY: The $15,015.00 demand backed by enforcement powers; (3) UNDER COLOR OF OFFICIAL RIGHT: Explicit invocation of municipal code authority; (4) WRONGFUL: Fees imposed for vacancy the City fraudulently created, never

billed for five years, then demanded only after federal lawsuit filing.

### B. The Claims Strengthen the Existing RICO Pattern

Even if the Court were to find issues with other aspects of Plaintiff's RICO claims, the extortion acts constitute separate predicate acts that independently support RICO liability. The multiple years of retroactive fees (2020, 2021, 2022) plus late fees establish the required pattern of racketeering activity.

### C. Inspector James's Retirement Is Irrelevant

The City argues James was retired when the August 2025 invoice was issued, but this misses the point entirely. The extortion claim is based on: (1) James's initial fraudulent condemnation creating the vacancy; (2) current Building Department officials' knowing continuation of the scheme; (3) retaliatory billing by current officials acting with knowledge of the fraudulent foundation; and (4) the ongoing criminal enterprise spanning both James's tenure and current administration. RICO liability extends to all enterprise participants, regardless of employment status at the time of specific predicate acts.

## VIII. THE CITY'S PROCEDURAL ARGUMENTS LACK MERIT

### A. The Proposed Amended Complaint Was Substantially Described

13

While Plaintiff acknowledges the better practice would have been to attach the proposed amended complaint, the memorandum in support provides extensive detail regarding the factual basis and legal theories of the proposed extortion claims. The City has suffered no prejudice from this technical deficiency, as evidenced by its detailed 12-page opposition addressing the substance of the proposed claims.

### B. The Court Granted Leave to File Untimely Response

The City criticizes Plaintiff for seeking leave to file an untimely response to the motion to dismiss, but the Court granted that motion (Doc. 58), mooting any procedural objection. The Court's grant of leave demonstrates the justice system's recognition that pro se litigants require reasonable accommodation.

## IX. THE PUBLIC INTEREST SUPPORTS AMENDMENT

Justice requires that courts examine the full scope of governmental misconduct, particularly when officials: (1) use enforcement powers to eliminate a citizen's income; (2) then demand payment for consequences of their own wrongful acts; (3) impose retroactive billing only after the victim files federal civil rights claims; and (4) claim the victim's resulting financial distress justifies continued enforcement. This pattern of conduct—forcing vacancy, eliminating income, then billing for the forced vacancy—epitomizes the abuse of official power that federal

extortion statutes were designed to prevent.

## X. THE CITY'S RELIANCE ON "COLLAPSE" EVIDENCE IS IMPROPER

The City extensively references alleged July 2025 events and Building Department records not included in Plaintiff's complaint or motion. To the extent the City seeks to introduce new factual matter via opposition brief: (1) such matter is improper on a motion to dismiss or motion for leave to amend; (2) the City's characterization of events is disputed and not established fact; (3) any post-lawsuit deterioration resulted from the City's own 2020 wrongful acts creating forced vacancy; and (4) the temporal sequence (2020 condemnation → 2025 lawsuit → 2025 deterioration → 2025 retaliatory billing) demonstrates causation running from City misconduct, not the reverse.

## XI. ADDRESSING THE CITY'S LEGAL ARGUMENTS

### A. Rooker-Feldman Does Not Bar These Claims

The City argues Rooker-Feldman doctrine bars Plaintiff's claims, but this argument fails because: (1) Plaintiff challenges the initial fraudulent condemnation and subsequent retaliatory billing; (2) these are independent federal claims, not appeals of state court decisions; (3) the extortion occurred through administrative action, not judicial decree; and (4) federal courts have independent jurisdiction over Hobbs Act violations.

15

### B. Governmental Entity Liability Under RICO

While the City correctly notes that municipalities face limitations under certain criminal statutes, civil RICO explicitly permits actions against "any person" including organizations. 18 U.S.C. § 1964(c). Federal courts have recognized municipal liability under civil RICO where the municipality acts through its agents. The extortionate conduct was committed by municipal officials acting under color of official right on behalf of the City.

## XII. CONCLUSION

The City's opposition reduces to a simple but legally insufficient argument: "We forced him out of business, he couldn't afford repairs after we eliminated his income, so our subsequent billing is justified." This circular reasoning cannot defeat a motion to amend, particularly where the proposed amendment: (1) arises from post-filing conduct by defendants; (2) states viable federal claims supported by documentary evidence; (3) relates directly to the existing RICO conspiracy claims; (4) reveals the continuing nature of the alleged criminal enterprise; and (5) demonstrates retaliatory intent through timing alone.

Moreover, Plaintiff has evidence that the VBML program generated $8 million in revenue for the City—a fact acknowledged by a City official. This evidence establishes the financial motive behind the systematic abuse of code enforcement powers to force properties into the VBML fee structure. Plaintiff will present witness testimony on this revenue-generation

scheme at trial.

The Court should grant leave to amend because: justice requires examination of defendants' retaliatory post-lawsuit conduct; the extortion claims are independently viable and strengthen the RICO pattern; Defendant City created the financial impossibility it now seeks to exploit; the retroactive billing only after lawsuit filing demonstrates bad faith; the $9 million VBML revenue establishes financial motive for the criminal enterprise; federal courts must remain open to victims of governmental extortion; and Plaintiff will not be deterred by procedural obstacles or intimidation tactics and is committed to pursuing this case through trial and, if necessary, appeal.

Plaintiff respectfully notes that the City is not dealing with someone who will abandon this pursuit of justice. Plaintiff has the documentation, legal billing records. witnesses, the engineering reports, and the determination to see this case through to its conclusion, regardless of the time or expense required. The full scope of the City's revenue-driven enforcement scheme will be exposed through discovery and presented to a jury. Dozens of property owners have told Plaintiff "you can't fight City Hall" and they surrendered their properties to avoid VBML fees exceeding $5,000, impossible insurance requirements, and threats of jail time. They had no choice but to forfeit their property rights under duress. But if Plaintiff doesn't fight this systematic abuse of governmental power, who will? Plaintiff has expended hundreds of hours prosecuting this case and is prepared to invest whatever additional time is necessary to achieve justice—not just for himself, but for every property

17

owner victimized by this extortionate scheme.

**PLAINTIFF'S SPECIFIC REQUESTS:**

1. Grant leave to amend the complaint to add Hobbs Act extortion claims;

2. Reject the City's improper reliance on post-complaint events to oppose amendment;

3. Recognize that the City cannot eliminate a property owner's income then demand payment based on consequences of that elimination;

4. Find that the five-year gap between alleged fee accrual and first invoice—coinciding precisely with federal lawsuit filing—establishes prima facie evidence of retaliatory intent;

5. Allow full development of these claims through discovery; and

6. Award Plaintiff documented preparation fees for the hours expended prosecuting this case in the interest of justice and deterrence of governmental abuse—Plaintiff seeks not only his own vindication but accountability for a scheme that has forced hundreds of property owners to forfeit their properties under duress. They seek justice through plaintiffs efforts.

Respectfully submitted,

/s/ John Klosterman
John Klosterman, Plaintiff Pro Se
5615 Sidney Road
Cincinnati, Ohio 45238
(513) 250-2610
johncklosterman@gmail.com

**CERTIFICATE OF SERVICE**

I hereby certify that on 10/24/25, a true and accurate copy of the foregoing was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system and copies will be mailed to those parties who are not served via the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ John Klosterman

Rebecca P. Salley
801 Plum Street suite 214
Cincinnati, Ohio 45202
rebecca.salley@cincinnati-oh.gov