

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION

**JOHN KLOSTERMAN,**

      **Plaintiff,**

**v.**

**KONZA, LLC, et al.,**

      **Defendants.**

**Case No. 1:25-cv-00312-SJD-KLL**

**Judge Susan J. Dlott**

**Magistrate Karen L. Litkovitz**

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO JENNIFER DONATHAN'S MOTION TO DISMISS**

## INTRODUCTION

Defendant Donathan's Motion to Dismiss fundamentally mischaracterizes both the nature of Plaintiff's claims and the extensive documentary evidence supporting those claims. The motion demonstrates unfamiliarity with over 3,100 pages of filings in lower court case A1905588 and misses critical evidence that directly refutes each argument presented. Ms. Donathan was not a passive bystander but an active, knowing participant who profited handsomely from a coordinated scheme to deprive Plaintiff of his properties real value through fraudulent means. The motion's attempts to dismiss these claims are futile given the overwhelming documentary record.

## I. THE LEGAL BILLING RECORDS ROADMAP

The most glaring deficiency in Defendant's motion is the failure to address the extensive

documentary evidence supporting Plaintiff's claims. The legal billing records from the receivership case ( see 12/6/22 motion for payment of expenses and fees) provide a detailed "roadmap" of who did what, when, where, and with whom—including extensive documentation of Ms. Donathan's specific involvement in the alleged fraudulent activities. These records, part of the lower court case documents and incorporated by reference into Plaintiff's complaint, specifically document: (1) extensive communication regarding fraudulent appraisals of 636 Delhi and 685 Halsey properties; (2) communication on sales document changes to frustrate legitimate bidders; (3) extensive communication regarding the final sales document to be "sold as is where is" with alleged continuous objections by HCLRC to effectuate the final sale price; (4) email chains showing coordination with buyers regarding closing procedures; and (5) communications regarding "edits for the sales agreement" passed back and forth with the buyers' attorney Kelley Allesee.

Also a $25,000 settlement offer to defendant Lentine in testimony by Lentine in the bench trial—material evidence demonstrating: (a) the coordinated nature of the enterprise; (b) Ms. Donathan's knowledge of improper conduct; (c) that participants were being compensated for their cooperation; and (d) consciousness of guilt with Boydstons " Orders " motion ( filed 9/8/23) that he requested Judge Cross to sign . It seeks absolution for all acts and persons with regard to the receivership. Defendant Donathan will be one affected if orders are filed.

## II. RESPONSE TO SUFFICIENCY OF PLEADINGS ARGUMENTS

### A. The Amended Complaint Contains Extensive Factual Allegations

Defendant's counsel selectively reads the complaint, claiming Ms. Donathan is mentioned

only "four times." This is deliberately misleading. The amended complaint specifically alleges that Ms. Donathan: (1) engaged in extensive communications regarding fraudulent appraisals (documented in legal billing records); (2) participated in communications regarding changes to sales documents designed to frustrate legitimate bidders; (3) helped craft the "sold as is where is" sales language—which Plaintiff correctly identifies as "hogwash" designed to facilitate the fraudulent transfer; (4) coordinated with prospective buyers (HCLRC) regarding how sales would close; and (5) accepted the $147,000 commission check knowing it derived from a fraudulent transaction.

## B. The "Engineered Sale" Admission

Ms. Donathan orchestrated the interior viewing of the properties on behalf of HCLRC where no other bidders were allowed access—per Boydston orders and the sales contract. This was not a competitive auction but an "engineered sale" as defendant Lentine characterized it, a fact that Richard Boydston verified under oath in the bench trial in early 2025. The question is: Who was actually running the auction sale? The answer, documented in the record, is that Ms. Donathan was not acting as a legitimate real estate agent but as a paid surrogate for Boydston and the HCLRC buyers.

## C. The Board of Revision Testimony

Ms. Donathan presented herself on the application as a legal real estate appraiser for the Board of Revision hearings—a fraudulent misrepresentation. While her initial filing was dismissed, Doe #4 stepped in to help Boydston, and they successfully reduced Plaintiff's two

properties' assessed values by $100,000. This raises an obvious question: Why would Ms. Donathan, who stood to receive a 10% commission on the sale price, work to reduce the properties' values by $100,000, thereby cutting her own commission by $10,000? The answer: Because she was not acting as a legitimate broker seeking the best price for the properties, but rather as a co-conspirator working to engineer a below-market sale to HCLRC—her true client in this transaction.

### D. The Email Chain Evidence

Ms. Donathan cannot claim ignorance. She was part of multiple email chains where: (1) the sales contract was changed at the alleged request of HCLRC; (2) communications went back and forth between Boydston and HCLRC's Allessee regarding edits to the sales agreement; and (3) the transformation from "auction" to predetermined sale to a single buyer was discussed and implemented.

