# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

JOHN KLOSTERMAN, et al.,
   Plaintiff,

v.

KONZA, LLC, RICHARD BOYDSTON,
DENTONS BINGHAM
GREENEBAUM LLP, CITY OF
CINCINNATI, et al.,
   Defendants.

Case No. 1:25-cv-00312-SJD-KLL
Judge Susan J. Dlott
Magistrate Karen L. Litkovitz

---

## PLAINTIFF'S REPLY: MEMORANDUM IN OPPOSITION TO JENNIFER DONATHAN'S MOTION TO DISMISS

---

## INTRODUCTION

Defendant Donathan's motion to dismiss asks this Court to ignore an uncomfortable truth: a real estate agent deliberately worked to reduce property values by $100,000 while claiming to represent the seller, accepted a $147,000 commission knowing the sale was fraudulent, collected approximately $67,400 in unearned commission on a judgment credit she never facilitated, and coordinated with buyers to exclude competitive bidders—all documented in billing records, the closing statement (exhibit A) she cannot deny and confirmed by sworn testimony admitting an "engineered sale."

Defense counsel employs a familiar tactic: selective reading of the Amended Complaint while ignoring over 3,100 pages of incorporated state court filings that document Defendant's specific role through billing records, email communications, and sworn testimony. The motion claims Donathan "is mentioned only four times" while deliberately overlooking the roadmap provided by legal billing records (12/6/22 motion for payment of expenses and fees in Case No. A1905588) detailing her communications regarding fraudulent appraisals, coordination on sales document changes, participation in crafting "sold as is where is" language, email chains with buyers regarding closing procedures, and communications with buyers' attorney Kelley Allesee regarding "edits for the sales agreement."

Most critically, Defendant's motion fails to answer a single devastating question: Why would a real estate agent working on commission deliberately reduce property values by $100,000, thereby cutting her own commission by $10,000? There is only one logical answer: she was working for the buyers, not the seller. This single fact demolishes every claim in her motion.

## I. THE SMOKING GUN DEFENDANT CANNOT EXPLAIN

### A. The $100,000 Value Reduction: Economically Irrational Unless Working for Buyers

Donathan presented herself on Board of Revision applications as a "legal real estate appraiser" and actively worked to reduce Plaintiff's property values by $100,000. Her initial filing was dismissed, but Boydston was assisted by (Doe #4) in successfully achieving this

2

reduction. Billing records document Boydston had two communications with the Board of Revision prior to the hearing—communications whose content discovery will reveal.

Let us do the arithmetic:

Real estate agents typically earn 10% commission on auction sales.

Reducing property values by $100,000 reduces the potential sale price by $100,000

This directly reduces Donathan's commission by $10,000

No rational agent working for the seller would voluntarily sacrifice $10,000 of her own money. But as it turned out, it wasn't an auction at all. The edits to the sales document worked, even if Boydston had to keep going back to Berding's court to get the legal blessing, legal records show.

The only economically rational explanation: Donathan was compensated by Boydston for reducing the appraisal values. This single fact proves she was not working as the seller's agent but as a participant in the buyer's scheme to acquire Plaintiff's properties below market value.

Defendant's motion offers no explanation for this economically irrational conduct. The silence is deafening.

B. The $147,000 Commission: Payment for Participation and Unjust Enrichment

In May 2023, Donathan accepted a $147,000 commission check knowing the sale was fraudulent. Defense counsel dismisses this with "no factual allegations of wrongdoing." This is willful blindness.

But the fraud goes deeper. The closing statement reveals the buyer actually paid only $809,716.25. However, Donathan calculated her 10% commission on $1,470,000—a figure that included a $674,017.00 judgment credit. Donathan thus collected commission on $674,017.00 she never earned through any real estate services. This constitutes unjust enrichment of approximately $67,400 in unearned commission on phantom consideration.