### E. Pleading Standard and Pro Se Status

The motion attempts to hold Plaintiff to an impossible standard while ignoring this Court's recognition that pro se pleadings must be liberally construed. This Court previously recognized challenges in the original complaint and provided Plaintiff an opportunity to amend. Plaintiff has done so in good faith, and the amended complaint, read fairly and in light of incorporated-by-reference documentary evidence, clearly states claims against Ms. Donathan.

## III. RESPONSE TO STATUTE OF LIMITATIONS ARGUMENTS

Defendant's statute of limitations argument fails for multiple independent reasons.

### A. Accrual Date for Ms. Donathan's Participation

The motion erroneously claims the limitations period began in February 2019 when the receivership was established. However: (1) Ms. Donathan did not become involved until 2021 when she was brought in for the sales process; (2) her fraudulent conduct continued through the closing in May 2023 when she accepted the $147,000 commission check; and (3) she continued to participate in the scheme through its completion—each act constituting a separate predicate act for RICO purposes.

### B. The Continuing Violation Doctrine

The "engineered sale" was not a single discrete act in 2023, but rather an ongoing conspiracy that: (1) began with planning in 2020; (2) accelerated with the receivership in 2021 at the BOR; (3) continued through Ms. Donathan's document manipulation involvement from 2021-2023; and (4) culminated in the fraudulent closing in May 2023. Under the continuing violation doctrine, the statute of limitations does not begin to run until the last act in furtherance of the conspiracy. For Ms. Donathan, that last act was accepting the commission check in May 2023—well within the four-year limitations period when this case was filed in May 2025.

### C. Fraudulent Concealment Tolling

The statute of limitations is tolled when defendants fraudulently conceal their wrongdoing. Here: (1) the scheme was deliberately concealed through misuse of court-appointed

5

receivership authority; (2) Ms. Donathan presented herself as a neutral broker when she was actually working for Boydston and the buyers; and (3) the true nature of the "engineered sale" was not revealed until Richard Boydston's sworn testimony in early 2025.

## D. Discovery Rule Application to Fraud Claims

Contrary to defense counsel's argument, the discovery rule does apply to fraud claims in Ohio. R.C. 2305.09(D) specifically provides that the statute of limitations for fraud does not begin to run until discovery of the fraud. Plaintiff did not and could not have discovered the full scope of Ms. Donathan's fraudulent participation until: (1) the legal billing records were disclosed; (2) the Boydston sworn testimony occurred in 2025; and (3) the full scheme was revealed through the bench trial of over 800 pages of transcripts filed in the underlying state proceedings. The case cited by defense counsel, Investors REIT One v. Jacobs, does not support their position regarding fraud claims, as it specifically distinguishes fraud from other tort claims regarding discovery rule application.

## IV. RESPONSE TO FIDUCIARY DUTY ARGUMENTS

### A. Establishment of Fiduciary Relationship

The motion claims no fiduciary relationship existed between Ms. Donathan and Plaintiff. This argument reflects a fundamental misunderstanding of the allegations.

1. Court-Appointed Receiver's Duties Flow to All Participants. As the real estate agent hired by the court-appointed receiver, Ms. Donathan owed fiduciary duties to the estate and, by extension, to Plaintiff as the property owner. The receiver's fiduciary obligations did not

6

excuse Ms. Donathan from her independent duties as a licensed real estate professional.

**2. Ohio Real Estate License Law Imposes Fiduciary Duties.** Ohio law imposes fiduciary duties on real estate licensees, including: (a) duty of loyalty; (b) duty to act in the best interests of the client; (c) duty to obtain the best price reasonably obtainable; and (d) duty to disclose conflicts of interest. Ms. Donathan violated all of these duties when she: (i) secretly worked for the buyers' interests rather than the estate; (ii) deliberately suppressed the properties' values; (iii) concealed her coordination with the buyers; and (iv) accepted compensation knowing it derived from a fraudulent transaction.

**3. Groob v. KeyBank Analysis.** The Groob case cited by defense counsel requires "special confidence and trust." Here, that trust was inherent in: (a) the court-appointed nature of the receivership; (b) Ms. Donathan's professional licensure and duties; (c) her ostensible role as the estate's agent tasked with obtaining fair market value; and (d) Plaintiff's reasonable reliance on the receiver's duty to employ trustworthy professionals.

**B. Fiduciary Duty Accrual**

Ms. Donathan's fiduciary duty claim accrued no earlier than 2021 when she became involved, and finally at the closing May 2023 when she accepted the commission check while knowing the sale was fraudulent. This claim is timely.