A real estate agent earns commission for services in facilitating a transaction between willing parties. Donathan provided no services whatsoever to generate the judgment credit—it was a bookkeeping entry from a fraudulent scheme. Yet she collected full commission on it. This unjust enrichment, combined with her other misconduct, demonstrates Donathan's knowing participation in the fraud and her financial motivation to ensure the engineered sale succeeded regardless of harm to Plaintiff.

Plaintiff reserves the right to seek leave of court to amend the Complaint to add an unjust enrichment claim based on this $67,400 in unearned commission. Additionally, Westcor Land Title Insurance Company, which issued title insurance for this fraudulent transaction, may face potential liability for insuring a sale it knew or should have known involved systematic fraud documented in state court filings and billing records.

4

This payment constitutes:

• A RICO predicate act under 18 U.S.C. § 1957 (monetary transactions in property derived from specified unlawful activity)

• Unjust enrichment of approximately $67,400 in commission on judgment credit Donathan never earned

• Direct evidence of knowing participation in the fraud

• A separate predicate act within the RICO limitations period (May 2023 to May 2025)

• Evidence of consciousness of guilt when considered with Boydston's 9/8/23 motion seeking absolution for "all acts and persons with regard to the receivership"

Consider the totality: Donathan worked to reduce property values (costing herself $10,000), coordinated exclusive viewings for preferred buyers, helped craft fraudulent sales documents, collected $67,400 in unearned commission on a judgment credit, and then accepted the full $147,000 knowing properties worth $3.5+ million sold for approximately $810,000 in actual consideration. This is not innocent participation. This is knowing, willful fraud—and profitable fraud at that.

## II. THE "ENGINEERED SALE" CONFESSION DEFENDANT CANNOT DENY

Defendant Richard Boydston admitted under oath in early 2025 bench trial testimony that this was an "engineered sale." Doc. 33 at ¶58. This is not Plaintiff's characterization. This is Defendant's confession. Donathan orchestrated interior viewings for HCLRC while excluding other bidders per Boydston's orders. Ken Knoppe bid $1,000,000 for all properties but was denied equal access to property viewings that Donathan arranged for the preferred buyers.

5

This was not standard real estate practice. This was coordination to ensure a predetermined outcome—an "engineered sale" rather than a competitive auction. Donathan facilitated this fraud through:

• Exclusive interior viewings for HCLRC while excluding competitive bidders

• Participation in crafting "sold as is where is" language designed to discourage competitive bidding

• Communications with buyers' attorney Kelley Allesee regarding "edits to the sales agreement"

• Email chains with buyers regarding closing procedures

• Communications regarding fraudulent appraisals of properties at 636 Delhi and 685 Halsey

All of this is documented in billing records incorporated by reference into the Amended Complaint. Doc. 33 at ¶32, ¶43, ¶58; see also billing records from Case A1905588, 12/6/22 motion for payment of expenses and fees. The arrogant fraud is breathtaking. But it was paid not by order signed by Magistrate Berding, who signed off on very questionable denials in the past, but refused to sign the payment motion of Boydston's request for $499,000 but instead requested Magistrate Berdoin to sign "for" her.

## III. DEFENDANT'S FIDUCIARY DUTY ARGUMENTS FAIL

### A. Ohio Statutory Fiduciary Duties Are Mandatory

Defendant argues she owed Plaintiff no duty because "Boydston hired her." This is legally incorrect and ignores Ohio statutory law. Ohio Revised Code § 4735.62 explicitly provides:

"In representing any client in an agency or subagency relationship, the licensee shall be a fiduciary of the client and shall use the licensee's best efforts to further the interest of the client including, but not limited to... (C) Following any lawful instructions of the client; (D) Performing all duties specified in this chapter in a manner that is loyal to the interest of the client..."

Ohio Rev. Code § 4735.62. These statutory duties exist regardless of who pays the commission. Ohio Rev. Code § 4735.18 provides for disciplinary sanctions for violations of fiduciary duties.