**V. RESPONSE TO ROOKER-FELDMAN ARGUMENT**

7

Defendant fundamentally misunderstands the Rooker-Feldman doctrine and its inapplicability to this case.

## A. This Case Does Not Seek Review of State Court Judgment

Plaintiff does not ask this Court to reverse or modify the state court's receivership order or sale approval. Rather, Plaintiff alleges that defendants—including Ms. Donathan—committed independent federal crimes (RICO violations) and state law torts in connection with that receivership. The fact that some alleged misconduct occurred in or around state court proceedings does not trigger Rooker-Feldman. As the Sixth Circuit has repeatedly held, Rooker-Feldman applies only when: (1) the plaintiff seeks appellate review of a state court judgment, OR (2) the plaintiff's claimed injury is the state court judgment itself. Here, neither applies. Plaintiff's injury is the loss of his properties through fraud, not the state court judgment approving the sale. The fraud claim is entirely independent of—though related to—the state proceedings.

## B. Independent Federal Claims

The RICO claims alleged here are uniquely federal causes of action that cannot be brought in state court. The state court had no jurisdiction to adjudicate whether the receivership participants were violating federal criminal law. Rooker-Feldman does not prevent federal courts from exercising their original jurisdiction over federal question cases merely because some facts overlap with state proceedings.

## VI. RESPONSE TO COLORADO RIVER ABSTENTION ARGUMENT

8

The Colorado River doctrine is inapplicable here for multiple reasons.

## A. No Parallel State Proceeding

The motion fails to identify what "parallel" state proceeding supposedly requires abstention. The receivership case is concluded as to the sale of Plaintiff's properties. The state court has no pending matter that duplicates the federal RICO and fraud claims here.

## B. Colorado River's Exceptional Circumstances Requirement

Colorado River abstention is "an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it." It requires exceptional circumstances. None exist here: (1) the federal court (this Court) has jurisdiction over RICO claims that the state court lacks; (2) there is no risk of inconsistent judgments; (3) the state proceedings are substantially complete as to the property sales; (4) federal interest in RICO enforcement weighs heavily against abstention; and (5) the state court cannot provide adequate remedy for federal civil rights violations. As Plaintiff stated: "The Colorado doctrine does not apply here; this court trumps any actions that the lower court has ordered. The plaintiff will not try to unwind any of the rulings for the better judgment is up to this court and not the state court."

## VII. SPECIFIC PREDICATE ACTS ATTRIBUTABLE TO MS. DONATHAN

To address the Court's previous order requiring specificity, Plaintiff identifies the following specific predicate acts by Ms. Donathan:

A. Wire Fraud and Mail Fraud (18 U.S.C. §§ 1341, 1343): (1) communications via email and telephone regarding the fraudulent appraisals; (2) transmission of the fraudulent sales

documents on multiple dates in the billing files; (3) transmission of closing documents containing misrepresentations; (4) communications with HCLRC regarding the engineered sale; and (5) acceptance of wire transfer of $147,000 commission from fraudulent proceeds.

**B. Conspiracy to Commit Wire/Mail Fraud (18 U.S.C. § 371):** Ms. Donathan's documented coordination with Boydston, HCLRC, and others to accomplish the engineered sale.

**C. State Law Predicate Acts:** (1) fraud—misrepresentation of her role, the nature of the sale, and the value of properties; (2) breach of fiduciary duty—as detailed above; (3) conversion—participation in the wrongful taking of Plaintiff's properties; and (4) civil conspiracy—agreement with others to accomplish the illegal goals.

## VIII. THE REAL QUESTIONS

The motion raises questions, but not the right ones. The questions that matter are:

**A.** Why would a real estate agent working on commission deliberately reduce property values by $100,000, thereby reducing her own commission by $10,000? Answer: Because she was not working for the estate or the seller, but rather for the buyers.

**B.** Why would a broker orchestrate private showings for one bidder while excluding all others? Answer: Because there was no real auction—it was an engineered sale to a predetermined buyer.

C. Why would a licensed professional participate in communications about "edits to the sales agreement" with the buyers' attorney? Answer: Because she was coordinating with the buyers, not representing the seller.

D. How does accepting a $147,000 commission check constitute "no factual allegations of wrongdoing"? Answer: It doesn't. The acceptance of that check, with knowledge of the underlying fraud, is itself a fraudulent act and a predicate act under RICO.

## IX. COUNT VII - BREACH OF FIDUCIARY DUTY

Contrary to defense counsel's claim that Count VII consists of "exactly one paragraph," the Count incorporates by reference all previous allegations and is supported by extensive factual pleading throughout the complaint.