B. Receiver's Agent Inherits Fiduciary Duties to Estate Beneficiaries

As the real estate agent hired by the court-appointed receiver to sell Plaintiff's properties, Donathan's fiduciary duties to Boydston necessarily included duties to maximize value for the estate beneficiary—Plaintiff himself. In SEC v. Elliott, 953 F.2d 1560, 1566 (11th Cir. 1992), the Eleventh Circuit held that "a receiver is a fiduciary who owes duties to all parties with an interest in the receivership estate." Agents hired by the receiver to handle estate assets inherit these fiduciary obligations. See also SEC, Investor Bulletin: 10 Things to Know About Receivers (explaining that "A receiver has a fiduciary duty to stakeholders and the court").

The case cited by defense counsel, Groob v. KeyBank, 108 Ohio St.3d 348, 2006-Ohio-1189, ¶16, requires "special confidence and trust." That trust existed inherently through: (1) the court-appointed nature of the receivership; (2) Donathan's professional licensure and statutory duties under Ohio Rev. Code § 4735.62; (3) her ostensible role as the estate's agent tasked with obtaining fair market value; and (4) Plaintiff's reasonable reliance on the receiver's duty to employ trustworthy professionals.

## C. The Breaches Are Comprehensive and Deliberate

Donathan violated her fiduciary duties through systematic, coordinated actions:

• Working to reduce property values by $100,000 at Board of Revision—cutting her own commission by $10,000 in conduct that makes no economic sense unless she was working for buyers

• Orchestrating exclusive inside viewings for HCLRC while excluding Ken Knoppe and other competitive bidders—inconsistent with running a legitimate auction

• Participating in communications with buyers' attorney Kelley Allesee regarding "edits to the sales agreement"—showing coordination with purchasers, not representation of seller

• Helping craft "sold as is where is" language designed to discourage competitive bidding

• Collecting $67,400 in unearned commission on a judgment credit she never facilitated

• Accepting $147,000 total commission in May 2023 knowing the sale was fraudulent

• Never reporting the misconduct to appropriate authorities or crying "halt, this is wrong!"

## IV. STATUTE OF LIMITATIONS: DEFENDANT MISREADS THE TIMELINE

**A. Donathan's Participation Began in 2021, Not 2020**

Defense erroneously claims the limitations period began in February 2020 when the receivership was established. This fundamentally misreads the Amended Complaint. Plaintiff specifically alleges Donathan did not join the sales conspiracy until 2021 when she was brought in for the sales process. Doc. 33 at ¶32.

Donathan's predicate acts occurred between 2021-2023:

• 2021: Board of Revision filings to reduce property values

• 2021-2022: Coordination with buyers on exclusive viewings and sales documents

• 2022-2023: Communications regarding fraudulent appraisals and "edits to sales agreement"

• May 2023: Acceptance of $147,000 commission including $67.400 in unearned income and knowing sale was fraudulent

Her last predicate act—accepting the $147,000 commission—occurred in May 2023, exactly two years before this action was filed in May 2025.

**B. Ohio Law Provides Four Years for Fiduciary Breach**

For breach of fiduciary duty claims, Ohio applies a four-year statute of limitations under R.C. 2305.09(D). Investors REIT One v. Jacobs, 46 Ohio St.3d 176, 182 (1989). Plaintiff's claims accrued between 2021-2023 and were filed in May 2025—well within the four-year period.

## C. Discovery Rule Applies to Fraud Claims

Contrary to defense counsel's argument, the discovery rule applies to fraud claims in Ohio. R.C. 2305.09(D) specifically provides that the statute of limitations for fraud does not begin to run until discovery of the fraud. In Consumers' Co. v. Sturgill, 63 Ohio St.3d 177 (1992), the Ohio Supreme Court held that "the statute of limitations for fraud does not begin to run until the fraud is discovered or, with reasonable diligence, should have been discovered."

Plaintiff could not have discovered the full scope of Donathan's participation until: (1) legal billing records were disclosed; (2) Boydston's sworn testimony in 2025 admitted the "engineered sale"; and (3) the full scheme was revealed through over 800 pages of bench trial transcripts.