A. Duty to Obtain Best Price. Ms. Donathan violated her fiduciary duty by: (1) working to reduce property values rather than maximize them; (2) coordinating with buyers to engineer a below-market sale; (3) excluding competitive bidders from the process; and (4) accepting a 10% commission on the fraudulently low sales price.

B. Duty of Loyalty. Ms. Donathan violated her duty of loyalty by: (1) secretly working for the buyers' interests; (2) prioritizing her relationship with Boydston and HCLRC over her duty to the estate; (3) concealing material facts from Plaintiff and the court; and (4) participating in

the conspiracy to deprive Plaintiff of fair market value.

C. Duty of Disclosure. Ms. Donathan violated her duty of disclosure by: (1) failing to disclose her coordination with buyers; (2) failing to disclose the engineered nature of the sale; (3) misrepresenting herself as a neutral professional; and (4) concealing material information about property values and the sales process.

## X. THE SIGNIFICANCE OF RICHARD BOYDSTON'S SWORN TESTIMONY

The motion mentions but does not meaningfully address Richard Boydston's sworn testimony in the early 2025 bench trial. That testimony is fatal to the defense arguments because Boydston admitted under oath that the sale was "engineered"—not a legitimate competitive auction but a predetermined transfer to HCLRC. This admission: (1) corroborates Plaintiff's allegations; (2) establishes the fraudulent nature of the transaction; (3) implicates all participants, including Ms. Donathan; and (4) provides the "smoking gun" that proves the conspiracy. As Plaintiff stated: "The transcripts tell it all and Ms. Donathan drank the cool aid and did what was required to get to the pay day." This is not hyperbole. The sworn testimony confirms what the billing records document: a coordinated scheme in which Ms. Donathan played an essential role.

## XI. PLAINTIFF HAS PROVIDED SPECIFIC FACTUAL ALLEGATIONS

Defense counsel attempts to paint Plaintiff's allegations as vague or conclusory. Nothing could be further from the truth. Plaintiff has: (1) identified specific documents supporting each

12

allegation; (2) referenced specific billing entries documenting Ms. Donathan's participation; (3) cited sworn testimony corroborating the conspiracy; (4) detailed the specific financial transactions (e.g., the $147,000 commission, the $25,000 Lentine settlement offer); (5) explained the specific duties Ms. Donathan violated and how she violated them; and (6) provided dates, amounts, and documentation for each material allegation.

If anything is vague or inadequately explained, it is defense counsel's motion, which: (a) ignores voluminous documentary evidence; (b) fails to address the billing records; (c) omits the $25,000 settlement offer; (d) mischaracterizes the nature and timing of Ms. Donathan's involvement; and (e) provides no explanation for Ms. Donathan's obviously conflicted conduct.

## XII. THE COMMISSION CHECK - A PREDICATE ACT AND EVIDENCE OF KNOWLEDGE

Ms. Donathan accepted $147,000 in commission from the May 2023 closing. This act is significant for multiple reasons:

A. Timing. The acceptance of this check in May 2023: (1) is within the statute of limitations (less than 4 years before this case was filed in May 2025); (2) represents a distinct predicate act for RICO purposes; (3) demonstrates continuing participation in the conspiracy through its conclusion; and (4) constitutes receipt of proceeds of fraud.

B. Knowledge. By accepting this commission, Ms. Donathan demonstrated that she: (1) knew

the sale was not arms-length; (2) understood she had helped engineer a below-market transaction; (3) chose to profit from her participation rather than report the misconduct; and (4) completed her role in the conspiracy.

C. "Sold As Is Where Is" - The Biggest Hogwash. As Plaintiff correctly identifies, the "sold as is where is" language in the sales documents was designed to discourage legitimate bidders and facilitate the engineered sale. Ms. Donathan's participation in crafting this language demonstrates her knowing participation in the fraud.

## XIII. THE FUTILITY OF THE MOTION

With respect, the motion displays a misunderstanding of the strength of Plaintiff's case and the documentary evidence supporting it. The motion appears to proceed on the assumption that ignoring: (1) the billing records roadmap; (2) the $25,000 Lentine settlement offer; (3) the Boydston sworn testimony; (4) the specific email chains documented in the record; and (5) the Board of Revision misrepresentation will somehow make these facts disappear or become irrelevant. They will not.

Discovery will only strengthen Plaintiff's case by revealing: (a) additional communications between Ms. Donathan and co-conspirators; (b) financial records showing the flow of funds; (c) additional evidence of coordination and conspiracy; and (d) the full scope of Ms. Donathan's knowledge and participation. The motion's attempts to avoid these realities through technical arguments are ultimately futile given the documentary record.