## D. RICO Separate Accrual Rule

For RICO claims, the Supreme Court in Klehr v. A.O. Smith Corp., 521 U.S. 179, 189 (1997), recognized that "some Circuits have adopted a 'separate accrual' rule in civil RICO cases, under which the commission of a separable, new predicate act within a 4-year limitations period permits a plaintiff to recover for the additional damages caused by that act."

Donathan's acceptance of the $147,000 commission in May 2023 constitutes both: (1) a separate predicate act under 18 U.S.C. § 1957; and (2) evidence of knowing participation in

10

the conspiracy. This occurred in May 2023, well within the four-year RICO limitations period when this case was filed in May 2025.

## V. ROOKER-FELDMAN AND COLORADO RIVER ARGUMENTS ARE MERITLESS

### A. This Court Has Jurisdiction Over Independent Federal Claims

Defendant fundamentally misunderstands the Rooker-Feldman doctrine. The Supreme Court in Lance v. Dennis, 546 U.S. 459, 464 (2006), clarified that Rooker-Feldman only bars cases where "the injury is caused by the state court judgment itself."

As the Sixth Circuit explained in McCormick v. Braverman, 451 F.3d 382, 396 (6th Cir. 2006), Rooker-Feldman applies when "a plaintiff asserts before a federal district court that a state court judgment itself was unconstitutional or in violation of federal law."

Plaintiff does not ask this Court to reverse or modify the state court's receivership order or sale approval. Rather, Plaintiff alleges that Defendants—including Donathan—committed independent federal crimes (RICO violations) and state law torts in connection with that receivership. Plaintiff's injury is not the state court judgment approving the sale, but the underlying RICO conspiracy and fraud that caused properties to sell for approximately $810,000 in actual consideration instead of $3.5+ million.

The RICO claims alleged here are uniquely federal causes of action that could not have been brought in state court. The state court had no jurisdiction to adjudicate whether receivership participants were violating federal criminal law. Rooker-Feldman does not prevent federal courts from exercising their original jurisdiction over federal question cases merely because some facts overlap with state proceedings.

**B. Colorado River Abstention Is Inappropriate**

Defense fails to identify what "parallel" state proceeding supposedly requires abstention. The receivership case is concluded as to the sale of Plaintiff's properties. The state court has no pending matter that duplicates the federal RICO and fraud claims here.

Colorado River abstention is "an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it." Colorado River Water Conservation Dist. v. United States, 424 U.S. 800, 813 (1976). No exceptional circumstances exist: (1) this Court has jurisdiction over RICO claims that state court lacks; (2) there is no risk of inconsistent judgments; (3) state proceedings are substantially complete as to property sales; (4) federal interest in RICO enforcement weighs heavily against abstention; and (5) state courts cannot provide adequate remedy for federal civil rights violations.

**VI. RULE 9(B) PARTICULARITY IS AMPLY SATISFIED**

12

Defense claims insufficient particularity under Fed. R. Civ. P. 9(b). However, Sanderson v. HCA-The Healthcare Co., 447 F.3d 873, 877 (6th Cir. 2006), requires "who, what, when, where, and how." Plaintiff provided:

WHO: Jennifer Donathan

WHAT:

• Reduced property values by $100,000 at Board of Revision

• Orchestrated exclusive showings for HCLRC while excluding Ken Knoppe

• Crafted "sold as is where is" language to deter competitive bidders

• Coordinated with buyers' attorney on "edits to sales agreement"

• Collected $67,400 in unearned commission on judgment credit

• Accepted $147,000 commission knowing sale was fraudulent

WHEN: 2021-2023, culminating in May 2023 closing

WHERE: Hamilton County receivership proceedings, Board of Revision hearings, property showings


HOW: Email communications documented in billing records (12/6/22 motion for fees), coordination with Boydston and buyers' attorney Kelley Allesee


The Sixth Circuit in Heinrich v. Waiting Angels Adoption Servs., Inc., 668 F.3d 393, 404 (6th Cir. 2012), held that "Plaintiff satisfies Rule 9(b) by incorporating documents that provide the necessary specificity." Plaintiff's incorporation by reference of 3,100+ pages of state court filings, billing records showing specific communications, and Boydston's sworn testimony admitting "engineered sale" amply satisfies Rule 9(b).