Moreover, the passage of time may affect certain options available to all parties. While Plaintiff has been forthcoming in attempting to resolve matters efficiently, there are time-sensitive considerations at play, with certain opportunities closing after November 6, 2025.

## XIV. WHAT THE RECORD SHOWS

The fundamental problem with the motion is that it asks this Court to ignore what the record clearly shows. The billing records, email chains, sworn testimony, and financial transactions paint a clear picture of Ms. Donathan's role in the conspiracy. Specifically:

A. Ms. Donathan worked to reduce property values by $100,000 while standing to lose $10,000 in commission—conduct that makes no economic sense unless she was working for the buyers, not the seller.

B. She orchestrated the exclusive inside viewings of properties for HCLRC while excluding other potential bidders, namely Ken Knoppe, who bid $1,000,000 for ALL the properties—conduct inconsistent with running a legitimate auction.

C. She participated in communications with the buyers' attorney Kelley Allesee regarding "edits to the sales agreement"—conduct showing she was coordinating with purchasers, not representing the seller.

**D. She helped craft the "sold as is where is" language—conduct designed to discourage competitive bidding and facilitate the engineered sale.**

**E. She accepted $147,000 in commission in May 2023 knowing the sale was fraudulent conduct constituting receipt of proceeds of fraud and a distinct RICO predicate act.**

**F. She never came forward to report the misconduct or cry "halt, this is wrong!"—conduct consistent with willing participation rather than innocent involvement.**

**XV. CONCLUSION**

**The Motion to Dismiss should be denied because:**

**A. The amended complaint states claims against Ms. Donathan with sufficient specificity and factual support. The original complaint identifies specific conduct, specific financial transactions, specific communications, and specific breaches of duty—all supported by documentary evidence in the record.**

**B. The statute of limitations has not expired for claims that accrued between 2021-2023. Ms. Donathan did not join the sales conspiracy until 2021, continued her participation through May 2023, and the limitations period is further tolled by fraudulent concealment and the discovery rule.**

**C. Fiduciary duties existed and were breached as specifically alleged. Ms. Donathan owed duties as a court-appointed receiver's agent, as a licensed real estate professional under Ohio law, and as a professional in a position of special trust. She violated all of these duties through her coordinated efforts to engineer a below-market sale.**

**D. The Rooker-Feldman doctrine is inapplicable to independent federal claims. Plaintiff does not seek review of the state court judgment but rather seeks remedies for federal crimes (RICO violations) that the state court had no jurisdiction to adjudicate.**

**E. Colorado River abstention is inappropriate where no parallel state proceeding exists. The state court receivership is complete as to the property sales, and no state proceeding duplicates the federal RICO and fraud claims here.**

**F. The documentary evidence, incorporated by reference, overwhelmingly supports the allegations. The billing records provide a detailed roadmap of Ms. Donathan's participation. The sworn testimony of Richard Boydston admits the "engineered sale." The financial records show the $147,000 commission and $25,000 Lentine settlement offer. The email chains document coordination with buyers. All of this evidence is ignored by the motion.**

**The facts speak for themselves: Ms. Donathan worked to reduce property values while claiming to represent the seller. She coordinated with buyers while claiming to run an auction. She participated in crafting fraudulent documents. She excluded competitive bidders. She**

accepted $147,000 knowing the sale was engineered. She didn't cry "halt, this is wrong!".

"Make no mistake that the facts that are present and filed with this court are overwhelming."

Plaintiff respectfully requests that the Court deny Defendant Donathan's Motion to Dismiss in its entirety and allow this case to proceed to discovery, where the full scope of Ms. Donathan's participation in the receivership fraud will be revealed. Given the time-sensitive nature of certain matters in this case, with November 6, 2025 representing a significant date, prompt resolution of this motion would serve the interests of justice and judicial efficiency.

Respectfully submitted,

John Klosterman, Pro Se
5615 Sidney Road
Cincinnati, Ohio 45238
513-250-2610
johncklosterman@gmail.com

**CERTIFICATE OF SERVICE**
The undersigned hereby certifies that a copy of the foregoing was served upon all parties through the court's CM/ECF system and on defense counsel at the addresses listed in their motion, on November 3, 2025.

John Klosterman

Jeffrey M. Nye, Esq.
Paul T. Saba, Esq. (0063723)
Jeffrey M. Nye, Esq. (0082247)
Bailey E. Sharpe, Esq. (0103565)

Attorneys for FRI Mason, LLC dba Keller Williams Advisors Realty
and Jennifer Donathan Attorney