13

## VII. CRITICAL EVIDENCE DEFENDANT CANNOT EXPLAIN

### A. The $25,000 Settlement Offer to Lentine

Defendant Lentine testified in bench trial about receiving a $25,000 settlement offer. This demonstrates: (1) the coordinated nature of the enterprise; (2) participants were being compensated for cooperation; (3) consciousness of guilt; and (4) Donathan's knowledge that misconduct was occurring throughout the receivership.

### B. Boydston's Motion for Absolution

Boydston filed a motion (9/8/23) requesting Judge Cross sign orders seeking absolution for "all acts and persons with regard to the receivership." Donathan will be affected if such orders are filed. This demonstrates consciousness of wrongdoing by all participants. Why would innocent participants need absolution?

### C. Ken Knoppe's Million Dollar Bid

Billing records document Donathan arranged interior viewings for HCLRC while excluding Ken Knoppe, who bid $1,000,000 for all properties—$190,000 more than the actual consideration paid ($810,000) and $215,000 more than the inflated sale price including the

14

phantom judgment credit. Donathan facilitated excluding a higher bidder to ensure the engineered sale succeeded. This is not how legitimate auctions operate.

## VIII. CONCLUSION: THE SILENCE SPEAKS VOLUMES

Defendant Donathan's motion asks this Court to ignore what cannot be explained:

• Why would a commission-based agent deliberately reduce property values, costing herself $10,000?

• Why would she exclude a $1,000,000 bidder while arranging exclusive viewings for buyers who ultimately paid $810,000?

• Why would she coordinate "edits to the sales agreement" with the buyers' attorney if representing the seller?

• Why would she collect $67,400 in commission on a judgment credit she never earned?

• Why would she accept $147,000 knowing properties worth $3.5+ million sold for $810,000 in actual consideration?

• Why did she never cry "halt, this is wrong" as the fraud unfolded?

The motion provides no answers because none exist except the truth: Donathan was working for the buyers, not the seller. She participated knowingly in an "engineered sale"—Defendant Boydston's own words under oath. She coordinated with buyers to exclude competitive bidders. She reduced property values to benefit purchasers. She collected unearned commission on phantom consideration. She accepted payment knowing the transaction was fraudulent.

Now, confronted with billing records she cannot deny, sworn testimony admitting the "engineered sale," closing statements showing $67,400 in unearned commission, and economically irrational conduct that proves she was working for buyers, Defendant circles the wagons with co-conspirators and asks this Court to dismiss based on procedural technicalities.

This Court should decline the invitation. The Amended Complaint states claims with specificity supported by extensive documentary evidence. Donathan owed fiduciary duties under Ohio statutory law and as the receiver's agent. The statute of limitations has not expired for actions occurring 2021-2023. Rooker-Feldman and Colorado River do not bar independent federal RICO claims. Rule 9(b) is satisfied through incorporation of over 3,100 pages of state court filings documenting Donathan's specific participation.

Most importantly, the evidence speaks for itself. A real estate agent deliberately worked to reduce property values by $100,000, cutting her own commission by $10,000. She then collected $67,400 in commission on a judgment credit she never earned. Only one explanation exists: she was working for the buyers, not the seller. These facts demolish every argument in her motion and prove knowing participation in fraud.

Plaintiff respectfully requests this Court deny Defendant Donathan's Motion to Dismiss and allow this case to proceed to discovery, where the full scope of Donathan's participation in the receivership fraud—documented in emails, communications, closing statements, and financial records she cannot deny—will be revealed. Defendant would be well-advised to consider

16

settlement negotiations before additional claims, including unjust enrichment and potential

involvement of title insurance carriers, further complicate her position.


Respectfully submitted,

John Klosterman, Pro Se
5615 Sidney Road
Cincinnati, Ohio 45238
513-250-2610
johncklosterman@gmail.com


**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a copy of the foregoing was served upon all parties
through the court's CM/ECF system or Email on this 19 day of November, 2025.

John Klosterman

Jeffrey M. Nye, Esq.
Paul T. Saba, Esq. (0063723)
Jeffrey M. Nye, Esq. (0082247)
Bailey E. Sharpe, Esq. (0103565)
SSP Law Co., LPA
2623 Erie Avenue
Cincinnati, OH 45208
513-533-6714
513-533-2999 (fax)
pts@sspfirm.com
jmn@sspfirm.com
bes@sspfirm.com
Attorneys for FRI Mason, LLC
dba Keller Williams Advisors Realty
and Jennifer Donathan

| Prominent Title Agency, LLC | ALTA Combined Settlement Statement |
|---|---|
| 7365 East Kemper Road<br>Suite B<br>Cincinnati, OH 45249<br>(513) 779-7714 | |

| File #: | 2022-46757-C | Property | See Addendum | Settlement Date | 05/01/2023 |
|---|---|---|---|---|---|
| Prepared: | 05/02/2023 | Buyer | Hamilton County Land | Disbursement Date | 05/01/2023 |
| Escrow Officer: | Brian Pyles | | Reutilization Corporation<br>3 East Fourth Street<br>Ste. 300<br>Cincinnati, OH 45202 | | |
| | | Seller | Konza LLC, Receiver<br>1835 Dexter Avenue<br>Cincinnati, OH 45206 | | |
| | | Lender | | | |

| Seller | | | Buyer | |
|---|---|---|---|---|
| **Debit** | **Credit** | | **Debit** | **Credit** |
| | | **Primary Charges & Credits** | | |
| | $1,474,017.00 | Sales Price of Property | $1,474,017.00 | |
| | | Deposit | | $10,000.00 |
| $499,717.76 | | Receiver Fees to Konza LLC | | |
| $674,017.00 | | City of Cincinnati Judgment Lien Credit | | |
| $84,478.04 | | Escrow Held by Prominent Title pursuant to court order | | |
| | | City of Cincinnati Judgment Lien Credit | | $674,017.00 |
| | | | | |
| | | **Payoffs/Payments** | | |
| $67,839.50 | | Payoff to Warsaw Federal S&L | | |
| | | Principal : $67,839.50 | | |
| | | Additional Interest : $0.00 | | |
| | | | | |
| | | **Government Recording and Transfer Charges** | | |
| $33.00 | | City/County tax/stamps Deed $33.00 Mortgage $ to Hamilton County Auditor | | |
| | | | | |
| | | **Commissions** | | |
| | | --$147,401.70 to Keller Williams Advisors Realty | | |
| $147,401.70 | | Commission paid at settlement | | |
| | | | | |
| | | **Title Charges** | | |
| | | Owner's title insurance to Westcor Land Title Insurance Company | $4,868.75 | |
| $350.00 | | Title-Closing Fee to Prominent Title Agency, LLC | $350.00 | |
| | | Title Exam Fee and Updates to Prominent Title Agency, LLC | $12,500.00 | |
| | | Binder to Prominent Title Agency, LLC | $50.00 | |
| | | Owner's OTIRB OH-112.1 Endorsement to Westcor Land Title Insurance Company | $1,947.50 | |
| | | | | |
| | | **Miscellaneous Charges** | | |
| $180.00 | | Overnight/Wire Services to Prominent Title Agency, LLC | | |

| Seller | | | Buyer | |
|---|---|---|---|---|
| **Debit** | **Credit** | | **Debit** | **Credit** |
| $1,474,017.00 | $1,474,017.00 | Subtotals | $1,493,733.25 | $684,017.00 |
| | | Due from Buyer | | $809,716.25 |
| | $0.00 | Due from Seller | | |
| $1,474,017.00 | $1,474,017.00 | Totals | $1,493,733.25 | $1,493,733.25 |

**EXHIBIT A**